# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TIMBER HILL LLC, on behalf of itself and all others similarly situated,<br><br>                     Plaintiff,<br><br>     v.<br><br>VALEANT PHARMACEUTICALS INTERNATIONAL, INC., J. MICHAEL PEARSON, HOWARD B. SCHILLER, ROBERT L. ROSIELLO, DEBORAH JORN, ARI S. KELLEN and TANYA CARRO,<br><br>                     Defendants. | Civil Case No. _____<br><br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

I.    NATURE OF THE ACTION ......................................................................... 2

II.   JURISDICTION AND VENUE ................................................................... 10

III.  PARTIES ..................................................................................................... 11

      A.    Plaintiff ............................................................................................ 11

      B.    The Corporate Defendant ................................................................. 11

      C.    The Management Defendants ........................................................... 11

      D.    Relevant Non-Parties ...................................................................... 13

IV.   FACTUAL BACKGROUND ...................................................................... 15

      A.    Valeant's Acquisition-Centric Business Model ............................... 15

      B.    Valeant's Extraordinary Price Hikes ............................................... 17

      C.    Valeant's Use of a Secret Pharmacy Network ................................. 21

            1.    Philidor ................................................................................... 22

            2.    Valeant's Other Secret Pharmacies ....................................... 25

            3.    Valeant Used its Secret Pharmacy Network to Insulate its Branded
                  Drugs from Generic Competition, Inflate Prices and Book
                  Fictitious Sales ..................................................................... 28

            4.    Valeant Exploits "Patient Assistance Programs" To Raise Prices ........... 40

            5.    The R&O Lawsuit and the Initial Disclosure of Valeant and
                  Philidor's Fraudulent Arrangement ....................................... 43

V.    DEFENDANTS MISLED INVESTORS REGARDING VALEANT'S
      BUSINESS MODEL AND MANIPULATED THE COMPANY'S FINANCIAL
      RESULTS ................................................................................................... 47

      A.    Defendants Made Numerous False or Misleading Statements Regarding
            Valeant's Business Model and Financial Results ............................. 47

      B.    Defendants' Statements Were False or Misleading When Made Because
            Valeant Was Engaged in a Fraudulent Scheme to Charge Exorbitant Prices
            for Its Drugs .................................................................................... 54

1.  Valeant's Business Model Relied on Massively Increasing the Prices for Drugs it Acquired ................................................................. 54

2.  Defendants Further Concealed From Investors That Valeant Created a Secret Network of Captive Pharmacies to Insulate its Branded Drugs From Generic Competition, Inflate Prices and Book Fictitious Sales ................................................................. 56

3.  Defendants Also Concealed from Investors that Valeant Deceptively used "Patient Assistance Programs" to Facilitate its Fraudulent pricing scheme ................................................................. 61

4.  The R&O Pharmacy Lawsuit ................................................................. 64

VI.   DEFENDANTS MISLED INVESTORS REGARDING VALEANT'S RELATIONSHIP WITH PHILIDOR AND OTHER PURPORTEDLY INDEPENDENT ENTITIES ................................................................. 67

A.   Defendants Made False or Misleading Statements Regarding Valeant's Control over Third-Party Distributors and Its Association with Variable Interest Entities. ................................................................. 67

B.   Defendants' Representations were False or Misleading When Made, in Light of Valeant's Relationship with Philidor ................................................................. 68

VII.   AS A RESULT OF DEFENDANTS' MISCONDUCT, VALEANT'S FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED AND IN VIOLATION OF GAAP ................................................................. 69

A.   Valeant Improperly Recognized Philidor Revenue ................................................................. 70

B.   Defendants Concealed the Impact of Philidor Transactions, as Well as the Massive Price Increases for Valeant Drugs, on the Company's Revenues ......... 72

C.   Valeant Failed to Report Philidor as a VIE ................................................................. 74

VIII.   DEFENDANTS MISLED INVESTORS REGARDING VALEANT'S INTERNAL CONTROLS, LEGAL COMPLIANCE, AND THE INTEGRITY OF ITS REPORTED FINANCIAL RESULTS ................................................................. 76

A.   Defendants Made False or Misleading Statements Regarding Valeant's Internal Controls. ................................................................. 76

B.   Defendants Touted Valeant's Commitment to Compliance ................................................................. 77

C.   Pearson, Schiller and Rosiello Signed SOX Certifications Attesting to the Truthfulness and Accuracy of Valeant's Reported Financial Results ................. 78

D.      Defendants' Statements Were False or Misleading When Made, in Light
        of the Rampant Misconduct at Valeant ................................................. 80

IX.    DEFENDANTS FALSELY REASSURED INVESTORS OF THE SOUNDNESS
       OF VALEANT'S BUSINESS PRACTICES AND FINANCIAL RESULTS
       AMIDST QUESTIONS RAISED BY OTHERS ............................................ 85

       A.      Defendants Made Numerous Reassurances in Response to Questions or
               Concerns Raised in 2014, Mostly in Connection with Valeant's Attempted
               Acquisition of Allergan ...................................................................... 85

       B.      Defendants' Reassurances in 2014 Were False or Misleading When Made,
               and Kept Investors in the Dark About the Fraud Pervading Valeant ................. 90

       C.      Defendants Continued to Reassure Investors in Response to Questions or
               Concerns Raised in 2015, Even After Valeant Was Forced to Disclose
               Certain Previously Concealed Facts Regarding Philidor ..................................... 93

       D.      Defendants' Reassurances in 2015 Were False or Misleading When Made,
               Notwithstanding Their Partial Disclosure of Previously Concealed Facts
               Regarding Philidor .............................................................................. 104

X.     THE TRUTH REGARDING DEFENDANTS' MISSTATEMENTS AND
       OMISSIONS WAS REVEALED TO INVESTORS THROUGH A SERIES OF
       PARTIAL DISCLOSURES ........................................................................ 107

       A.      Disclosures in September and October 2015 ...................................... 107

       B.      Disclosures in November and December 2015 .................................... 121

       C.      Disclosures in February and March 2016 ........................................... 126

       D.      Disclosures from April to August 2016 .............................................. 134

XI.    RECENT EVENTS CONTINUE TO EVIDENCE MASSIVE FRAUD AT THE
       COMPANY ............................................................................................. 139

XII.   ADDITIONAL INDICA OF DEFENDANTS' SCIENTER ........................... 141

       A.      Valeant's Admission of Improper Conduct ........................................ 142

       B.      The Management Defendants' Role in Valeant's Business Strategy ................. 142

       C.      The Management Defendants' Decision to Close Philidor ............................. 146

       D.      Valeant's Refusal to Pursue Remedies Against Individual Wrongdoers ........... 149

       E.      Congressional Hearings ..................................................................... 150

F.  The Stream of Executive Departures in the Wake of the Fallout from the
Fraud Further Indicates Defendants' Scienter ..................................................... 152

G.  Pearson Actively Misled Ackman, a Significant Valeant Investor .................... 153

H.  Valeant's Executive Compensation Program ...................................................... 154

I.  The Necessity of Inflating Valeant's Stock Price to Sustain Valeant's
Acquisition-Centric Business Model .................................................................. 157

XIII.  LOSS CAUSATION ........................................................................................................ 157

XIV.  PLAINTIFF'S RELIANCE ............................................................................................. 158

XV.  THE EFFICIENCY OF THE MARKET FOR THE SUBJECT DERIVATIVES ......... 159

XVI.  NO SAFE HARBOR ....................................................................................................... 160

XVII.  CLASS ACTION ALLEGATIONS ................................................................................ 161

XVIII. COUNTS .......................................................................................................................... 163

XIX.  PRAYER FOR RELIEF .................................................................................................. 166

XX.  JURY DEMAND .............................................................................................................. 166

Plaintiff, by and through its undersigned counsel, brings this securities class action for violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), codified at 15 U.S.C. § 78(j), Rule 10b-5 promulgated thereunder, codified at 17 C.F.R. § 240.10b-5, and Section 20(a) of the Exchange Act, codified at 15 U.S.C § 78(t)(a), as a related action to *In re Valeant Pharmaceuticals International, Inc. Securities Litigation*, No. 3:15-cv-07658-MAS-LHG. This action is brought on behalf of Plaintiff and other similarly situated persons and entities that purchased call options on Valeant Pharmaceuticals International, Inc. ("Valeant" or the "Company") common stock and/or sold put options on Valeant common stock during the period January 4, 2013 through August 11, 2016, inclusive (the "Class Period"), and were damaged thereby (the "Class"), against Valeant, as well as former Valeant senior executives J. Michael Pearson, Howard B. Schiller, Robert L. Rosiello, Deborah Jorn, Ari S. Kellen and Tanya Carro (collectively, "Defendants").[1]

Plaintiff alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters. Plaintiff's information and belief is based upon, *inter alia*, the independent investigation of Plaintiff's counsel which included the analysis of: (1) regulatory filings made by Valeant with the United States Securities and Exchange Commission ("SEC"); (2) research reports by securities and financial analysts; (3) transcripts of

---

[1] In accordance with Local Rule 10.1, Plaintiff provides the following information regarding the named parties: (i) Plaintiff Timber Hill maintains its headquarters at One Pickwick Plaza, Suite 210, Greenwich, CT 06830; (ii) Defendant Valeant Pharmaceuticals International, Inc. maintains its United States headquarters at 400 Somerset Corporate Boulevard, Bridgewater, NJ 08807; (iii) Defendant J. Michael Pearson's address is 74 Village Road, New Vernon, NJ 07976; (iv) Defendant Howard B. Schiller's address is 40 Montview Avenue, Short Hills, NJ 07078; (v) Defendant Robert L. Rosiello's address is 55 Davis Hill Road, Weston, CT 06883; (vi) Defendant Deborah Jorn's address is 6 Firethorn Court, Warren, NJ 07059; (vii) Defendant Ari S. Kellen's address is 694 Downing Street, Teaneck, NJ 07666; and (viii) Defendant Tanya Carro's address is 231 Ronan Way, Branchburg, NJ 08853.

Valeant's earnings and other investor conference calls; (4) publicly available presentations, press releases, interviews and media reports by Valeant; (5) economic analyses of the movement and pricing of Valeant publicly traded common stock and derivative securities; (6) consultations with experts; and (7) documents made public through Congressional hearings concerning Valeant, which reference internal Valeant documents, including e-mails.

## I.    NATURE OF THE ACTION

1.    This action arises from a massive fraudulent scheme perpetrated by Valeant, its senior executives and those working in concert with them to artificially inflate Valeant's revenues and purported profits through, among other things, a clandestine pharmacy network, deceptive drug pricing and reimbursement practices, and fictitious accounting.  Throughout the Class Period, Valeant engaged in a growth by acquisition strategy, repeatedly reporting extraordinary quarterly and year-end revenue and earnings growth.   Defendants variously attributed Valeant's extraordinary performance to its *"innovative"* marketing, *"outstanding"* sales teams, *"great leadership"* and alternative fulfillment channels that purportedly provided Valeant with a *"competitive advantage."*

2.    Defendants consistently concealed from investors the fact that the business model Defendants touted was in reality a sham – predicated upon artificial and unsustainable growth propped up by deceptive and illegal conduct.  The scope of Defendants' fraud was so vast in its planning and execution and so devastating to investors, patients, physicians and insurers that the media has dubbed it the *"Pharmaceutical Enron."*

3.    The success of Valeant's business model was contingent upon a multitude of deceptive practices which were designed to induce the purchase of Valeant-branded drugs notwithstanding dramatic price increases far beyond industry norms, including:

- routing prescriptions through Valeant's captive network of pharmacies while

concealing that such pharmacies were not independent;

- physically altering physician prescriptions to require Valeant products;

- submitting false information to third party payors; and

- secretly waiving patient copays to reduce patient complaints about the price increases, while simultaneously concealing these practices from payors.

4.     The above practices were designed to deceive payors into reimbursing Valeant for drugs at higher prices than they would have paid if such practices had not been utilized.  Valeant also falsified its financial statements in violation of generally accepted accounting principles ("GAAP") by recording revenues for products shipped to pharmacies it controlled, in effect selling to itself, and double counting revenues by recording revenues a second time when the products were sold by its captive pharmacies.

5.     Defendants made numerous materially false and misleading statements and omissions of material facts to investors throughout the Class Period regarding:  (1) Valeant's business strategy and financial results; (2) Valeant's relationship with entities over which the Company purported to have limited or no control; (3) the adequacy of the Company's internal controls; and (4) Valeant's commitment to compliance with governing laws and regulations.

6.     *First*, for years, Valeant actively concealed that its business strategy relied on a series of deceptive practices, which drove the Company's revenues from its key dermatology, neurology and other products.  Those practices included:

  a.  **Price Gouging**:  Defendants concealed from investors the extent to which Valeant's profitability and purported growth were contingent upon massive price increases of Valeant-branded drugs.  For example, Valeant claimed it was contractually limited to price increases of 10% or less, but often raised the price of

3

drugs by 100% to *3,000%*.  Such drastic price increases provided an illusory boost to profitability to meet short-term financial targets, but were ultimately unsustainable as they exposed Valeant to enormous attendant business and regulatory risks that ultimately materialized in the form of Congressional investigations, termination of business relationships with payors and consumer backlash.

b. **Secret Network of Captive Pharmacies**:  Independent pharmacies serve as a check on price gouging by encouraging the substitution of cheaper generic products when available.  A key component of Valeant's strategy was to re-route prescriptions away from independent pharmacies and into Valeant's secret network of controlled pharmacies, made up of entities named after chess moves.  Philidor RX Services, LLC ("Philidor") (described more fully below) was a specialty mail-order pharmacy in Valeant's secret network and the brainchild of Defendants, formed with the assistance of Valeant employees who used aliases to conceal their involvement with Philidor.  Valeant concealed its control over Philidor to create the false impression that Philidor and its entire network of pharmacies were independent, reducing the likelihood that payors or pharmacy benefit managers ("PBMs") would subject the pharmacies to enhanced scrutiny through audits and, as a result, refuse to reimburse the higher-priced Valeant drugs or unnecessary refills.  Concealing its relationship with Philidor was particularly important because Philidor engaged in additional deceptive practices to wrongfully obtain payment for Valeant's drugs, such as altering physician prescriptions to require Valeant products and resubmitting rejected claims using false information.

c. **Patient Assistance**:  Patient copays also function to reduce fraud by ensuring patients have an incentive to complain if they are prescribed high-priced medications.  Thus, practices designed to waive or eliminate patient copays to increase sales and sale prices can violate criminal antikickback laws if government payors, such as Medicaid, are targeted.  Valeant targeted private payors with such deceptive practices, even though those practices still carried massive business risks, including violating state laws and contracts and alienating physicians, payors and PBMs, and thereby reducing overall sales.  To prolong its scheme to defraud, Valeant secretly waived copays, thereby diverting negative media attention and silencing patients from complaining to their physicians and insurers.

d. **Misrepresenting Volume Growth**:  To conceal the size of Valeant's price increases, and the extent to which its growth was dependent on such increases, Defendants misrepresented Valeant's volume growth in its statements to investors.  For example, even though price increases were responsible for 80% of Valeant's growth in the first quarter of 2015 ("1Q15"), Defendant Pearson falsely claimed that Valeant had grown more due to volume increases than price increases.

e. **Accounting Fraud**:  Valeant used Philidor to record fictitious sales and inflate its revenues in violation of GAAP.  Although GAAP required Valeant to record revenues only on the ultimate sale to a patient, Valeant recognized revenue on shipments to Philidor, and then double-counted revenues by recognizing revenue a second time when Philidor shipped products to patients.

7. *Second*, Defendants' business model relied on improper practices by Philidor, along with a host of shell companies owned through Philidor, which Valeant used to acquire interests in

additional retail pharmacies throughout the United States.  Unbeknownst to investors and the public:  (a) Philidor was formed to increase the sales prices of Valeant-branded drugs and avoid substitution of those drugs with less-expensive generic competitors; (b) Valeant employees worked at Philidor; (c) Valeant was Philidor's only client and had the ability to close its business; (d) Valeant paid Philidor's owners $100 million for the right to acquire Philidor for $0; (e) Valeant was consolidating Philidor's financial results as its own; (f) Valeant had obtained explicit rights to direct Philidor's activities; and (g) Valeant materially increased its sales volume through Philidor as Philidor expanded its network of pharmacies and began selling drugs in states where it did not obtain, or had been denied, a pharmacy license.

8.      Philidor employees, as well as Valeant employees staffed at Philidor, were instructed to employ a host of deceptive practices—referred to in manuals distributed to employees as "back door approaches" to receiving payment from insurance companies—to prevent the substitution of generic equivalents for Valeant-branded drugs.  Those "approaches" included changing prescription codes on claims to require that the prescriptions be filled with Valeant drugs; making claims for refills that were never requested by patients; misrepresenting the identity of dispensing pharmacies to bypass denials of claims for Valeant drugs; and submitting claims that inflated the prices charged by failing to account for Valeant's waivers of patient copays.

*Third*, Valeant lacked adequate internal controls, as well as compliance and training programs. Contrary to their representations to investors, Defendants were not committed to compliance with governing legal, regulatory or contractual obligations.

*Fourth*, Defendants' undisclosed practices significantly increased Valeant's attendant exposure to, among other things, government investigations, regulatory sanctions, criminal charges, reputational harm and decreased sales.  Valeant was not, as Defendants represented,

employing a "lower-risk, output-focused research and development model," but rather subjecting the Company to enormous undisclosed risk.

9.      The truth concerning Valeant's fraudulent practices started emerge through a series of partial corrective disclosures beginning in September of 2015.  The full disclosure of the facts and materialization of the risks associated with Defendants' misstatements and omissions did not occur until August 10, 2016 at the earliest, when *The Wall Street Journal* reported that the U.S. Attorney's Office for the Southern District of New York was considering bringing criminal charges against Defendants.

10.     As the reality of Valeant's undisclosed and wrongful conduct began to emerge in September 2015, Valeant and its management continued to mislead investors by minimizing and obfuscating the truth.  For example, in late September 2015, when Congress and market analysts began to uncover the astronomical prices Valeant was charging for certain drugs, Valeant and its management continued to conceal the extent of Valeant's reliance on price increases by telling investors that "Valeant is well-positioned for strong organic growth, even assuming little to no price increases. As we have stated many times, Valeant's core operating principles include a focus on volume growth . . . ."

11.     When Philidor's existence was exposed in October of 2015, Defendants sought to persuade investors that Philidor and its business were not critical to Valeant, Valeant had always accounted for Philidor appropriately in accordance with GAAP and that Defendants "continue[d] to be very comfortable with [Valeant's] 2016 EBITDA expectation of greater than 7.5 billion," even without the improper advantages that Philidor had afforded to Valeant.  Further obfuscating the impact that the dismantling of its specialty pharmacy scheme would have, Valeant announced a replacement deal with Walgreens in December 2015 which Pearson falsely claimed would "more

than replace [] Philidor," despite Valeant's internal understanding that the success of the Walgreens deal would depend upon the very same volume increases that Valeant already knew it could not achieve and had sought secretly to replace with its price-gouging model.  This scheme was all in an effort to further conceal investors from the pervasiveness of the problems at Valeant and the unsustainability of its business model.

12.     The partial revelations of wrongdoing at Valeant also led to the departure of numerous senior executives and directors.  Indeed, Valeant subsequently attributed its fictitious accounting to the "***improper conduct***" of former Chief Financial Officer ("CFO") Howard Schiller and former Corporate Controller Tanya Carro, as well as the unethical "***tone at the top***" set by senior management.  Deborah Jorn, who led Valeant's dermatology division responsible for a substantial portion of Philidor's sales, was also forced out of the Company.  Remarkably, Valeant replaced the majority of its Audit Committee, which had reviewed and approved the Company's accounting with respect to Philidor.

13.     Valeant also withdrew certain of its financial statements, restated its revenue for fiscal year 2014, significantly reduced its revenue and profitability guidance for 2015 and 2016, and admitted the Company's disclosure controls and internal controls over financial reporting were inadequate.  Moreover, Valeant is currently the focus of numerous government investigations, including those led by Congress, the SEC and the U.S. Department of Justice ("DOJ").

14.     Defendants' misstatements and omissions of material facts caused the prices of Valeant common stock and call options to be artificially inflated during the Class Period and caused the prices of Valeant put options to be artificially deflated during the Class Period.  These misstatements and omissions were ultimately revealed through the partial disclosures discussed above.  Such disclosures ultimately informed investors that they had been misled to believe the

Company was an innovative industry leader when, in fact, its purported success was predicated on rampant misconduct.

15.     In response to these disclosures, the price of Valeant's common stock fell by more than *90%*, from its Class Period high of over $262 per share on August 5, 2015 to less than $25 on August 11, 2016.  These disclosures also removed the artificial inflation in the prices of Valeant call options and removed the artificial deflation in the prices of Valeant put options, causing billions of dollars in damages to Plaintiff and other similarly situated investors that purchased Valeant call options and/or sold Valeant put options during the Class Period.

**The Subject Derivatives**

16.     Call options and put options are financial derivative instruments whose value is a function of the price of the underlying security (in this case, Valeant common stock), and are subject to price fluctuation corresponding with the increase or decrease in the price of the underlying security.  A call option is a contract between a seller (the option writer) and a purchaser (the option holder), under which the option purchaser has the right, but not the obligation, to exercise the option, and thereby purchase the underlying security at an agreed-upon price (the "strike" or "exercise" price) from the seller by a pre-set expiration date.  The call option purchaser (Plaintiff and other members of the proposed Class in this matter) will benefit if the price of the underlying security appreciates so that the option can be either:  (1) resold at a price higher than the price at purchase; or (2) exercised at a strike price lower than the market price of the underlying security.

17.     A put option is a contract between a seller (the option writer) and a purchaser (the option holder), under which the put option purchaser has the right, but not the obligation, to exercise the option, and thereby sell the underlying security at an agreed-upon price.  The put

9

option seller (Plaintiff and other members of the proposed Class in this matter) is obligated to purchase the underlying security at the agreed-upon price if the option is exercised on or before the expiration date.  Put option sellers generally lose value on their positions when the market price of the underlying security declines.

18.     As a result of Defendants' fraudulent scheme, the price of the security underlying the call options purchased and put options sold by Plaintiff and other members of the proposed Class — Valeant common stock — was artificially inflated during the Class Period.  Therefore, the prices of Valeant call options purchased by Plaintiff and other members of the proposed Class were artificially inflated during the Class Period, while the prices of Valeant put options sold by Plaintiff and other members of the proposed Class were artificially deflated during the Class Period.  Consequently, Plaintiff and other members of the derivatives Class suffered billions of dollars in damages by trading in the subject derivatives at prices that did not reflect their true value. Through this action, Plaintiff asserts claims on behalf of itself and other similarly situated derivatives purchasers and sellers to recover damages caused by Defendants' misconduct.

## II.     JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action in accordance with Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

20.     Personal jurisdiction exists over Defendants in accordance with Section 27 of the Exchange Act, as well as the Fifth Amendment of the United States Constitution.

21.     Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. § 1391.  Valeant's United States headquarters are located in this District and the acts and events described in this Complaint, including the dissemination of false or misleading information, occurred in substantial part in this District.

22.     Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE").

## III.   PARTIES

### A.     Plaintiff

23.     Plaintiff Timber Hill LLC ("Timber Hill") is a Connecticut limited liability company with its principal place of business at One Pickwick Plaza, Greenwich, Connecticut 06830.   As set forth in its Certification (Exhibit 1, hereto), Plaintiff Timber Hill traded in derivatives instruments during the Class Period and suffered damages as a result of the conduct complained of herein.

### B.     The Corporate Defendant

24.     Defendant Valeant Pharmaceuticals International, Inc. is a Canadian corporation with its international headquarters located at 2150 St. Elzéar Blvd. West, Laval, Quebec, Canada. Valeant's U.S. headquarters and principal place of business is at 400 Somerset Corporate Boulevard, Bridgewater, New Jersey.

25.     Valeant is a pharmaceutical and medical device company that sells medical devices and pharmaceuticals in over 100 countries around the world.   Valeant is one of the largest pharmaceutical companies in the United States.   Shares of Valeant stock trade on the New York Stock Exchange (the "NYSE") and the Toronto Stock Exchange (the "TSX") under the ticker symbol "VRX."

### C.     The Management Defendants

26.     Defendant J. Michael Pearson ("Pearson") was Valeant's Chief Executive Officer and a director of the Company (including its predecessor entity) from 2008 until May 3, 2016.

From March 2011 to January 2016, Pearson was also Valeant's Chairman of the Board of Directors.  Pearson took medical leave in January and February 2016, and in March 2016 the Company announced that Pearson would be replaced.

27.     Defendant Howard B. Schiller ("Schiller") was Valeant's CFO and Executive Vice President from December 2011 until his resignation from the position on June 30, 2015.  Schiller also served on Valeant's Board of Directors from September 2012 until June 2016.  While Pearson was on medical leave in January and February of 2016, Schiller served as the Company's interim CEO.  On March 21, 2016, Valeant announced that Schiller had engaged in "improper conduct" concerning the Company's accounting restatement and requested Schiller's resignation as a director of the Company.  Schiller refused the request.  He was not selected as a candidate for re-election to the Board of Directors.

28.     Defendant Robert. L. Rosiello ("Rosiello") served as Valeant's CFO and an Executive Vice President of the Company from July 2015 to December 31, 2016.  Rosiello also served as one of three members of the Company's "Office of the CEO" when Pearson was on medical leave and before Schiller was appointed interim CEO.

29.     Defendant Deborah Jorn ("Jorn") was Vice President of Global Marketing at Bausch & Lomb from June 2010 until she joined Valeant in August 2013, when Valeant acquired Bausch & Lomb.  Jorn was a Valeant Executive Vice President and Company Group Chairman from August 2013 through her departure on March 2, 2016.  During that time period, Jorn also served as general manager of Valeant's U.S. dermatology business.

30.     Defendant Tanya Carro ("Carro") was at all relevant times Valeant's Corporate Controller.  On March 21, 2016, Valeant announced that Carro had been placed on administrative leave for "improper conduct" that led to the "provision of incorrect information to the [ad hoc]

committee and the company's auditors."  Carro was replaced as Controller on March 23, 2016.

31.     Defendant Dr. Ari S. Kellen ("Kellen") served as Valeant's Executive Vice President and Company Group Chairman from January 1, 2014 to December 31, 2016.  Kellen temporarily served as one of the three members of the Office of the CEO during the period in early 2016 that Pearson was on medical leave and before Schiller was appointed interim CEO.  After Jorn left the Company in March 2016, Kellen became the head of Valeant's U.S. dermatology business.

32.     Pearson, Schiller, Rosiello, Jorn, Carro and Kellen are collectively referred to as the "Management Defendants."

### D.     Relevant Non-Parties

33.     Philidor was incorporated in January 2013 with the substantial assistance of Valeant.  Philidor was a specialty pharmacy registered as a Delaware limited liability company with its headquarters at 400 Horsham Road, Suite 109, Horsham, Pennsylvania, and served as the hub of Valeant's clandestine network of captive specialty pharmacies used to hawk Valeant's overpriced branded drugs and to protect those drugs from competition from low-cost generic alternatives.  Philidor's only client was Valeant, and Philidor's sole purpose was to act as a mechanism through which Valeant could sell its massively overpriced branded drugs.   In December 2014, Valeant (through a subsidiary) formalized its control over Philidor, paying Philidor $100 million for a so-called option to purchase Philidor for $0 at any point in time over the ensuing decade (the "Philidor Purchase Option").  This so-called option was simply an acquisition of Philidor by Valeant; but it was structured as an "option" to justify Defendants' failure to disclose this acquisition to investors and others.  Demonstrating the close coordination between Valeant and Philidor, the numerous related entities which formed Valeant's secret network of specialty pharmacies were named for chess strategies, including:

- **Philidor:** Philidor itself refers to 18th-century chess player François-André Danican Philidor's eponymous opening move;

- **KGA Fulfillment Services Inc.:** KGA, an acronym for "King's Gambit Accepted," is an opening move in chess, and was a wholly-owned Valeant subsidiary that paid $100 million to obtain the option to acquire Philidor in December of 2014;

- **Isolani, LLC:** Isolani refers to an isolated queen's pawn and is usually a weakness but there can be counter-plays.  Isolani, LLC was incorporated to acquire a California-based pharmacy to circumvent the prior denial of Philidor's license to operate in California; and

- **Back Rank LLC:**  In chess, the term "back rank" involves a checkmate along the back rank (last row).  Back Rank used one of Philidor's Pennsylvania addresses and its president, James Fleming ("Fleming") was the Controller at Philidor.

34.     Andrew Davenport was the CEO of Philidor and worked with several Valeant employees to form Philidor in January 2013.  Davenport held an approximate 40% ownership stake in Philidor.  Following Philidor's formation, Davenport worked with Valeant's employees to facilitate the fraudulent sale and reimbursement of Valeant's drugs through Philidor.  Based on his involvement in the Philidor Purchase Option transaction, Davenport personally received $40 million.

35.     In December 2016, Davenport was arrested and charged by the U.S. Attorney's Office for the Southern District of New York with four counts of fraud and conspiracy for his involvement with Philidor.

36.     On May 22, 2018, Davenport was found guilty on all charges, including wire fraud and conspiracy to commit money laundering.

14

## IV.    FACTUAL BACKGROUND

### A.    Valeant's Acquisition-Centric Business Model

37.    Prior to and during the Class Period, Valeant's business model was focused on achieving revenue growth by acquiring drugs and drug companies and then raising prices of the acquired drugs.  Since 2010, Valeant has acquired companies with a total value of at least $36 billion. Valeant is the sixth-largest acquirer, globally, by deal size.  Since 2008, when Pearson became CEO of Valeant, Valeant has acquired at least 100 companies.

38.    While traditional pharmaceutical companies place a heavy emphasis on R&D spending as a percentage of revenue, Pearson claimed that such spending was wasteful, R&D had a low rate of success and a better business strategy would be to grow through acquisitions.  To this end, Pearson focused on acquiring companies with already-established products, cutting costs and dramatically raising prices while using deceptive tactics to exploit gaps Valeant's employees had identified in the healthcare system.  In particular, Pearson and the Company targeted areas of the pharmaceutical market lacking competition from large companies, such as dermatological products.

39.    Through Valeant's acquisition focus, the Company was able to acquire a diverse portfolio of drugs.  In September 2010, Valeant completed a $3.3 billion merger with Biovail Corporation, which resulted in a combined company having access to dermatological drugs, an anti-depressant drug known as Wellbutrin and drugs used to treat central nervous system disorders. Valeant's revenue and stock price increased following the merger.  In 2012, Valeant paid approximately $2.6 billion for Medicis Pharmaceutical Corporation ("Medicis") and its portfolio of acne medications and other aesthetic skin care products.  Valeant expanded into developing markets in Eastern Europe, as exemplified by the acquisition of the Russian-based Natur Produkt International and its portfolio of cough and cold treatments for $180 million.  Valeant also targeted

15

markets outside the traditional pharmaceutical industry, acquiring Bausch & Lomb, an eye-care giant known for its specialized ophthalmology and contact lens products, in 2013.  In April 2015, Valeant acquired Salix Pharmaceuticals and its portfolio of drugs for the treatment of gastrointestinal disorders for $11 billion.

40.     Until 2015, Valeant's acquisition model appeared successful, capable of cutting costs in the pharmaceutical companies that Valeant acquired while maintaining or increasing sales volumes.  Indeed, the Company reported growth quarter after quarter:   $3.48 billion for 2012, $5.76 billion for 2013, $8.25 billion for 2014 and $7.71 billion for the first three quarters of 2015. By July of 2015, when Valeant's common stock price reached an all-time high, the market valued Valeant at $90 billion, the largest pharmaceutical company based in the United States.

41.     During the Class Period, Valeant credited its success to its supposedly innovative business model as implemented by its CEO and other members of senior management, aggressive cost-cutting strategies, "outstanding sales teams, implementation of innovative marketing approaches, great leadership, [and] a portfolio of great products."

42.     Similarly, in a February 22, 2015 Valeant press release, Pearson attributed Valeant's explosive growth to the Company's "output-focused research and development model," which involved "focusing on innovation through our internal research and development, acquisitions, and in-licensing" and "focusing on productivity through measures such as leveraging industry overcapacity and outsourcing commodity services."  These representations concealed from Plaintiff and members of the Class – as well as regulators – the true drivers of the Company's growth.

43.     In reality, Valeant's growth was driven by its fraudulent use of a secret network of captive pharmacies and a host of other deceptive business practices.  Valeant's use of a clandestine

pharmacy network enabled the Company to exponentially increase the prices of its branded drugs, despite the fact that cheaper, generic substitutes existed for many of them.  In an effort to conceal its scheme, Valeant consistently downplayed the extent to which pricing increases contributed to the Company's growth.  For example, on an April 29, 2015 conference call with investors, Pearson was asked how much price contributed to growth in the quarter.  Pearson falsely responded that "[i]n terms of price volume, actually, volume was greater than price in terms of our growth."  On February 3, 2016, after Valeant's extraordinary price increases became the subject of widespread public attention and reproach, including probes by federal authorities, regulators and lawmakers, Valeant issued a press release *admitting* that Pearson's statement on the April 2015 conference call was false and that, in truth, Valeant's growth was a result of its increasing the prices of its drugs.  This admission was detailed by, *inter alia*, *The Wall Street Journal*, in a February 2, 2016, article titled, "Valeant's Sales Growth:  Driven by Price Increases or Volume Growth?"  In a further effort to obscure Valeant's reliance on the price increases facilitated by its captive network of pharmacies and other deceptive business practices, Valeant made critical changes to its disclosures to investors in 2013, making it difficult, if not impossible, to determine whether Valeant's growth was attributable to its acquisition strategy or organic growth.  Valeant refused to breakout the revenue numbers for major acquisitions, making it impossible for investors to track whether acquired drugs were experiencing any organic growth.  In addition, Valeant reduced the number of operating segments from four to only two in 2013.  Because various segments were driven by just a few main products, investors could previously track how those products were performing. But with only two operating segments, it became impossible for investors to obtain that same information.

### B.     Valeant's Extraordinary Price Hikes

44.     Valeant's business strategy was predicated on inflating the Company's stock price

by reporting short term gains in order to create an illusory picture of Valeant's business performance and prospects.  These short terms gains undermined the long-term health of the Company because price gouging (facilitated by deceptive marketing and distribution practices) is an unsustainable business practice that carries increased business, reputational, compliance and regulatory risks.  It also increases overall costs in the healthcare system and leads to push back from patients, physicians, pharmacies and PBMs, as well as risks of nonpayment by payors.

45.    Unbeknownst to Plaintiff and other derivatives purchasers and sellers, by late 2012, Valeant and its management recognized that growth through Valeant's "acquisitions" model could not be sustained by relying on cost-cutting and volume.  Thus, Valeant and its management secretly reoriented the Company's business model to engage in undisclosed price gouging.

46.    A 2016 report published by the United States Senate revealed that, in late 2012, Valeant was facing declining revenue in its "Neurological and Other" division.  To fight this decline, Valeant's management, including Pearson, developed, approved and implemented a plan called the "Orphan Drug Pricing Strategy."  The Orphan Drug strategy aimed to combat declining revenue by adopting repeated price increases.  The precise price increases were determined by Pearson and other high-level Valeant executives.

47.    One early example of this strategy occurred after Valeant's acquisition of Cuprimine, a drug used since 1965 to treat Wilson's disease, a rare condition that prevents the body from processing copper.  As part of the Company's undisclosed "Orphan Drug Strategy," Valeant executives, including Pearson, raised the price of Cuprimine by nearly *5,800%*.  Valeant similarly approved drastic price increases on Syprine, raising its price by *3,200%*.

48.    Valeant's acquisition of Isuprel and Nitropress from Marathon Pharmaceuticals

("Marathon") is another example of Valeant's strategy of acquiring products and sharply increasing their price to exorbitant levels. In late 2014, Valeant began exploring the acquisition of Isuprel and Nitropress, which are heart medications used in emergency situations. The drugs were owned by Hospira and moderately priced for years. Marathon acquired them and implemented significant price increases, but Valeant's senior executives saw money left on the table.

49. On December 3, 2014, Andrew Davis ("Davis"), Valeant's Senior VP for Business Development, emailed Laizer Kornwasser ("Kornwasser"), Valeant's EVP/Company Group Chairman, that another "opportunity company is [M]arathon, value is largely derived from 2 hospital products they bought from Hospira which have no IP [intellectual property protections]." Steve Sembler, the general manager of Neurology responded that those two drugs "make up the VAST majority of revenue" at Marathon and "[t]his would also have to be a price play (if we determine there is upside to take price) . . ."

50. Defendants worked in conjunction with consultants from Marketing Medical Economics ("MME") to study the pricing of Nitropress and Isuprel. In a presentation, MME noted that Hospira had priced Nitropress at $47 in 2013. Marathon acquired the drug and increased the price to $214. Similarly, MME noted that Hospira had priced Isuprel at $48 in 2013. Marathon raised the price to over $200. MME claimed there was still "***upward potential for pricing***" on these drugs, adding that for Nitropress "***most patients treated are in critical condition***."

51. Defendants also worked alongside consultants from Pearson's former employer, McKinsey & Company ("McKinsey"), as they considered the potential for dramatically increasing the prices of Isuprel and Nitropress. On December 29, 2014, Aamir Malik, the co-leader of McKinsey's global Pharmaceuticals & Medical Products Practice, wrote an email to Pearson and

Davis regarding those and other drugs, stating that they "have material pricing potential." McKinsey also noted that "Smaller/older products (e.g., Isuprel and Nitropress) are not reviewed on formulary. . . . Products have been in the system for so long that reviews are practically rubber stamped."

52.     Valeant's analyses showed that generic competition would likely not arrive until mid-2017 with volume decreases each year following generic entry.  As soon as the drugs were acquired, Pearson, Schiller, Davis and others held a meeting to discuss price.  Davis recommended a steep increase in price, but Pearson decided to raise prices even higher than recommended.

53.     Isuprel and Nitropress provide examples of how dramatic price increases provided a short-term surge in profitability.  The two drugs had total revenues of approximately $150 million in 2014.  However, Valeant forecasted an increase to approximately $525 million for 2015 based on "***Aggressive Pricing through consultant recommendation***."  The increased revenue had nearly the same impact on bottom line profitability because, as Valeant's Senior Director of Finance said in an email to Davis on March 24, 2015, the price assumptions "are leading to high gross margins (more than 99%)."  By the end of 2015, Valeant recorded gross revenues from the sale of Isuprel and Nitropress of approximately $540 million against a cost of approximately $2 million.

54.     These practices were widespread.   According to a Deutsche Bank Securities Inc. ("Deutsche Bank") analysis, in 2015 alone, Valeant raised prices on its brand-name drugs an average of 66%, approximately five times more than its closest industry peers.  As another example of Valeant's price gouging, 100 capsules of Syprine and 100 capsules of Cuprimine were priced at approximately $650 and $450, respectively, in May 2010.  By July 2015, Valeant had raised the prices of Syprine to over $21,000 for 100 capsules (a more than 32-fold increase) and Cuprimine to over $26,000 for 100 capsules (a more than 58-fold increase), even though Valeant had spent

little or no money on additional R&D relating to those medications.  These products also had incredibly high margins as, for example, Valeant sold Cuprimine for approximately $240 in Brazil and $350 in Canada, roughly 1% of its price in the United States.

55.     Additional examples where Valeant dramatically increased the prices of the drugs it acquired included:  (i) Glumetza, a diabetes drug which was increased from approximately $900 per 90 tablets to over $10,000 (a more than 11-fold increase); (ii) Targetin, a T-cell lymphoma drug which was increased from approximately $1,800 per tube to over $30,000 (a more than 16.7-fold increase); (iii) Carac cream, a drug for precancerous legions which was increased from approximately $230 to over $2,800 per tube (a more than 12-fold increase); (iv) Wellbutrin XL, an anti-depressant, had eleven price increases during the Class Period as a one-month supply of Wellbutrin XL costs approximately $1,400 while its generic counterpart costs just $30; (v) Addyi, a recently U.S. Food and Drug Administration ("FDA") approved "Female Viagra" drug, was increased by 100% immediately following Valeant's acquisition of the drug from Sprout; and (vi) Mephyton, a drug that helps blood clot, has seen eight price increases since July 2014, costing $58.76 a tablet, up from $9.37.

## C.    Valeant's Use of a Secret Pharmacy Network

56.     Because Valeant relied on undisclosed price gouging rather than volume increases to sustain its growth, it needed to ensure it could sustain those price increases despite a competitive pharmaceutical industry.  To isolate its brand name drugs from generic competition and boost sales, Valeant relied upon a secret network of controlled specialty pharmacies to increase sales of its branded drugs despite the availability of cheaper alternatives.  Specifically, Valeant's secret controlled network of pharmacies protected Valeant drugs from competition by ignoring legal and contractual mandates that require the substitution of generic equivalents for Valeant-branded drugs.  Additionally, Valeant's controlled pharmacies submitted false claims information to

21

insurers and other third-party payors.  The scheme allowed Valeant to increase the price of drugs without decreasing the volume of drugs sold no matter the price—and thereby continue to mislead investors about the sustainability of the Company's business model.  Insurers and other third-party payors therefore were deceived into paying for Valeant's exorbitantly priced branded drugs and were prevented from substituting cheaper generics when working through Valeant's captive specialty pharmacies.

### 1.    Philidor

57.    Philidor was the most prominent of the Company's captive pharmacies, licensed in 45 states and the District of Columbia while operating as a purportedly independent "specialty" mail-order pharmacy.  True specialty pharmacies primarily sell self-administered specialty drugs covered under a patient's pharmacy insurance benefit.  These specialty drugs are usually highly differentiated brand-name drugs for patients undergoing medical treatments for complex illnesses such as HIV and cancer.  These drugs often are self-administered through injections and may require constant refrigeration.  None of this was true for drugs supplied by Philidor.

58.    To the contrary, Philidor dispensed only Valeant's undifferentiated traditional brand-name drugs—primarily Valeant's dermatological products—many of which had generic low-cost substitute drugs.  And far from being independent, as Valeant attempted to persuade investors when Philidor first came to light, Philidor has since acknowledged that Valeant was Philidor's "only client."

59.    From Philidor's incorporation on January 2, 2013, Valeant was closely linked to Philidor's operations and development.  Valeant's employees worked closely with Philidor's founders in establishing Philidor as a means to funnel Valeant's high-priced brand-name drugs to patients.  In December 2012, Valeant hired manager Gary Tanner to serve as the Company's special "liaison" with Philidor and to help develop the pharmacy's operations.  On January 2, 2013,

the same day that Philidor was incorporated, Valeant hired Laizer Kornwasser, a former senior executive at Medco, to serve as Valeant's EVP/Company Group Chairman to oversee Valeant's relationship with Philidor.  Throughout their time at Valeant, Kornwasser and Tanner oversaw Philidor's operations and were compensated handsomely by Valeant for their work with Philidor.

60.     From Philidor's incorporation in January 2013 until October 2015 (when Valeant finally revealed its relationship with Philidor), Valeant installed a number of its employees (including Kornwasser and Tanner) at Philidor to ensure that Valeant's fraudulent business objectives would be met.  For example, Valeant placed a team of thirty employees within Philidor so that those employees could educate doctors on how to direct patients to Valeant's products. Throughout Philidor's existence, Valeant employees supervised critical aspects of Philidor's business operations, including interviewing potential new hires for Philidor and helping to manage Philidor's billing practices.

61.     Valeant went to great lengths to conceal Valeant's connection to Philidor.  For example, Valeant employees used fictitious names when sending emails from Philidor accounts to hide the fact that the employees were working for both Philidor and Valeant.  One Valeant employee who also worked for Philidor, Bijal Patel, was instructed to use "Peter Parker" as an alias (from the comic book Spiderman) when sending emails from his Philidor account to obscure the fact that he was employed by both Valeant and Philidor.  For the same reason, other Valeant employees used email aliases such as "Jack Reacher" (the protagonist of a series of books written by Lee Child) and "Brian Wilson" (the lead singer and songwriter of the Beach Boys).

62.     Valeant's close relationship with Philidor went far beyond overlapping personnel. On December 15, 2014, Valeant paid $100 million for the option to purchase Philidor for $0 any time within the next ten years and agreed to certain milestone payments based on Philidor's sales.

The first milestone payment for $33 million was paid on January 15, 2015, and further milestone payments were contingent upon achieving certain sale thresholds.

63.     Consistent with its efforts to conceal the use of overlapping employees, Valeant improperly structured the transaction with Philidor to avoid public disclosure.   Valeant's subsidiary KGA, rather than Valeant, was used to obtain the Philidor Purchase Option.  And, rather than call the transaction what it was—*a purchase*—Valeant acquired Philidor through a convoluted put option structure, whereby Valeant paid $100 million to Philidor's owners, including some Valeant employees, for the option to acquire Philidor for nothing within the following ten years.

64.     The Philidor Purchase Option agreement was an acquisition in all but name.  Not only did Valeant, through KGA, pay the entirety of Philidor's valuation up front, but Valeant also had the right to form a joint steering committee that would "assess and discuss" matters relating to Philidor's "internal policies, manuals and processes."   The transaction document also gave Valeant the right to "make the final determination" with regard to "the Strategic Plan of Philidor" and "the compliance of [Philidor] with applicable Legal Requirements, Contractual obligations (including agreements with Third-party payors) and the Company's internal policies and manuals" in the event of any failure to reach an agreement among the joint steering committee members. The joint steering committee also was given the "the right to review, prior to their submission, all applications of the Company for licenses and permits (including state pharmacy licenses)."   In effect, Valeant obtained the right to control Philidor, consistent with the fact that Valeant had already been controlling critical aspects of Philidor's business since inception by placing Valeant employees in supervisory roles at Philidor.

65.     Further, Valeant and Philidor entered into an exclusive distribution and services

agreement on December 15, 2014.  The agreement superseded the previous services agreement that Philidor had signed in January 2013 with Medicis (one of the pharmaceutical companies that Valeant acquired in 2012).  In the agreement, Philidor represented it would "operate in full compliance with all licenses and permits required by Laws and all contracts with participating insurance companies and Third Party Payors."  The agreement gave Valeant the right to inspect Philidor's policies and procedures and do site visits to verify such compliance.  Kellen signed on behalf of Valeant with Andrew Davenport ("Davenport"), Philidor's CEO, signing for Philidor. Products covered by the agreement included, among others, Elidel, Jublia and Solodyn.

### 2.     Valeant's Other Secret Pharmacies

66.     After forming Philidor, Valeant and its management created a number of shell companies affiliated with Philidor through which Valeant surreptitiously acquired interests in smaller retail pharmacies across the country to extend the captive pharmacy network.  Through this process, Valeant and its management developed a network of at least 76 captive specialty pharmacies through which Valeant could file pharmacy applications with state regulators.  In order to keep their captive pharmaceutical network a secret, Defendants caused the shell companies to make false and misleading statements in pharmacy applications filed with state regulators that failed to disclose the companies' relationship with Valeant and Philidor.  For example, Philidor submitted an application with the California State Board of Pharmacy on or about August 15, 2013 that contained numerous false and misleading statements designed to hide Valeant's control over Philidor.  In that application, the California State Board of Pharmacy found that Philidor and its CEO Davenport, while under penalty of perjury, falsely represented that:

- Alan Gubernick was Philidor's accountant and bookkeeper, when in reality it was Gregory W. Blaszczynski, who, unbeknownst to state regulators, was an employee of BQ6 Media, an instrumentality of Valeant and Philidor;

- there were no individuals or entities with a beneficial interest in Philidor;

- there were no owners or shareholders of Philidor, when in fact there were sixteen;

- there were no persons with a beneficial interest in Philidor, when in fact there were sixteen;

- there were no entities with 10% or more ownership interest in Philidor; and

- Davenport himself was not an owner of Philidor, when in fact he owned a 27% stake in the company.

67.    On May 16, 2014, the California State Board of Pharmacy denied Philidor's license application, finding that Philidor and Davenport knowingly made false statements concerning these topics, and that they made these statements "with the intent to substantially benefit [Philidor and Davenport]," and that Philidor and Davenport, by virtue of their false statements, were "***guilty of unprofessional conduct***."   The California State Board of Pharmacy affirmed its denial of Philidor's pharmacy license in February 2016.

68.    According to published reports, less than 1% of applications for this particular license are denied.

69.    Undeterred by the California State Board of Pharmacy's findings and determined to gain access to the California market, the largest insurance marketplace in the United States, Defendants caused a Valeant/Philidor-controlled shell company, Lucena Holdings ("Lucena"), to acquire a stake in a California pharmacy called "West Wilshire Pharmacy" in an effort to circumvent the Board of Pharmacy's licensing denial.  In a "Change of Permit Request" filed with the California State Board of Pharmacy on September 24, 2014, Defendants caused Lucena to falsely represent that Lucena did not have a parent company; that the only entity or individual with an interest in Lucena was Gregory W. Blaszczynski, who, unbeknownst to state regulators, was an employee of BQ6 Media, an instrumentality of Valeant and Philidor; and that Lucena's CEO and

pharmacist-in-charge, Sherri Leon, was not, and had never been, "associated in business with any person, partnership, corporation, or other entity whose pharmacy permit . . . was denied." In fact, Leon was Philidor's Director of Pharmacy Operations, and California had denied Philidor's pharmacy application earlier that same year.

70.     The California scheme was not limited to Lucena. On December 1, 2014, Philidor caused another shell company, Isolani, LLC, to acquire a California-based mail-order pharmacy, R&O Pharmacy ("R&O"). Once Philidor acquired R&O through Isolani, R&O's business grew significantly by dispensing thousands of prescriptions for Valeant-manufactured drugs—primarily expensive prescriptions for acne or eczema-related dermatological conditions. Isolani concealed from California regulators its relationship with Philidor and Valeant, and R&O only uncovered the relationship between Philidor and Valeant when R&O conducted its own investigation into Philidor.

71.     Defendants and Philidor conducted a similar scheme in Texas, through a Philidor-controlled shell company called Back Rank, LLC ("Back Rank"). Back Rank, whose managing member was James R. Fleming, Philidor's Controller, took control of Houston-based Orbit Pharmacy, Inc. ("Orbit Pharmacy"). In an application filed with the Texas State Board of Pharmacy in September 2015, Orbit Pharmacy—at the direction of Defendants and Philidor—falsely represented that no state had ever denied a pharmacy application filed by any of "the pharmacy's owner[s] or partner[s]." This statement was false because California had denied Philidor's pharmacy application in the prior year.

72.     While elements of Valeant's secret captive pharmacy network have become public, Valeant and Philidor still have not disclosed the full scope of the network or shell companies and affiliated subsidiaries that Valeant and Philidor used to hide the fraud.

73.     Notably, Valeant never disclosed Philidor in any of its SEC filings prior to October 19, 2015, and it structured the transaction acquiring Philidor in an improper attempt to avoid public disclosure.  Philidor also never publicly disclosed its arrangement with Valeant prior to October 19, 2015.

###     3.     Valeant Used its Secret Pharmacy Network to Insulate its Branded Drugs from Generic Competition, Inflate Prices and Book Fictitious Sales

74.     Because Valeant could not support its purportedly "low-risk" model on volume growth and cost cutting, Valeant and its management sought to implement significant price increases across Valeant's portfolio of acquired drugs.  Valeant's use of its captive secret pharmacy network was vital to the Company's true (and undisclosed) business model by avoiding competition from generic substitutes, inflating prices and increasing fraudulent sales.  Valeant's pricing would have been unsustainable in a competitive market:  customers generally would not pay the exorbitant prices for Valeant's brand-name drugs, and doctors would not commonly prescribe Valeant's exorbitantly priced brand-name drugs, had the existing generic alternatives been made available by the captive specialty pharmacies.  Valeant's secret network of captive pharmacies, however, insulated Valeant's branded drugs from generic competition, as Valeant could be certain that the pharmacies would dispense Valeant's branded drugs rather than generic equivalents.

75.     Philidor's fraudulent dispensing of Valeant-branded drugs violated the laws of fourteen states—including the state in which Philidor is headquartered, Pennsylvania—that require pharmacists to substitute generic equivalents for branded drugs.  In the states where cost-cutting laws do not exist, contracts between pharmacies and insurers or their PBM agents generally mandate that the pharmacy dispense generic substitutes in place of branded equivalents whenever possible.  Philidor and Valeant's fraudulent conduct violated these statutory and contractual

28

requirements.

76.     Through Valeant's secret network of pharmacies, Defendants were able to channel prescriptions for Valeant's branded drugs, including those ostensibly dispensed by smaller retail pharmacies in their captive network, through Philidor, where Valeant and Philidor employees used various fraudulent means to ensure Valeant's branded drugs – and not generics – were dispensed. Fourteen states, including Pennsylvania, require pharmacists to substitute generic equivalents for branded drugs.  Moreover, contracts between pharmacies and TPPs or their PBM agents typically require the pharmacy to dispense a generic substitute for a branded drug where available. Defendants' refusal to substitute generic alternatives for expensive Valeant-branded drugs, despite their widespread availability, violated these statutory and contractual mandates.

77.     Through its illegal and fraudulent practice, Valeant shielded its branded products from generic competitors. This scheme allowed Valeant to maintain or increase high prices not only for pharmaceutical drugs no longer protected by patent and subject to competition from direct generic equivalents, but also for branded drugs still protected by patents for which a near-perfect substitute existed.

78.     Accordingly, Valeant appeared immune to the limitations on growth encountered by seemingly every other pharmaceutical company.  Other drug companies see their drug-specific revenue decline when a generic version of that drug becomes available, a generic version of a near-perfect substitute becomes available or a cheaper branded drug reaches the market. Valeant, however, seemed capable of maintaining growth indefinitely.  This was a façade.

79.     As but one example, Valeant's fraudulent arrangement with Philidor allowed the Company to double revenue generated by Wellbutrin XL, an off-patent anti-depressant sold through Philidor and the captive pharmacy network.  Valeant was able to double the drug's revenue

by almost tripling prices from less than $6,000 to $17,000 for a year's supply of the drug, despite the existence of a generic equivalent for only $360 a year.  These results required the undisclosed illicit scheme.

80.     The fraudulent captive pharmacy arrangement similarly enabled Valeant to increase the price of and revenue derived from its dermatology drugs, even when those drugs faced competition from far cheaper generic equivalents.  From 2013 to 2015, during which time Valeant launched and exploited its secret captive pharmacy scheme and experienced significant stock price appreciation, Valeant dramatically increased the price of more than 50 drugs.  The price increases significantly outpaced those of competitors in the pharmaceutical industry.   Although the Company characterized its price increases as price "optimization," in reality, the Company was engaged in massive and unprecedented price gouging.  Over a nearly two-and-a-half-year period, Valeant instituted the following pricing increases, among others:

| Valeant Drug | From | Through | Years | Percent Increase |
|---|---|---|---|---|
| Carac Cream | Q1-13 | Q3-15 | 2.50 | 557% |
| Wellbutrin XL 300 MG Tablet | Q1-13 | Q3-15 | 2.50 | 381% |
| Tretinoin 0.1% CRM | Q2-14 | Q3-15 | 1.25 | 328% |
| Vanos 0.1% CRM | Q1-13 | Q3-15 | 2.50 | 279% |
| Targretin 60g 1 % Gel | Q1-13 | Q3-15 | 2.50 | 250% |
| Aldara 5% CRM | Q1-13 | Q3-15 | 2.50 | 223% |
| Xerese 5%-1% Cream | Q1-13 | Q3-15 | 2.50 | 216% |
| Noritate 1% Cream | Q1-14 | Q3-15 | 1.50 | 212% |
| Migranal Nasal Spray | Q1-13 | Q3-15 | 2.50 | 159% |
| Loprox 1% Shampoo | Q1-13 | Q3-15 | 2.50 | 145% |
| Atralin 0.05% Gel | Q1-13 | Q3-15 | 2.50 | 135% |
| Dihydroergotamine Mesylate 4 MG/ML Nasal Spray | Q1-14 | Q3-15 | 2.50 | 90% |
| Jublia (Efinaconazole topical solution 10%) | Q2-14 | Q3-15 | 1.25 | 20% |

81.     These price increases would not have been possible but for Valeant's undisclosed fraudulent arrangement with Philidor and the captive pharmacy network.  As described above, Valeant went to great lengths to conceal its scheme.  Valeant prevented Philidor and the other captive pharmacies from disclosing their relationship with Valeant to the insurance companies, to regulators, to other third-party payors or to PBMs.

82.     Valeant and Philidor expressly misrepresented their relationship—and the involvement of additional captive pharmacies—to insurers and other third-party payors, their PBM

agents and their members to increase the reimbursements paid by the payors and to maximize Valeant's drug sales.  Valeant's fraudulent scheme is documented in manuals provided to Philidor employees charged with handling claims submitted to third-party payors.  The manuals explained that "[w]e have a couple of different 'back door' approaches to receive payment from the insurance companies."  The "back door approaches" involved rewriting prescription information, filing claims for refills that patients never requested and falsely representing the identity of the pharmacies that dispensed the drugs to reduce denials of claims for Valeant drugs.  Valeant's internal emails and correspondence between Valeant and Philidor, including a July 19, 2015 email from Philidor's CEO Davenport, demonstrate that both parties in the fraudulent arrangement— Valeant and Philidor—were fully aware of these "back door approaches."

83.     To rewrite prescription information, Valeant and Philidor instructed employees at Philidor and other captive pharmacies to deliberately modify the doctor's prescriptions so as to require the prescription be filled with expensive Valeant-branded drugs, rather than the cheaper generic substitutes that the pharmacies would be required to provide by law or contract.  Generally, pharmacists who receive a prescription for a branded drug instead dispense a generic substitute when available.  Because some alternatives may not be perfect substitutes, physicians are able to prescribe particular branded drugs by specifying "dispense as written" on the prescription. *Bloomberg* reported on October 29, 2015 that Philidor employees confirmed that Valeant's captive pharmacies regularly falsified prescriptions by adding the words "dispense as written" whenever the prescription included Valeant products and cheaper generic substitutes were available.  The employees interviewed in the *Bloomberg* investigation specified that Valeant and Philidor employed this fraudulent method for increasing sales volume at the inflated prices especially for Valeant's dermatologic products for which third-party payors would otherwise refuse to fund,

including Retin-A Micro and Vanos.

84.     Valeant directed two forms of fraud perpetrated by Philidor employees.  First, Valeant directed Philidor employees to avoid third-party payors' denials of claims for expensive Valeant-branded drugs by modifying prescription codes so that the prescriptions appeared to order only Valeant-branded drugs, thereby precluding the use of low-cost generic alternatives.  Second, when third-party payors denied initial claims for Valeant drugs because the prescription allowed for generic substitutes, Philidor employees falsely resubmitted modified prescriptions allowing only for the dispensing of Valeant drugs as new prescriptions.

85.     Valeant used false pharmacy identifications to misrepresent to insurance companies and other third-party payors which pharmacies were dispersing the Valeant-branded drugs. Valeant and Philidor's manual for handling claims directed Philidor employees to submit claims to third-party payors or their PBM agents first using Philidor's National Provider Identification Number ("NPI").  If the claim was rejected, the manual directed employees to resubmit that claim on the NPI of another captive-Valeant/Philidor controlled pharmacy.  Valeant thus directed Philidor employees to claim that a pharmacy dispensed a prescription that the pharmacy had not actually dispensed and may not have even stocked.

86.     Former Philidor/Valeant employees told *Bloomberg* that they received maps and specific instructions detailing the false NPI information that they should fraudulently submit if a third-party payor denied a claim from a particular dispensing pharmacy.  Valeant/Philidor issued a manual instructing employees on how to handle claims which stated that if an employee received a denial for a particular third-party payor, it should "submit the NPI for our partner in California, West Wilshire Pharmacy" because "[t]here is a good chance they are contracted."  In the event that the third-party payor denied West Wilshire Pharmacy's NPI, Valeant/Philidor instructed

employees to replace the denied pharmacy with "Cambria Central Fill insurance and run that as the primary."  Cambria Central Fill, based out of Philadelphia, Pennsylvania, was another of Philidor's secret retail pharmacies.

87.    Valeant and Philidor also directed pharmacies in the Valeant network, such as Isolani, to use the NPI belonging to the California-based R&O Pharmacy, which was another Valeant/Philidor controlled entity.  In many instances, Philidor employees submitted claims for prescriptions that R&O had never filled and for drugs that R&O did not even stock.  By directing employees to submit fraudulent NPI information for claims, Valeant and Philidor sought to secure payment for properly denied claims.  In an interview with the Southern Investigative Reporting Foundation, a former Philidor claims adjudicator, Taylor Geohagen, explained this fraudulent practice as follows:  "Pretty much everything we did in the [Philidor] Adjudication department was to use the [NPI] codes from the pharmacies we bought out to get something [approved] in a pinch."

88.    Additionally, Philidor and Valeant submitted falsified payer audits to third-party payors or their PBMs.  Generally, the retail pharmacies themselves submit payer audits for the prescriptions they fill.  By contrast, in Valeant's captive pharmacy network, Valeant's agents would submit the payer audits on behalf of all the captive pharmacies, so as to inaccurately state that a particular pharmacy had filled a particular prescription, when those prescriptions had actually been filled by Philidor or one of Valeant's other captive pharmacies.  To perpetrate this fraud on the third-party payors, Defendants' agents falsely claimed authority to approve the audit statements on behalf of the retail pharmacies, or even forged the signatures of management at those pharmacies.

89.    For example, a July 14, 2015 email between Russell Reitz of R&O Pharmacy and

Eric Rice, Senior Director at Philidor, demonstrates that Defendants' agents' audit statements submitted on behalf of R&O Pharmacy falsely claimed that R&O had dispensed Valeant prescriptions when, in fact, Philidor had actually filled those prescriptions.  In that email, Reitz wrote to Rice that Philidor fraudulently billed R&O for prescriptions "filled by some other pharmacy" or "filled and billed before the execution of the R&O purchase and sale agreement," using Reitz's National Council for Prescription Drug Programs number without Reitz's knowledge or consent.  In some cases, the prescriptions that Philidor claimed R&O dispensed in R&O's fraudulent audit statements were for drugs that R&O not only had not dispensed, but also did not stock.

90.     Valeant and Philidor also fraudulently submitted numerous prescription renewals for reimbursement when patients had not requested renewals of their prescriptions.  As Philidor customers explained in an investigative article published by New York magazine on January 13, 2016, Valeant and Philidor directed its captive pharmacies to automatically refill patients' prescriptions for Jublia and other Philidor-dispensed Valeant drugs regardless of whether the patients had actually requested refills.  Even when patients actively refused refills, Philidor made it nearly impossible for those patients to decline or cancel the refills.  Accordingly, Valeant and Philidor fraudulently represented to third party-payors and PBM agents that patients had requested prescription renewals for Valeant-branded drugs even when patients actively declined a prescription renewal.

91.     Valeant also sought prescription renewals for non-chronic conditions that are generally resolved by a limited course of treatment.  Thus, for certain dermatological conditions treated by Valeant-branded drugs that required only one course of treatment, Valeant fraudulently stated that patients had requested prescription renewals from third-party payors even though the

conditions were resolved through a single treatment.  Because Valeant directed Philidor to waive patient copays through the deceptive PAPs program, discussed above, this scheme frequently went undetected, since there existed no incentive for patients to complain about the unnecessary refills for which the patients were not charged.

92.     One Philidor employee explained in an online forum that Philidor frequently "auto ship[ped] [Valeant-branded drugs] without proper approval" even when "most people do not need these refills" because "it is free for the patient but Philidor gets anywhere from \$550-\$1220 from the insurance companies."  Another Philidor employee further explained:

> They took the list of customers who had been approved by [insurance] and had refills available. Instead of waiting for the customer to call they would dial and leave a msg saying your refill will be shipped unless you call within 24 hrs. They would do this on the 30th day of the rx. Previously they had a Co pay so would have to wait to get approval to charge the 35.00 Co pay, making the Co pay 0 allowed them to ship refills whether u wanted them or not. Not a bad money making idea except most people did not really need refills of Solodyn so soon . . . Of course these refills were out the door ASAP sometimes within an hour of the call and the [insurance] money would come in.
>
> What patients don't get is your [insurance] company is paying 500 plus bucks for an old medication reformulated and refills not needed. I would bet a lot of Solodyn and Jublia bottles are just lying around still in the shipping package.
>
> If you ever saw Wolves of Wallstreet well that was sorta what some of us saw at Philidor. Let's say on average a person does not need a refill of Solodyn for 45 or 60 days from the 1st fill and you force them to take it at 30 days every month \$\$\$\$\$\$\$\$\$\$\$\$\$\$\$ and a ton of it! Think about it.

93.     Valeant and Philidor also misrepresented to insurance companies and other third-party payors the dispensing pharmacies "actual charges" for Valeant-branded drugs by failing to disclose that Valeant instructed Philidor to waive patient copays on those drugs.  Insurance companies institute copays to:  (i) deter insured patients from wastefully consuming medically unnecessary pharmacy products; (ii) incentivize insured patients to choose generic substitutes

when available; and (iii) discourage unnecessary refills of prescription medications.  By waiving copays at Valeant's direction, Philidor removed all three incentives for controlling unnecessary costs.  In turn, this practice meant that third-party payors would incur the increased costs associated with the unnecessary and exorbitantly priced Valeant-branded drugs, and those increased costs would ultimately be passed through to patients and the insured public.  To discourage pharmacies like Philidor from waiving copays, PBMs contract with pharmacies to mandate that pharmacies attempt to collect the copayment, and submit their claims reflecting "actual charges," which take into account discounts or waivers applied.  While Philidor would waive copays at Valeant's direction, Philidor frequently submitted claims for the prescriptions that falsely represented to the insurers and other third-party payors that the patient had been charged the full price of the drug and contributed the copay.

94.     Valeant and Philidor also issued patient-facing misrepresentations to increase the volume of Valeant's drug sales.  Valeant and Philidor falsely represented to doctors and patients that Valeant drugs were available at no cost if the patients and physicians submitted their prescriptions directly to Valeant's captive secret pharmacy network.  Channeling patients and physicians through Philidor allowed Valeant to guarantee that prescriptions would be filled with Valeant-branded drugs, rather than cheaper generics as would occur by law or contract if filled by a pharmacy outside of Valeant's captive and undisclosed network.  In furtherance of this scheme, Valeant and Philidor issued coupons that fraudulently told patients that third-party payors would not be billed if the prescriptions for Valeant-branded pharmaceuticals were submitted directly to Philidor.  One patient submitted a consumer complaint to the Better Business Bureau ("BBB") on March 2, 2015, which the BBB documented as follows:

> Complaint: Received a call from the [Philidor] representative stating that
> they wanted to refill a Rx for ******. They stated that they had a coupon

37

that would pay for the medication completely, and even said "at no cost to you". Unfortunately, I said OK. In reviewing my healthcare plan claims, I noticed that they bill my Plan for $449.55. Since I have a $1500 deductible, I may be liable for this charge. This is not what I agreed to and not what the representative said would occur. I would like this claim removed from my healthcare plan immediately. I will return the ****** unopened in order to have this taken off my Claims.

95.     In reality, the third-party payors were billed for the Valeant-branded drugs, despite Valeant and Philidor's representations to the contrary.   Valeant and Philidor's billing of the insurers was then passed onto the patients, whom Valeant and Philidor had promised not to bill. Indeed, one patient reported:

> [M]y dermatologist provided me with a "Trial Coupon" for JUBLIA; a topical solution used to treat toenails. The trial coupon offers a "$0 copay for 12 months" of this medicine . . . . Philidor RX Services continues to INCORRECTLY bill my health insurance which, in turn, is impacting my HSA / MRA Funds - each time, removing $100 from MY Medical Reimbursement Account.

96.     Another customer reported similar conduct to the BBB:

> Hello. My child had an appointment with a local dermatologist. While we were there we were referred to Philidor RX Services for filling two acne prescriptions. The dermatologist assured me that I would be charged only $25 and nothing more from our health insurance company. She also gave us a coupon to use for one of the prescriptions that would make it free. I called Philidor and gave them all of the information that was provided to me by the dermatologist. Philidor charged me $220 from my FSA account ($110 for each prescription). I contacted Philidor and spoke with a man who said his name was Mickey. Mickey told me that I needed to submit a statement from my insurance company showing that $220 was withdrawn from my FSA account. I did as requested and have sent the information via email to Philidor, Attn: Mickey, twice. I have received no response and no refund.

97.     Anticipating these complaints, Valeant and Philidor sought to insulate their captive pharmacies from consumer retaliation.  Valeant and Philidor attempted to make it as difficult as possible for patients to complain to Philidor that their insurers had been billed for Valeant-branded drugs despite coupons or sales literature indicating that insurers would not be billed. Philidor

customers and patients frequently reported being directed to sales staff (who rebuffed the complaints) when they tried to report the fraudulent marketing schemes to Philidor.

98.     Valeant was aware of—and indeed was directing—Philidor's improper practices even before the $100 million payment to Philidor was made.  As explained above, Valeant's management was involved in Philidor's formation and decision-making.  Valeant's senior management, and even members of Valeant's Board of Directors, went on site visits to Philidor before the $100 million acquisition.  After the payment for the convoluted Philidor Purchase Option, Valeant concealed the transaction and Valeant's control over Philidor from investors and all healthcare sector stakeholders—including physicians, patients, private payors and PBMs.

99.     Until the fraudulent arrangement was exposed in October of 2015, Valeant utilized this hidden relationship to artificially inflate revenues.  Because Valeant and its management knew that Valeant could not record revenue from shipping products to Philidor after Valeant's acquisition of Philidor, Valeant shipped millions of dollars of products to Philidor to inflate revenue *directly before the purchase of the put option*.  Despite the fact that this manipulative practice clearly violated GAAP, Schiller, Carro and Ingram the Valeant Audit Committee, the Finance and Transactions Committee and the entire Valeant Board of Directors approved the deceptive accounting practices involving Philidor.  During an October 26, 2015 investor conference call, Robert A. Ingram, a member of Valeant's Board of Directors since September 2010, admitted that the Audit Committee of the Board and the full Board of Directors approved Valeant's (misleading) accounting concerning Philidor.  Slides that corresponded to the investor call stated that the "***Finance and Transactions Committee, Audit and Risk Committee and Full Board reviewed the transaction***" and "***[t]he appropriate accounting treatment was determined by management and reviewed with the Audit and Risk Committee***."

### 4.    Valeant Exploits "Patient Assistance Programs" To Raise Prices

100.    In addition to relying on its secret network of pharmacies to support its price-gouging model, Valeant also deceptively employed "patient assistance programs" ("PAPs") to support growth while raising prices.  PAPs are typically offered by drug companies to provide financial assistance to patients so that they can have access to medically critical drugs.  But Valeant's PAPS had an entirely different purpose.  Specifically, Valeant's PAPs waived patient copay requirements for Valeant's drugs—not to provide access to medically critical drugs, but instead to ensure that patients would not complain about being prescribed Valeant's branded and overpriced drugs rather than medically equivalent and far cheaper generics.  By eliminating copays, Valeant muted the incentive for patients to seek out lower-priced substitute drugs.  Thus, Valeant could sell medically unnecessary branded drugs—despite the availability of low-cost generic substitutes—at an artificially inflated price.  Had Valeant declined to waive the patient copays, patients would have chosen lower-cost generic drugs to avoid the unnecessary and costly prescriptions and thus would have lowered costs for the insurance companies.  Valeant also concealed the Company's practice of waiving patient copays, keeping private insurance companies in the dark so that they would continue to pay for the Valeant-branded drugs even when unnecessary.  Thus, Valeant manipulated the PAP system to conceal the extent of its price increases from the paying public.

101.    Valeant specifically targeted private insurers because of federal anti-kickback laws that prohibit such practices when government payors are involved. Testifying before the House Oversight Committee and the Committee on Aging of the U.S. Senate ("Committee on Aging") on April 27, 2016, Pearson acknowledged that Valeant was "not allowed to" use the co-pay reduction programs for those on federal insurance programs.  Senator Elizabeth Warren explained why:  "These [co-pay reduction] programs are illegal [with regard to federal payors] because

Medicare and Medicaid understand that the programs are scams to hide the true cost of the products from the consumer and drive up the cost of all the taxpayers." At the same hearing, Mark Merritt, President and CEO of the Pharmaceutical Care Management Association ("PCMA"), which represents PBMs, testified that Valeant caused third-party payors "to pay hundreds of thousands more for the most expensive brands" through copay coupons that allowed patients to bypass cheaper generic drugs.

102.    From 2012 to 2015, Valeant's PAPs expenditures grew 11-fold, rising from $53 million in 2012 to over $600 million in 2015, with the expectation that PAPs expenditures would rise to over $1 billion in 2016. These rates grew even while the Company's revenues were increasing at a significantly slower rate (roughly 3-fold), from $3.5 billion in 2012 to $10.4 billion in 2015.

103.    Throughout this period, Valeant misrepresented the true purpose of its PAPs program. A draft Q&A directed Valeant employees to respond to the question of "Isn't Valeant just trying to make insurers and managed care providers pay as much as possible for these drugs?" with the following answer: "No. These rate increases are essential to ensure that Valeant is able to continue to offer these important pharmaceuticals to our patients who are afflicted with Wilson's disease while also remaining commercially viable." Valeant's production costs for these drugs had not increased in reality. Valeant was instead using these price increases to chase additional revenue growth. Despite the fact that Valeant's business model had eliminated nearly all spending on R&D, Valeant's customer service department lied to patients, claiming "there are many challenges associated with developing treatments for rare conditions such as Wilson's disease, the investments we make to develop and distribute novel medicines are only viable if there is a reasonable return on the company's investment and if our business is sustainable."

104.    When certain elements of Valeant's business model were revealed to the public in October 2015 (namely, the existence of the previously undisclosed Philidor relationship), Valeant spun further deceptions.  In a letter to Senator Claire McCaskill dated October 30, 2015, Pearson stated that Valeant was "beginning to reach out to hospitals to determine an appropriate pricing strategy" for those "institutions where the impact was significantly greater."  Despite these representations, and a 30% discount program that Valeant announced shortly after the letter to Senator McCaskill, investigators could not find a single hospital that received the discounts.

105.    A number of individuals, many of whom were affiliated with hospitals, testified before the Senate Aging Committee in or around April 2016 that they had not received any of the promised discounts.  This was because Valeant had, in reality, maintained its price gouging well beyond October 2015 in a desperate attempt to generate further revenue growth.  By way of example, the Cleveland Clinic explained that it had called a then-vice president of Valeant, Brian Stolz, to inquire about the announced discounts.  Stolz stated that he would get back to the Clinic about the discounts, but Cleveland Clinic never received the promised follow-up.  Likewise, the University of Utah Health Care wrote to the Senate Aging Committee explaining that "Valeant refused to talk [] about better contracted prices."  This was true, despite Pearson's October 2015 letter to Senator McCaskill indicating that Valeant would contact "hospitals that were impacted by the new pricing" to arrange pricing discounts.

106.    Subsequently, Valeant effectively admitted that Pearson's representation was inaccurate.  In an April 23, 2016, written response to the Senate Aging Committee, Stolz stated that, "[a]s of this date, Valeant has not entered into contracts with individual hospitals to provide volume-based discounts for Nitropress and Isuprel" and had executed contracts with only three hospital groups.  Thus, as of April 23, 2016, nearly half a year after Pearson's letter to Senator

McCaskill, Valeant had done almost nothing to address the price increases.

### 5.  The R&O Lawsuit and the Initial Disclosure of Valeant and Philidor's Fraudulent Arrangement

107.  Valeant's desire to grow its captive pharmacy network ultimately led to its undoing. The Company's acquisition of R&O Pharmacy would result in an investigation and lawsuit against Philidor that exposed the specialty pharmacy's relationship with Valeant and the related captive network of secret specialty pharmacies.

108.  As mentioned above, on December 1, 2014, Philidor acquired a specialized dispensary for gastroenterology patients, R&O Pharmacy, from Russell Reitz.  It became apparent to Reitz during the sale that Philidor was not licensed by the California State Board of Pharmacy. Immediately following the sale, R&O began to receive a massive increase in prescriptions from physicians using Philidor's mail-order service.  The number of prescriptions sent to R&O significantly exceeded the size of R&O's business prior to Philidor's acquisition of the pharmacy.

109.  The orders, as discussed above, were consistently for expensive Valeant-branded pharmaceuticals, often ordered in bulk, which would be dispensed by Reitz through mail directly to patients.  R&O would then receive payments from private health insurers, which frequently sent R&O single checks for more than $1 million covering hundreds of patients.

110.  R&O Pharmacy's newfound business was unusual in at least three respects:  (i) the volume of prescriptions that R&O filled through Philidor-directed patients was unusually large; (ii) the prices of the prescriptions were extremely high, even for a specialized pharmacy like R&O that frequently dealt in costly specialty drugs; and (iii) whereas most specialty pharmacies deal in treatments for chronic and serious medical conditions, the overpriced prescriptions that R&O was receiving from Philidor were for Valeant-branded drugs that treated common dermatological conditions such as Solodyn for acne, Elidel for eczema and Jublia for toenail fungus, all of which

43

could have been appropriately treated by any number of generic substitutes.

111.    The significant change in R&O's business following the acquisition resulted in an audit from one of R&O's PBMs.  The audit revealed that Philidor was using R&O to fill thousands of prescriptions for individuals all around the country, including patients with whom Reitz had never been in contact but whose prescriptions had been filled with his name and R&O's NPI.  Even more confounding was the fact that many of the prescriptions that R&O had been credited with fulfilling were for medications that R&O did not carry, and some of those prescriptions had been backdated to before Reitz sold R&O to the Philidor-controlled entity.  These fraudulent practices continued throughout the summer of 2015.

112.    Because of the serious concerns raised by the PBM's audit, in the summer of 2015, R&O began its own investigation into Philidor.  R&O's investigation uncovered Philidor's unsuccessful application for a pharmacy license with the California State Board of Pharmacy in 2013, which had been denied in 2014 by the California Board because Philidor's application contained "false statements of fact."  R&O's discovery of the previous unsuccessful application alerted Reitz to the fact that Philidor had purchased R&O exclusively to use R&O as a mechanism for Philidor to conduct business in California despite the California Board's denial of Philidor's pharmacy license application.

113.    In a July 14, 2015 email to Eric Rice, the Isolani executive who signed the acquisition agreement with R&O (and who was also Senior Director at Philidor), Reitz raised "the issue of Philidor's improper, and perhaps illegal, use of [R&O Pharmacy's] number without [Reitz's] knowledge or consent to bill for prescriptions that" other pharmacies had filled and, in some cases, had even been billed before Isolani acquired R&O.  In the email, Reitz instructed Philidor to end the fraudulent practice immediately, and he noted that the acquisition agreement

mandated that Philidor and Isolani (the Philidor-controlled entity through which Philidor acquired R&O) apply for a permit to operate in California—a "process [that] does not take 7 months." Accordingly, Reitz requested all documents concerning Isolani's or Philidor's application for a pharmacy license before the California State Board of Pharmacy.

114.     Five days later, on July 19, 2015, Philidor's CEO Davenport responded by email to Reitz.  In that email, Davenport stated that Philidor would cease using R&O's NPI number to fill prescriptions, and that Philidor had "halted activity pending coming to some alignment with you." In response, Reitz inquired why "Philidor is responding to my concerns instead of Eric Rice," who had signed the acquisition agreement by which Isolani acquired R&O Pharmacy.  Reitz also noted that he had recently learned Rice signed off on an audit that Reitz had refused to sign, despite the fact that "Rice is not the [pharmacist-in-charge] (I am) and has never stepped through R&O's doors.  I am not sure how he could verify the accuracy of anything pertaining to that audit."

115.     In response, and indicative of the severity of Reitz's concerns, on July 21, 2015, Philidor dispatched Rice and additional Philidor executives including CEO Davenport, Controller Fleming, and General Counsel Gretchen Wisehart to California to meet in person with Reitz at R&O.  Reitz's concerns on behalf of R&O were not resolved at the meeting, and R&O retained counsel who sent a letter to Rice on July 22, 2015, noting that Rice "appear[ed] to be engaging in widespread fraud."

116.     Several weeks later, on August 18, 2015, Philidor's Controller Fleming emailed Reitz to suggest responses to a pending audit.  One of the most prominent red flags identified in the audit was the fact that a large number of prescriptions R&O was filling were then shipped to patients in Pennsylvania, where Philidor was based.

117.     In light of the apparent widespread fraud, on August 31, 2015, R&O's counsel sent

a notice of termination to Isolani's law firm, writing:  "It is now crystal clear that Isolani/Philidor fraudulently induced Mr. Reitz to sign the [transaction] agreements in order to allow Isolani/Philidor to engage in a massive fraud. . . . Isolani is simply a shell created by Philidor to perpetrate a massive fraud against not only against Mr. Reitz and R&O, but also the California State Board of Pharmacy, [and] various payer networks."  In the letter, R&O's counsel stated that Philidor was clearly using R&O for improper purposes because Philidor had been denied a California license.  Specifically, R&O's counsel stated that Philidor:

> targeted Mr. Reitz and R&O back in the fall of 2014 because it needed access to R&O's valuable multi-state pharmacy licenses and payer contracts . . . . Philidor then created Isolani as the instrumentality to improperly use R&O's NCPDP and NPI numbers to distribute pharmaceuticals in jurisdictions that Philidor would not have access to but for R&O. . . . Mr. Reitz's worst fears have been realized, as he has obtained irrefutable proof that despite Mr. Davenport's written assurance, Isolani/Philidor continue to use R&O's . . . NPI numbers to bill payors for prescriptions dispensed by Philidor . . . Mr. Reitz now has concrete evidence that representatives of Isolani/Philidor have signed false and misleading payer audits and falsely represented themselves as officers or employees of R&O . . . to certain payors.

118.    Valeant, evidently realizing that Reitz's investigation of Philidor was endangering the Company's undisclosed business model, then intervened.  In response to the August 31, 2015 letter, Valeant's General Counsel sent letters to Reitz demanding $69 million in payments from R&O.  The letters demonstrate that Valeant was not only a drug manufacturer supplying Philidor, but in fact was at the center of a fraudulent scheme perpetuated in coordination with Philidor. Following Valeant's intervention, Isolani's counsel sent an email on September 6, 2015, notifying R&O's counsel that Isolani was seeking a protective order against Reitz and an accounting.  R&O's counsel responded to Isolani by stating that Isolani must have known for "at least six weeks that Mr. Reitz was in receipt of checks paid to his company to protect himself and his company from the massive potential/actual civil, regulatory and even potential criminal liability that your clients

46

have exposed him to due to their malfeasance," also noting that R&O's counsel had outlined the illicit conduct in prior correspondence "to which your clients have provided no denials."

119.    R&O, through its counsel, then stated that it had not received any invoice from Valeant for any amount at any point in time, indicating that either Valeant and R&O are "victims of a massive fraud perpetuated by third parties," or that "Valeant is conspiring with other persons or entities to perpetuate a massive fraud against R&O and others."

120.    Reitz and R&O eventually filed suit against Valeant in October 2015.  The resulting disclosures, including the facts set forth above, precipitated a series of events that ultimately revealed the true nature of Defendants' and Philidor's fraudulent arrangements and the network of secret and captive specialty pharmacies.

## V.    DEFENDANTS MISLED INVESTORS REGARDING VALEANT'S BUSINESS MODEL AND MANIPULATED THE COMPANY'S FINANCIAL RESULTS

### A.    Defendants Made Numerous False or Misleading Statements Regarding Valeant's Business Model and Financial Results

121.    Throughout the Class Period, Defendants repeatedly misled investors regarding Valeant's business model and financial results, which (together with Defendants' other misstatements and omissions) caused the prices of Valeant common stock and call options to be artificially inflated; and caused the prices of Valeant put options to be artificially deflated.

122.    On January 4, 2013, the first day of the Class Period, CEO Michael Pearson, and CFO Howard Schiller hosted a conference call with investors and analysts to discuss Valeant's 2013 financial guidance.  Pearson and Schiller made several statements concerning Valeant's business model, financial prospects and the benefits of its new Alternative Fulfillment ("AF") initiative. The AF strategy had been employed at Medicis Pharmaceutical Corporation, which Valeant acquired in or around December 2012.  Through the AF initiative, Valeant attempted to

47

have patients take their prescriptions to specialty pharmacies that would assist patients and doctors in obtaining insurance coverage for Valeant drugs rather than generic substitutes, or would provide incentives for patients to purchase Valeant drugs instead of generics. Pearson stated during the January 4 call: "2012 was another very strong year for Valeant. From a top line perspective we added over $1 billion in revenue in 2012 . . . . On the bottom line, we delivered cash EPS growth of greater than 50% as compared to 2011, ***demonstrating once again the sustainability of our business model***."

123. When asked about pricing for Solodyn, a dermatological product acquired in the Medicis transaction, Pearson responded: "In terms of Solodyn, we're not assuming we're making any kind of major price increases in terms of the end consumer. Through the AF programs, it will allow us our sort of average price internally to go up, because of the way that system works." Pearson also touted the expansion of Valeant's AF initiative:

> Yes, the more we understand about it the more excited we get about it, quite frankly because it's not just a singular sort of initiative that there's a whole evolution being planned in terms of the Stage I, Stage II, Stage III. And there's some exciting opportunities there that we're not going to give specifics of. And also as we had hoped, we think it will apply to more than just Solodyn. Ziana [used to treat acne] is actually also being—already Medicis has Ziana being used in the AF program, and we see application for a number of our dermatology products and potentially neurology products in the US.

124. When asked what percentage of Solodyn revenue would go through the AF initiative, Pearson replied:

> [I]t's much - it will be much closer to 50% than 10%, that's for sure. And yes, what we - the AF, if it all works out, will both help eliminate or get rid of non-revenue producing or non-profitable scripts, but hopefully can be used to start generating truly profitable scripts through a different channel. That's the intent, and we're seeing evidence that that will work.

125. On February 28, 2013, Valeant issued a press release and hosted a conference call regarding its 2012 financial results. In response to a question about the AF strategy, Pearson

represented: "The program is working actually quite well. We are going to be rolling out a couple new generations of the program but we're not going to talk about it on this call." When pressed for details on the "Medicis alternate fulfillment channel" and "how that sort of contributes to the growth," Pearson stated:

> We have never given details. Medicis never gave details. And that was probably a smart practice. We are not going to give details in terms of what's flowing through full alternate fulfillment and what's not. What we can reiterate is that all of our key brands in dermatology since our sales force meeting are now growing.

126.   Defendants continued to tout Valeant's purportedly sound and profitable business model throughout the Class Period, including through the following representations:

(a)      During a June 11, 2013 presentation at the Goldman Sachs Healthcare Conference, Schiller stated "it's all trying to focus on profitable scripts, and stay away from those scripts that are unprofitable, and more judicious use of copay cards and the rest, and making sure when a customer, a patient is covered, you get reimbursed for it."

(b)      During an August 7, 2013 conference call to discuss Valeant's 2Q13 financial results, Pearson stated: "[W]e're not going to go - therapeutic areas are largely driven by R&D in terms of why people organize that way, and we don't plan to spend - increase our R&D spend as a percent of sales to what other companies are doing. And we'll continue to focus on both specialty segments and attractive geographic markets."

(c)      In an October 31, 2013 press release reporting its 3Q13 financial results, Valeant represented its "Developed Markets revenue was $1.14 billion, up 77% as compared to the third quarter of 2012" and "[t]he growth in the Developed Markets was driven by continued improvement in many of our Dermatology prescription

brands, our aesthetics and oral health portfolios, our orphan drug products and CeraVe [a line of skincare products]."

(d)     During a January 7, 2014 conference call, Pearson attributed Valeant's "continuing track record of consistent strong performance in terms of growth in revenues, earnings, and most important, returns to all of you, our shareholders" to "***strong organic growth in a fiscally responsible manner*** for the products that we already own, coupled with a consistent track record of buying durable assets in a very disciplined manner and over-achieving in terms of improving growth rates and extracting cost synergies."

(e)     Defendants made similar representations regarding the Company's AF initiative, "growth" (or "organic growth"), or increasing revenues in:  (i) Pearson's statements during the Goldman Sachs Healthcare CEOs Unscripted: A View from the Top Conference on January 7, 2014; (ii) Valeant's February 27, 2014 press release discussing its 2013 financial results, as well as its earnings call the same day; (iii) Valeant's May 8, 2014 1Q14 earnings call; (iv) Valeant's July 31, 2014 press release announcing 2Q14 financial results, as well as its earnings call the same day; (v) Valeant's October 20, 2014 press release announcing 3Q14 results, as well as its earnings call the same day; (vi) Valeant's January 8, 2015 earnings guidance call; (vii) Valeant's February 22, 2015 press release announcing 4Q14 and FY14 financial results, as well as the Company's February 23, 2015 earnings call; (viii) Valeant's 2014 Form 10-K filed on February 25, 2015; (ix) Valeant's April 29, 2015 press release announcing 1Q15 financial results, as well as its earnings call the same day; (x) Valeant's April 30, 2015 1Q15 Form 10-Q; (xi) Pearson's

statements during Valeant's annual shareholders meeting on May 19, 2015; (xii) Valeant's July 23, 2015 press release announcing 2Q15 financial results, as well as its earnings call the same day; (xiii) Valeant's July 28, 2015 2Q15 10-Q; and (xiv) Valeant's October 26, 2015 3Q15 10-Q.

(f)     In its 2013 10-K issued on February 28, 2014, Valeant stated "[g]eneric versions are generally significantly less expensive than branded versions, and, where available, may be required in preference to the branded version under third party reimbursement programs, or substituted by pharmacies," and "[t]o successfully compete for business with managed care and pharmacy benefits management organizations, we must often demonstrate that our products offer not only medical benefits but also cost advantages as compared with other forms of care."  Valeant made similar statements in its 2014 10-K.

(g)     The 2013 10-K also touted Valeant's "lower risk research and development model," which "allow[ed] [the Company] to advance certain development programs to drive future commercial growth, while minimizing our research and development expense."  Valeant made similar statements regarding its "***lower risk research and development model***" in its (i) May 9, 2014 1Q14 10-Q; (ii) August 1, 2014 2Q14 10-Q; (iii) October 24, 2014 3Q14 10-Q; (iv) 2014 Form 10-K; (v) Registration Statement and Prospectus issued in connection with the Company's March 2015 $1.45 billion public offering of 7.3 million shares of common stock ("March 2015 Stock Offering"); (vi) April 30, 2015 1Q15 10-Q; and (vii) July 28, 2015 2Q15 10-Q.

(h)     During a February 23, 2015 earnings call, Schiller stated, "The outstanding work of our sales teams, implementation of innovative marketing approaches, great leadership, a portfolio of great products, and our four new launch products have contributed to the turnaround and the outstanding results in our dermatology business in Q4 and 2014."

(i)     During an April 22, 2015 earnings call, in response to an analyst's question as to "how much was price versus volume that contributed to growth in 1Q . . . [a]nd what do you factor in your full-year guidance price versus volume," Pearson responded: "***In terms of price volume, actually volume was greater than price in terms of our growth.*** Outside the United States it's all volume *. . . . **And in the US it's shifting more to volume than price, and we expect that to continue*** with our launch brands. A lot of our prices for most of our products are negotiated with managed care. ***And there's only a limited amount of price that we can take***."

(j)     During Valeant's 2015 annual shareholder meeting on May 19, 2015, Pearson stated "we have a differentiated R&D model that has and will continue to deliver more innovative products to our customers at a lower cost than our competitors."

(k)     On May 21, 2015, Pearson attended an RBC Capital Markets, LLC Investor Meeting on Valeant's behalf and made numerous statements about the Company's pricing, source of growth, and accounting practices, including:

> (i)     when asked to discuss pricing in the United States, Pearson said that due to managed care contracts, Valeant was "***contractually not allowed to raise prices beyond***" an average of "***5%***," including in its Dermatology business segment;
>
> (ii)    while discussing pricing, Pearson said of the Neurology and Other business segment, "***that's where we have the most ability to raise price[s] and play with price***" and raising prices "***is I believe not, at least***

*from your [an investor's] standpoint a bad thing*." Pearson further stated orphan products provided him with the opportunity to be flexible with pricing. He also said Valeant's base plan was around 5% price increases adding that Valeant had raised prices more in certain areas but that "*we don't plan for them, but again if we can take advantage of— during times we've had significant price increases in acquisitions*." Rather than disclosing the deceptive tactics to implement the price increases, Pearson claimed Valeant was able to raise prices by buying products from companies "*that did not price their product the right way;*"

(iii)   Pearson said they raised the prices of blood-pressure medications Isuprel and Nitropress because Marathon Pharmaceuticals, from which Valeant had purchased those drugs, left money "on the table"; he further claimed the drugs were priced much lower than competitive products, stating they raised prices "*because the drugs were mispriced vs. comparative products*," adding "*that can create lot of value[] for shareholders;*''

(iv)   Pearson further stated "*we've been accused of our growth being price and not volume*" but claimed "*organic growth is more volume than price and will continue to be;*"[2] and

(v)   Pearson reassured investors "*our accounting practices are fine*" and added "*[w]e get audited all the time, by the SEC . . . and we have absolutely no issue from a government standpoint,*" and "*we never had a financial irregularity.*

(l)   During Valeant's July 23, 2015 earnings call, Pearson was asked about a price increase on the diabetes drug Glumetza and the "extent to which you envision more pricing power . . . broadly speaking, in the U.S.?" He responded:

I think most pharma companies that I'm aware of, as the product gets into the last stages of their life, like Glumetza—we're going to lose Glumetza within six months—often price increases are taken at the end. *So that was just consistent with what most companies do*.

*Our view on pricing*—across most of our portfolio, we do not take prices. Outside the US, there's like zero price. I think, . . . as we get more and more

---

[2] In a May 21, 2015 email to Pearson with the subject "price/volume," Schiller stated: "Last night, one of the investors asked about price versus volume for Q1. Excluding [M]arathon, price represented about 60% of our growth. If you include [M]arathon, price represents about 80%." Additionally, on May 26, 2015, an RBC analyst reported that one of the key takeaways from the meetings with Valeant management and Pearson was "volume not price is fueling organic growth."

into segments like contact lenses and consumer products and other devices, we're not able to take price. So we're opportunistic when it comes to price. **But our base strategy is, how do we grow organically through volume, which is—I think this quarter, we once again exhibited our ability to do so**.

**B.    Defendants' Statements Were False or Misleading When Made Because Valeant Was Engaged in a Fraudulent Scheme to Charge Exorbitant Prices for Its Drugs**

**1.    Valeant's Business Model Relied on Massively Increasing the Prices for Drugs it Acquired**

127.    As discussed in Section IV above, contrary to Valeant's representations regarding its growth model and the significance of increasing sales volumes to the Company's financial success, Valeant's business strategy was predicated on massive drug price increases.

128.    Specifically, Valeant saw orphan drugs as affording a prime opportunity to boost revenue by increasing prices.  While the higher prices could attract generic competitors, generic drugs face a 42-month backlog at the FDA for approval.  Valeant took advantage of that time lag to engage in price gouging to meet financial targets.

129.    Internal Valeant documents released in connection with Congress's investigation of the Company illustrate Defendants' strategy of acquiring drugs and then massively increasing their prices.  A February 2, 2016 memorandum from Democratic staff members to Democratic members of the House Committee on Oversight and Government Reform ("House Oversight Committee"), for example, recounts the process by which Valeant purchased Isuprel and Nitropress from Marathon for $350 million "and increased their prices by 525% and 212% overnight."

130.    The House Oversight Committee memo states that e-mails to and from Valeant executives (including Pearson), internal and external Company projections and analyses on revenues and profits, and "public relations strategy documents" indicate Pearson "purchased

Isuprel and Nitropress in order to dramatically increase their prices and drive up his company's revenues and profits."  The memo makes several other key observations based on the documents, as recounted below.

131.   *First*, the documents demonstrate "Valeant identified goals for revenues first, and then set drug prices to reach those goals."  Valeant "employed this strategy for both Isuprel and Nitropress, generating gross revenues of more than $547 million and profits of approximately $351 million in 2015 alone," whereas Valeant's R&D expenses for Isuprel and Nitrporess were "nominal."

132.   *Second*, the documents show "Valeant employed a public relations strategy used by other drug companies to distract public attention away from its price increases to focus instead on patient assistance programs, particularly with respect to several Valeant drugs that treat small patient populations."  Indeed, the documents indicate "Valeant used its patient assistance programs to justify raising prices and to generate increased revenues by driving patients into closed distribution systems."

133.   *Third*, while Valeant officials anticipated both Isuprel and Nitropress would eventually face competition from generics, the documents show that those executives "sought to exploit this temporary monopoly by increasing prices dramatically to extremely high levels very quickly."

134.   *Fourth*, information obtained by the House Oversight Committee "shows that Mr. Pearson utilized this strategy with many more drugs than Isuprel and Nitropress."  Specifically, "[f]rom 2014 to 2015, Valeant increased the prices of more than 20 additional 'U.S. Prescription Products' by more than 200%"; the Company "raised the prices of several of these products multiple times from 2014 to 2015, in some cases by as much as 800%."

**2.     Defendants Further Concealed From Investors That Valeant Created a Secret Network of Captive Pharmacies to Insulate its Branded Drugs From Generic Competition, Inflate Prices and Book Fictitious Sales**

135.     Also, as discussed in Section IV above, Valeant devised a scheme to funnel sales through a nationwide network of captive pharmacies to protect its price gouging practices from generic competition.  Through this secret network, Valeant was able to insulate its products from generic competition by:  (i) violating statutory or contractual mandates requiring substitution of generic equivalents for Valeant-branded drugs; and (ii) submitting false claims information to TPPs and PBMs.  These fraudulent practices caused TPPs and PBMs to overpay for Valeant's expensive branded drugs, enabling Valeant to artificially boost sales and reap enormous profits from the price-gouging practices discussed above.

136.     After Philidor was formed, Defendants created a host of shell companies tied to it, which they used to acquire interests in smaller retail pharmacies throughout the United States and secretly extend their captive pharmacy network.  As discussed above, Defendants created a network of at least 76 "phantom" pharmacies by causing Philidor or its affiliates to file with state regulators pharmacy applications on behalf of various shell companies that Valeant and Philidor used to implement their scheme.

137.     Defendants used Valeant's network of pharmacies to channel prescriptions for Valeant's drugs through Philidor, where Valeant and Philidor employees used various fraudulent means to ensure that Valeant's branded drugs, rather than generics, were dispensed.  Defendants' misconduct violated the laws of at least 14 states, which require pharmacists to substitute generic equivalents for branded drugs, as well as contracts between the pharmacies and TPPs or their PBM agents, which typically require the pharmacy to dispense a generic substitute for a branded drug where available.  Further, by minimizing generic substitution, and thus substantially shielding Valeant drugs from generic competition, Defendants inflated the prices of Valeant's drugs far

beyond the prices at which they had previously been marketed and sold.

138.    And by concealing Valeant's relationship with Philidor, Valeant's relationships with its network of pharmacies, and the pharmacies' relationships with each other, Defendants were able to spread claims across ostensibly unrelated pharmacies.   That practice caused Defendants' misconduct to go undetected by:  (i) creating the false impression that pharmacies had independently determined to dispense Valeant's high-priced drugs for legitimate reasons and (ii) burying fraudulent claims among the large volume of the pharmacy network's claims.

139.    Valeant also did not disclose Philidor in any of its SEC filings during the Class Period before October 19, 2015.  Likewise, Philidor never publicly discussed the nature of its relationship to Valeant before October 19, 2015.

140.    Additionally, Defendants made false or misleading statements directly to TPPs, their PBM agents, and their members/beneficiaries to improperly maximize the reimbursements paid by TPPs and to boost Valeant's drug sales.  Many aspects of Defendants' fraudulent schemes were catalogued in manuals distributed to Philidor employees to guide their handling of claims submitted to TPPs.

141.    *First*, Defendants instructed Philidor employees to change codes on prescriptions to require that they be filled with Valeant's drugs as opposed to less-expensive generic alternatives, *i.e.*, to be "dispensed as written."  As *Bloomberg* reported on October 29, 2015, former Philidor employees explained that practice was frequently implemented with respect to certain key Valeant dermatological products that encountered repeated denials from TPPs, such as Retin-A Micro (used to treat acne) and Vanos (used to treat skin conditions such as eczema).

142.    *Second*, Defendants used false pharmacy identification information to bill TPPs for prescriptions to bypass the TPPs' denials of claims for reimbursement.   Defendants' claims-

57

handling manual instructed Philidor employees to submit claims to TPPs or their PBM agents using Philidor's National Provider Identification Number, or "NPI."  If a claim was rejected, employees were instructed to resubmit that claim using an NPI belonging to a different pharmacy in Defendants' captive network—that is, to claim a pharmacy had dispensed a prescription it did not in fact dispense, and in some cases did not even stock.

143.    As reported by *Bloomberg*, Defendants' claims-handling manual instructed employees who received certain denials from TPPs to "submit the NPI for our partner in California, West Wilshire Pharmacy," noting "[t]here is a good chance they are contracted."  If a claim using West Wilshire's NPI was denied, the next step was to "add the Cambria Central Fill insurance and run that as the primary"—one of Philidor's secret retail pharmacies based out of Philadelphia, Pennsylvania. The manual stated, "They should then get a paid claim and then Cambria . . . will reimburse us."

144.    Likewise, Defendants routinely caused pharmacies in the Valeant network, including Isolani, to use the NPI belonging to California-based R&O Pharmacy, one of the constituents of Defendants' captive network, to bill for prescriptions R&O had never filled, and in some cases did not even stock. In a July 19, 2015 email to R&O, Philidor CEO Andrew Davenport acknowledged he was aware of that practice.  And in an interview with the Southern Investigative Reporting Foundation, Taylor Geohagen, a former Philidor claims adjudicator during the Class Period, confirmed that practice was routinely implemented:  "Everything we did in the [Philidor] Adjudication department was use the [NPI] codes from the pharmacies we bought out to get something [approved] in a pinch."

145.    To conceal Defendants' use of false pharmacy identification numbers, Philidor and Valeant also submitted false or misleading payer audits to TPPs (or to their PBMs) on behalf of

the retail pharmacies with which Valeant was secretly associated, falsely representing that the pharmacy had filled certain prescriptions when in fact those prescriptions had been filled by Philidor or one of its other captive pharmacies.  Defendants and their agents also misrepresented their authority to approve the audit statements on behalf of the retail pharmacies, and in some cases forged the signatures of principals at those pharmacies.  As Russell Reitz of R&O noted in a July 14, 2015 email to Philidor Senior Director Eric Rice, Philidor had billed R&O for prescriptions that were either "filled by some other pharmacy" or "were filled and billed before the execution of the R&O purchase and sale agreement" and thus fraudulently billed using Reitz's National Council for Prescription Drug Programs ("NCPDP") number without his knowledge or consent.

146.    *Third*, in submitting numerous prescription renewals for reimbursement, Valeant and Philidor falsely represented to TPPs and their PBM agents that patients had requested renewals of their prescriptions when in fact no such request had been made. As *New York* magazine reported on January 13, 2016, Defendants caused Philidor and its captive pharmacies to automatically refill patients' prescriptions for Jublia, among other Philidor-dispensed Valeant drugs, notwithstanding that the patients had not requested any refills, and made it virtually impossible for patients to decline or cancel those automatic refills. As discussed above, Philidor's practice of waiving patient copays in connection with Defendants' fraudulent scheme allowed it to go undetected, as patients were not incentivized to complain about unnecessary refills for which they were not charged a copay.

147.    *Fourth*, when submitting claims to TPPs, Defendants misrepresented to TPPs the dispensing pharmacy's "actual charges" for Valeant drugs by failing to account for Defendants' practice of routinely waiving patient copays.  The collection of copays from insureds incentivizes them to select generics when available and only refill medications when needed, whereas waiving

copays discourages patients from actively avoiding low-value or medically unnecessary medicines.  PBM contracts with pharmacies therefore mandate that pharmacies make every attempt to collect the copayment and submit claims reflecting their "actual charges," taking into account any discounts or waivers applied.  Defendants routinely waived copays for patients prescribed Valeant drugs, but when submitting claims for such prescriptions Defendants falsely represented to TPPs that the patient had been charged the full price of the drug.

148.    *Fifth*, Defendants made misrepresentations directly to patients to boost Valeant's drug sales.  Specifically, Defendants disseminated false statements (including in brochures and coupons) to doctors and patients that falsely promised patients Valeant drugs at no cost only if they submitted their prescriptions directly to Philidor.  By encouraging patients to submit claims directly to Philidor, Defendants ensured that prescriptions for Valeant drugs would not wind up being filled by a non-captive pharmacy that would substitute cheaper generics for the branded drugs, but would instead end up at Philidor, where Valeant's branded drugs would be dispensed.  To induce those patients to take advantage of the discounts, the coupons falsely assured them that their TPPs would not be billed.

149.    To further aid their fraud, Defendants made it difficult for patients to contact Philidor to complain, for example, that their insurers had been billed in contravention of promises made in coupons and sales literature or that they had received unrequested refills.  For example, Philidor invested very little in creating a call center to handle customer complaints and problems; customers and patients routinely reported that they were directed to sales staff when they tried to report those problems.

150.    Notably, before Valeant's $100 million payment to Philidor, Valeant's senior management and members of the Board, including the entire Audit Committee, went on site visits

to Philidor during which Valeant was provided further access and exposure to Philidor's business practices and operations.   After the payment, Valeant intentionally avoided disclosing its relationship with Philidor in its financial statements.   Defendants concealed from investors (as well as physicians, patients, private payors, and PBMs) the $100 million payment, Valeant's controlling relationship, and that Philidor's financials were being consolidated into Valeant's.

151.   Further, Valeant used that hidden relationship to inflate its revenues.   Defendants knew that after the formal consolidation of Philidor was completed, Valeant was prohibited from recording revenue for shipping products to Philidor, because that was tantamount to shipping products to itself.   Instead, to enable it to properly recognize revenue, Valeant would have to wait until Philidor shipped the products to patients.   Accordingly, before the agreement was signed in December 2014, Valeant shipped millions of dollars of products to Philidor to inflate Valeant's revenue. That manipulative practice clearly violated GAAP.   Nevertheless, Schiller, Carro, and the entire Valeant Board approved the accounting with respect to Philidor.

### 3.   Defendants Also Concealed from Investors that Valeant Deceptively used "Patient Assistance Programs" to Facilitate its Fraudulent pricing scheme

152.   As noted in Section IV above, Valeant further facilitated its fraudulent pricing scheme by systematically causing patient copays for drugs to be waived when submitting claims to insurance companies and other TPPs.   The undisclosed copay waivers led patients to obtain higher-priced Valeant drugs rather than lower-priced generic substitutes and to obtain unnecessary refills, whose costs were reimbursed by insurance companies and other TPPs.   Had the copays not been waived, patients would have had the incentive to choose lower-cost generics and avoid unnecessary prescriptions.   Further, had Defendants properly disclosed their routine waiver of patient copays, PBMs and TPPs would not have paid the prices they did for the relevant Valeant-branded drugs, or paid for them at all.

61

153.    Valeant thus used its PAPs as another deceptive tactic to conceal its price gouging from private payors, and in turn to reduce patient complaints, minimize patients' refusal to accept unnecessary refills or enrollment in automatic refill programs and avoid negative publicity.

154.    Valeant also directed patients into its secret network of pharmacies and offered discounts as a means to quell any pushback on price increases for its drugs.  Valeant developed a PR strategy to divert attention from any negative media regarding patient complaints over massive price increases by highlighting their purported increased PAPs.

155.    An internal Valeant analysis outlining the Company's "Orphan Drug Model" for Syprine, Cuprimine, and Demser (used to treat pheochromocytoma, a tumor that forms in the adrenal glands) reflected that strategy.  The analysis stated "[t]ake initial 25% price increase to drive patients into the restricted distribution model," and noted "[h]igh deductible copay requires increased foundation support." The analysis "assume[d] target price increases of 100% for Demser and Cuprimine" and "price target increases of 500% for Syprine."

156.    Another internal Valeant presentation detailed the proposed launch of a new PAP called "Valeant Coverage Plus Program." The presentation stated "[t]he program will be funded through planned price increases [i.e. funded by higher prices to payors rather than by Valeant]." The analysis directed claim adjudicators to "[u]tilize all of patient resources prior to co-pay mitigation or foundation assistance" when adjudicating claims and to use a "[p]atient assistance program or free goods as last resort." The presentation noted Valeant had an opportunity to expand utilization "for niche brands" that "[i]nvolves a combination of alternative/restricted distribution model, advocacy support and patient assistance programs" along with "planned pricing actions expected to maximize overall returns."

157.   The presentation also identified the risks of such tactics (which were concealed from investors), including that "[s]ubstantial price actions could attract undue negative publicity from patients, HCP's [healthcare providers], payors, and/or government agencies" and "Managed Care plan actions against products could limit/ restrict re-imbursement."  To address the risks, the presentation included a "PR Mitigation" plan to "[p]rivately address concerns from patients, insurance companies or managed care providers to prevent public displays of negative sentiment" and "[m]inimize media coverage of the pricing increase."

158.   As part of the PAP and PR strategy, the presentation also encouraged false or misleading responses to inquiries about price increases.  A draft Q&A directed that the response to the question "Isn't Valeant just trying to make insurers and managed care providers pay as much as possible for these drugs?" was:  "No.  These rate increases are essential to ensure that Valeant is able to continue to offer these important pharmaceuticals to our patients who are afflicted with Wilson's disease while also remaining commercially viable."  Valeant's costs of producing those drugs in fact had not increased and the price increases (which resulted in gross margins exceeding 90%) were not required to keep Valeant commercially viable.

159.   Valeant also targeted its deceptive assistance programs at hospitals and other healthcare providers, which came to light in the Senate Aging Committee hearings.  In a letter to Senator Claire McCaskill dated October, 30, 2015, Pearson stated "for those institutions where the impact [of price gouging] was significantly greater, we are beginning to reach out to hospitals to determine an appropriate pricing strategy."  Valeant soon announced a 30% discount program.  As stated above, at the April 2016 hearing, Senator McCaskill noted she had not found a single hospital that had received the discounts.  Hospital-affiliated witnesses at the hearing also denied

receiving the discounts, and several more sent letters to the Senate Aging Committee stating they had not received any such discounts.

### 4.      The R&O Pharmacy Lawsuit

160.     As discussed above, aspects of Valeant's scheme were illustrated through an inquiry by R&O, which its owner Russell Reitz sold to Philidor on December 1, 2014.

161.     Following the sale, R&O was inundated with thousands of prescriptions from doctors using Philidor's mail-order service—dwarfing the customary size of R&O's business. Philidor sent R&O bulk orders of Valeant drugs and Reitz dispensed them to patients directly or by mail.  Payment later arrived in the form of paper checks from health insurers, with each check covering hundreds of patients and typically made out for over a million dollars.

162.     Not only was the volume of Philidor-channeled patients unusually large, the prescriptions Philidor was filling were extraordinarily expensive, even compared to the specialized prescriptions R&O usually dispensed.  Yet most of the overpriced prescriptions R&O was filling were Valeant drugs indicated for simple dermatological conditions, such as Solodyn for acne, Elidel for eczema, and Jublia for toenail fungus.

163.     In March 2015, Reitz received an audit from one of his PBMs, which showed R&O was being used by Philidor to fill thousands of prescriptions across the country. Those prescriptions had been filled with Reitz's name and R&O's NPI, but they were dispensed to patients Reitz had never heard of and many were for medications R&O did not carry.  Some prescriptions were even backdated to dates from before Reitz had sold R&O to Philidor.  Those practices continued throughout the summer of 2015, when R&O began investigating Philidor. R&O's investigation uncovered that (as discussed above) Philidor filed an application with the California Pharmacy Board in 2013 that was denied because it contained "false statements of fact."

Reitz then realized Philidor had purchased R&O to use it as a channel through which to conduct business in California and circumvent the California Pharmacy Board's denial.

164.     On July 14, 2015, Reitz wrote an email to Philidor Senior Director Eric Rice to address "the issue of Philidor's improper, and perhaps illegal, use of my [pharmacy] number without my knowledge or consent to bill for prescriptions that were" either filled by other pharmacies or billed before the execution of the agreement to purchase R&O.  Reitz demandedthey cease the practices immediately, adding that the agreement required Philidor/Isolani to apply for a permit and asking for all documents relating to the application.

165.     On July 19, 2015, Philidor CEO Andrew Davenport emailed Reitz stating Philidor stopped using R&O's NPI number and "halted activity pending coming to some alignment with you."  On July 21, 2015, Rice and several Philidor executives, including Davenport, Philidor's Controller James R. Fleming, and its General Counsel Gretchen Wisehart, flew to California to meet Reitz at R&O.  The meeting did not satisfy R&O's concerns, and the next day counsel for R&O sent a letter to Rice noting they "appear[ed] to be engaging in a widespread fraud."

166.     On August 18, 2015, Fleming emailed Reitz suggesting responses to an audit. One of the issues identified in the audit was the large number of prescriptions being filled by R&O that were shipped to patients from Pennsylvania, where Philidor was based.

167.     On August 31, 2015, counsel for R&O sent a notice of termination to Isolani's law firm, stating "[i]t is now crystal clear that Isolani/Philidor fraudulently induced Mr. Reitz to sign the [Sale, Management Services, and related] Agreements in order to allow Isolani/Philidor to engage in a massive fraud." R&O's counsel added "Isolani is simply a shell created by Philidor to perpetrate a massive fraud against not only Mr. Reitz and R&O, but also the California State Board of Pharmacy, [and] various payer networks."  R&O's counsel noted Philidor had been denied a

California license and "targeted Mr. Reitz and R&O back in the fall of 2014 because it needed access to R&O's valuable multi-state pharmacy licenses and payer contracts," and "Philidor then created Isolani as the instrumentality to improperly use R&O's NCPDP and NPI numbers to distribute pharmaceuticals in jurisdictions that Philidor would not have had access to but for R&O." Counsel added "Mr. Reitz's worst fears have been realized, as he has obtained irrefutable proof that despite Mr. Davenport's written assurance, Isolani/Philidor continue to use R&O's . . . NPI numbers to bill payors for prescriptions dispensed by Philidor," and asserted "Mr. Reitz now has concrete evidence that representatives of Isolani/Philidor have signed false and misleading payer audits and falsely represented themselves as officers or employees of R&O . . . to certain payors."

168.    In response to Reitz's investigation of Philidor, he received letters from Valeant's General Counsel demanding $69 million in payments from R&O. Those letters made clear that Valeant was acting in concert with Philidor to perpetrate the conduct of which Reitz complained.

169.    On September 6, 2015, Isolani's counsel sent an email informing R&O's counsel that they were seeking a protective order against Reitz and for an accounting. R&O's counsel responded that Isolani had known for "at least six weeks that Mr. Reitz was in receipt of checks paid to his company to protect himself and his company from the massive potential / actual civil, regulatory and even potential criminal liability that your clients have exposed him to due to their malfeasance," adding that the conduct was outlined in prior correspondence "to which your clients have provided no denials."

170.    R&O claimed that it never received a previous invoice from Valeant for any amount and that either Valeant and R&O were "victims of a massive fraud perpetuated by third parties" or

"Valeant is conspiring with other persons or entities to perpetuate a massive fraud against R&O and others."  Reitz ultimately filed suit against Valeant.

## VI.   DEFENDANTS MISLED INVESTORS REGARDING VALEANT'S RELATIONSHIP WITH PHILIDOR AND OTHER PURPORTEDLY INDEPENDENT ENTITIES

### A.   Defendants Made False or Misleading Statements Regarding Valeant's Control over Third-Party Distributors and Its Association with Variable Interest Entities.

171.   Defendants stated repeatedly during the Class Period that "pricing and sales volume of certain of our products . . . are distributed by third parties, over which we have no or limited control."  Defendants made that representation in Valeant's (1) 1Q13 10-Q; (2) 2Q13 10-Q; (3) 3Q13 10-Q; (4) 2013 10-K; (5) 1Q14 10-Q; (6) 2Q14 10-Q; (7) 3Q14 10-Q; (8) 2014 10-K; (9) 1Q15 10-Q; and (10) 2Q15 10-Q.

172.   Defendants also repeatedly represented that Valeant had no material association with or exposure to variable interest entities ("VIEs"), defined by GAAP as legal entities subject to consolidation.   In its 2013 10-K, for example, Valeant stated "[t]here were no material arrangements determined to be variable interest entities."

173.   Similarly, in the "Business Combinations" section of its 2014 10-K, Valeant stated that during 2014 it "completed other smaller acquisitions, including the consolidation of variable interest entities, which are not material individually or in the aggregate," and that those acquisitions were "included in the aggregated amounts presented" in the 10-K.  Valeant repeated that representation in its 1Q14 10-Q.

174.   Valeant further stated in its 2014 10-K that "[t]he consolidated financial statements include the accounts of the Company and those of its subsidiaries and any variable interest entities ('VIEs') for which the Company is the primary beneficiary."

175.    The offering materials issued in connection with the March 2015 Stock Offering also discussed the Company's "Other Recent Acquisitions," but failed to mention Valeant paid $100 million for the option to acquire Philidor just three months prior to the March 2015 Stock Offering, and claimed the Company was "not currently a party to any significant transactions" other than its acquisition of Salix Pharmaceuticals, which was being funded by the proceeds of the stock offering.

176.    The March 2015 Stock Offering materials also stated Valeant's "inventory is held at retail pharmacies and other non-wholesale locations over whose buying patterns we will have limited influence" and the "pricing and sales volume of certain of our products (or Salix's products) . . . are distributed or marketed by third parties, over which we have no or limited control."

177.    During the Company's July 23, 2015 conference call, a Jefferies LLC analyst questioned whether the number of prescriptions for Jublia going through specialty pharmacy channels had improved. Valeant's Company Group Chairman Ari Kellen responded:

> ***Yes, the adoption through multiple specialty pharmacies continues.*** I think last time we said Jublia was around 50%. That trend continues. For derm[atology] overall, it varies by product, but it's around 40%.

**B.    Defendants' Representations were False or Misleading When Made, in Light of Valeant's Relationship with Philidor**

178.    The above statements were false or misleading when made because:  (1) Philidor was formed with the assistance and for the benefit of Valeant to increase the sales prices of Valeant-branded pharmaceutical products and to avoid substitution of Valeant drugs with competing generic products; Valeant employees worked at Philidor; Valeant was Philidor's only client and had the ability to shutter its business; Valeant paid Philidor's owners $100 million for the right to acquire Philidor for $0; Valeant was consolidating Philidor's results as its own, and

had obtained explicit rights to direct Philidor's activities; and those facts were being concealed by Valeant from private payors, patients, physicians, PBMs, and investors; (2) as detailed above, Valeant materially increased its sales volume through Philidor as Philidor expanded its network of pharmacies and began selling in states where it did not have, or had been denied, a license; and (3) as noted above and detailed below, Valeant improperly recognized Philidor revenue, in violation of GAAP, causing Valeant's revenues, net income, and EPS to be materially misstated.

## VII.   AS A RESULT OF DEFENDANTS' MISCONDUCT, VALEANT'S FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED AND IN VIOLATION OF GAAP

179.   Throughout the Class Period Valeant's periodic financial statements filed with the SEC represented that Valeant's financial results were prepared in accordance with GAAP. Financial statements filed with the SEC are presumed to be misleading and inaccurate if they have not been prepared in conformity with GAAP.  *See* Regulation S-X, 17 C.F.R. § 210.4-01(a)(1). That presumption also applies to interim financial statements filed with the SEC.  *See* 17 C.F.R. § 210.10-01.

180.   Valeant has admitted that its reported revenues for the financial periods below were overstated by the following amounts during the Class Period:

| Financial Period | Amount By Which Reported Revenue Was Overstated |
|---|---|
| 3 months ended Sept. 30, 2014 | $12.9 million |
| 3 months ended Dec. 31, 2014 | $44.6 million |
| 12 months ended Dec. 31, 2014 | $57.5 million |
| 3 months ended Mar. 31, 2015 | $20.8 million |
| 6 months ended June 30, 2015 | $20.8 million |
| 9 months ended Sept. 30, 2015 | $20.8 million |

181.   Valeant's financial statements during the Class Period were materially misstated and violated GAAP (and certain of the Company's critical accounting policies) in numerous ways,

including:   (1) by improperly recognizing Philidor revenue, in violation of GAAP; (2) by concealing Philidor as a VIE, in violation of GAAP as well as Financial Accounting Standards Board ("FASB") Accounting Standards Codification Topic 810, Consolidation; (3) by concealing information regarding the impact of Philidor and price increases on its reported revenue and earnings, in violation of SEC disclosure rules; and (4) because Defendants' false or misleading statements were quantitatively and qualitatively material, including as contemplated by SEC Codification of Staff Accounting Bulletins Topic 1-M, Materiality.   Additionally, as detailed below, Defendants falsely certified that Valeant's internal controls over financial reporting and its disclosure controls were effective, in violation of SOX and SEC rules, as well as the Committee of Sponsoring Organizations, Internal Control – Integrated Framework ("COSO Framework").

### A.    Valeant Improperly Recognized Philidor Revenue

182.    On March 21, 2016, Valeant confirmed that it had materially overstated Philidor revenue in violation of GAAP and would be restating its financial statements for fiscal year 2014 and the first nine months of fiscal year 2015, and that, as a result, the Company's 2014 10-K and its 1Q15, 2Q15, and 3Q15 10-Qs could no longer be relied on.  Valeant concluded that before its purchase option agreement with Philidor in 4Q14, certain sales transactions involving Philidor were not executed in the normal course of business and collectability was not reasonably assured at the time the revenue was recognized.  *See* FASB Accounting Standards Codification Topic 605, Revenue Recognition; SEC Staff Accounting Bulletin No. 104 ("SAB 104").

183.    As discussed earlier, Valeant entered into a purchase option agreement with Philidor on December 15, 2014.  Valeant previously had recognized revenue on sales to Philidor when Valeant delivered products to Philidor, *i.e.*, on a sell-in basis.  After entering into the option agreement, however, Valeant was required to recognize revenue when Philidor distributed the products to the end customers (patients), *i.e.*, on a sell-through basis.

184.    In 4Q14, leading up to the option agreement's execution, Valeant improperly recognized revenue on sales transactions with Philidor that were not executed in Valeant's normal course of business, but rather to inflate revenues.  As Valeant admitted in its 2015 10-K, those purported sales transactions included "fulfillment of unusually large orders with extended payment terms and increased pricing, an emphasis on delivering product prior to the execution of the purchase option agreement and seeking and filling a substitute order of equivalent value for an unavailable product."  Valeant recorded revenue from those improper sales transactions.  Further, after recording revenue on those fictitious sales, and after executing the option agreement, Valeant recognized revenue a second time as Philidor sold the same products to end customers.

185.    With respect to the 4Q14 Philidor transactions, collectability was not reasonably assured at the time the revenue was originally recognized, and thus should not have been recognized.  Valeant accordingly acknowledged in its March 21, 2016 press release that the Company's financial statements for the year ended December 31, 2014 were materially misleading and required restatement.

186.    The Philidor-related misstatements and disclosure violations were each quantitatively and qualitatively material to Valeant's financial statements during the Class Period.  For example, Valeant emphasized its U.S. organic sales growth and dermatology sales growth throughout the Class Period, of which sales to Philidor constituted a material portion.  Further, the improperly recognized revenue from Philidor transactions enabled Valeant to meet its "Cash EPS" of $2.58 for 4Q14 and exceed its 4Q14 Cash EPS guidance of $2.55.  Had such revenues been properly recognized, Valeant would have missed its guidance and reported Cash EPS of $2.51.

**B.      Defendants Concealed the Impact of Philidor Transactions, as Well as the Massive Price Increases for Valeant Drugs, on the Company's Revenues**

187.    Valeant also failed to disclose the Philidor relationship and its impact on the Company's revenues, as well as Valeant's dependency on price increases, in the Management's Discussion and Analysis ("MD&A") section of each of quarterly and annual report Valeant filed during the Class Period.

188.    During the Class Period, Valeant repeatedly emphasized U.S. organic sales growth and sales growth in its dermatology segment, as well as the role of volume increases, as opposed to price increases, on its revenue growth.   Further, as detailed above, the Valeant pharmacy network and price increases were major drivers of the Company's purported revenue and profitability growth trends during the Class Period, including U.S. organic sales growth, dermatology, and neurology sales growth, and overall prescription volume growth.   Valeant accordingly was required to disclose Philidor's impact on Valeant's revenue growth.   But Valeant failed to disclose those facts in the MD&A sections of its SEC filings until 3Q15.

189.    Valeant was also required to disclose the trend of increasing sales through Philidor because Philidor was a separate sales channel with different characteristics than Valeant's traditional sales channels.   SEC staff provides specific examples of required MD&A disclosures regarding sales channels, including "[c]hanging trends in shipments into, and sales from, a sales channel or separate class of customer that could be expected to have a significant effect on future sales or sales returns."   SAB 104, Topic 13.B.   During the Class Period, Valeant disclosed "[p]rovisions to reduce gross product sales to net product sales" in its financial statements.   The sales provisions as a percentage of gross sales increased significantly throughout the Class Period, including increases of 47%, 7%, and 28% in 2013, 2014, and 3Q15, respectively.   But Defendants failed to disclose that those significant increases in provisions were tied to deceptive practices,

such as routing patients into Valeant's secret pharmacy network and improperly using PAPs. Valeant failed to disclose Philidor as a distinct sales channel and, as a result, Valeant's reported growth was not indicative of future performance.

190. As described above, Philidor also employed practices to deceive TPPs. As a result, Valeant's sales, through its concealed relationship with Philidor, were unsustainable. When private insurers and PBMs became more aware of Philidor and its practices in late 2015, they immediately stopped reimbursing Philidor. As a result, Valeant closed Philidor. The significant financial impact that Philidor's closing ultimately had on Valeant's future financial results, including its revenues and earnings, is the type of information Valeant was required to disclose under the SEC's MD&A rules, *i.e.*, that Valeant's results were not indicative of future results due to the significant negative impact Valeant would suffer were Philidor to close.

191. Finally, Valeant was required to disclose its price gouging, which constituted a major driver of the Company's revenue and profitability growth trends, in its annual and quarterly reports. Indeed, at the April 27, 2016 hearing of the Senate Aging Committee, Pearson testified that Valeant's 1Q13 to 3Q15 revenue growth and profitability were driven primarily by price, not volume. When asked if he could name a single drug that Valeant acquired where it did not raise the price, Pearson responded "[n]ot in the United States." In light of those facts, Valeant was required to disclose its dependency on, and the impact of, price increases on its reported revenues and earnings, as Item 303 of SEC Regulation S-K ("Item 303"), 17 C.F.R. § 229.303, explicitly requires reporting issuers to report details in MD&A disclosures describing changes in volume or price that impact reported revenues. Moreover, in SAB 104, SEC staff makes it clear that an analysis of volume and price changes affecting changes in revenue are required MD&A

disclosures.  As detailed above, Valeant's dependency on price increases and their impact on Valeant's reported revenues were concealed from investors during the Class Period.

192.    The SEC MD&A rules require disclosure of material events that would cause reported financial information to not necessarily be indicative of future operating performance. Because of the unsustainable nature of Valeant's deceptive practices, Valeant was required to disclose the practices and associated risks and that its financial performance was not indicative of future results.  As discussed below, in October 2015 Valeant provided certain disclosures regarding price and volume as part of its 3Q15 earnings presentation, which were not provided earlier in the Class Period.  Valeant's October 19, 2015 investor presentation, for example, showed that through the first nine months of 2015, volume for the Company's neurology business had declined 7% while net realized price had increased 30%—thus demonstrating that without price increases, revenues for neurology would have declined.

193.    Valeant's 10-Ks and 10-Qs were also materially false or misleading because they failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a material adverse effect on the Company's liquidity, net sales, revenues, and income from continuing operations, as required by Item 303.

## C.    Valeant Failed to Report Philidor as a VIE

194.    Valeant also failed to disclose Philidor as a VIE.  Under FASB Accounting Standards Codification Topic 810, Consolidation ("ASC 810"), a company must disclose in its financial statements both unconsolidated and consolidated VIEs.  In its October 26, 2015 investor presentation, Valeant admitted it had considered Philidor a VIE before entering into the purchase agreement.  Accordingly, pursuant to ASC 810, Valeant was required to determine if Philidor needed to be consolidated in its financial statements.  The relevant test for determining if a VIE

should be consolidated is determining whether or not the company is the "primary beneficiary" of the VIE.

195.    In its October 26, 2015 presentation, Valeant claimed it was not the primary beneficiary of Philidor until after the purchase option agreement was executed in December 2014. But ASC 810's guidance nonetheless required disclosure of material unconsolidated VIEs. Accordingly, before the December 15, 2014 option agreement, Valeant was required to disclose its unconsolidated VIE relationship with Philidor because it was material.  In particular, Valeant was required to disclose in its pre-December 2014 financial statements:  (1) quantitative and qualitative information about its involvement with Philidor, including Philidor's nature, size, purpose, activities and how it was financed; and (2) the methodology for Valeant's purported conclusion that it was not the primary beneficiary of Philidor, including disclosure of key factors, assumptions and significant judgments used in making that determination.  *See* ASC 810-10-50-5A.  Instead, in violation of GAAP, Valeant stated in its 2013 10-K that "[t]here were no material arrangements determined to be variable interest entities."

196.    Further, following the execution of the purchase option agreement (when Valeant purportedly concluded it was the primary beneficiary of Philidor and consolidated Philidor's financial results), Valeant was required under ASC 810 to disclose, in addition to the information discussed immediately above, which factors resulted in a change of the reporting with respect to the VIE (Philidor), including the impact of the change on Valeant's consolidated financial statements.  *See* ASC 810-10-50-5A.  Valeant failed to disclose that information in its 2014 10-K.

197.    Valeant also failed to make additional VIE-related disclosures necessary to comply with ASC 810's principal disclosure objective of providing users of the Company's financial statements with information concerning:  (1) significant judgments and assumptions made in

determining whether Valeant needed to consolidate Philidor or disclose information about its involvement with Philidor; (2) the nature of, and changes in the risks associated with, Valeant's involvement with Philidor; and (3) how Valeant's involvement with Philidor affected the Company's financial position, financial performance and cash flows.  *See* ASC 810-10-50-8.  But Valeant did not make any required disclosures related to its VIE relationship with Philidor until the Company's 3Q15 10-Q.

## VIII.  DEFENDANTS MISLED INVESTORS REGARDING VALEANT'S INTERNAL CONTROLS, LEGAL COMPLIANCE, AND THE INTEGRITY OF ITS REPORTED FINANCIAL RESULTS

198.    Defendants represented throughout the Class Period that:   (1) Valeant's management evaluated the effectiveness of the Company's disclosure controls and procedures and concluded they were effective; (2) compliance was "very, very important" to the Company; and (3) as mandated by SOX, Valeant's reported financial results were not impacted by fraud.  Those representations were false or misleading when made, however, in light of the rampant misconduct at Valeant.

### A.    Defendants Made False or Misleading Statements Regarding Valeant's Internal Controls.

199.    In its 1Q13 10-Q, Valeant stated:

> Our management, with the participation of our CEO and Chief Financial Officer ('CFO'), has evaluated the effectiveness of our disclosure controls and procedures as of March 31, 2013. Based on this evaluation, our CEO and CFO concluded that our disclosure controls and procedures were effective as of March 31, 2013.

That assurance to investors was likewise included in Valeant's:  (1) 2Q13 10-Q; (2) 3Q13 10-Q; (3) 2013 10-K; (4) 1Q14 10-Q; (5) 2Q14 10-Q; (6) 3Q14 10-Q; (7) 2014 10-K; (8) 1Q15 10-Q; (9) 2Q15 10-Q; and (10) 3Q15 10-Q.

200. Additionally, Valeant's 2013 10-K included Management's Conclusion, signed by Pearson and Schiller, "that our internal control over financial reporting was effective as of December 31, 2013."

201. And Valeant's 2014 10-K, signed by Pearson and Schiller, included "Reports of Management on Financial Statements and Internal Control over Financial Reporting," stating:

> Financial Statements
>
> The Company's management is responsible for preparing the accompanying consolidated financial statements in conformity with United States generally accepted accounting principles ("U.S. GAAP"). In preparing these consolidated financial statements, management selects appropriate accounting policies and uses its judgment and best estimates to report events and transactions as they occur. ***Management has determined such amounts on a reasonable basis in order to ensure that the consolidated financial statements are presented fairly, in all material respects. Financial information included throughout this Annual Report is prepared on a basis consistent with that of the accompanying consolidated financial statements.***
>
> Internal Control Over Financial Reporting
>
> Under the supervision and with the participation of management, including the Company's Chief Executive Officer and Chief Financial Officer, the Company conducted an evaluation of the effectiveness of its internal control over financial reporting based on the framework described in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. ***Based on its evaluation under this framework, management concluded that the Company's internal control over financial reporting was effective as of December 31, 2014***.

**B.   Defendants Touted Valeant's Commitment to Compliance**

202. On July 29, 2013, in connection with Valeant's acquisition of Bausch & Lomb, Valeant filed a Form 8-K attaching a memorandum to employees of the merging companies and a copy of the anticipated organizational chart of the combined entity.  In the memorandum Valeant described its "Organizational Design and Philosophy":

> In the end, our primary mission is to serve the patients and consumers who

use our products, the physicians who prescribe / recommend them and the customers who provide retail outlets for these products. Healthcare companies are held by society to the highest possible ethical standard—and they should be. Adhering to this extremely high ethical bar supersedes any financial or other objective.

\* \* \*

Consistent with our decentralized operating philosophy, our corporate center will be small, lean and focused on . . .

\* \* \*

Ensuring adequate controls to protect our shareholders and to ensure we are in compliance with all regulatory requirements.

203.     Similarly, on Valeant's August 7, 2013 earnings call, Pearson assured investors there were no increased compliance risks accompanying Valeant's non-traditional business model, stating:

> *In terms of compliance, compliance is obviously very, very important for us.* When people come back and they rate our Company on our most positive attributes and our most negative attributes, and at the very top of the list of the positive is ethical. So our employees really do appreciate it. *That's our most important thing that—that comes before everything.*

**C.     Pearson, Schiller and Rosiello Signed SOX Certifications Attesting to the Truthfulness and Accuracy of Valeant's Reported Financial Results**

204.     Beginning in Valeant's 1Q13 10-Q and continuing in all of the Company's other 10Qs and 10Ks during the Class Period, Pearson (as to all of those filings), Schiller (as to filings before 2Q15), and Rosiello (as to the 2Q15 and 3Q15 10-Qs) each signed certifications pursuant to Sections 302 and 906 of SOX attesting that, among other things:

(a)     the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by th[e] report";

(b)    "[b]ased on [his] knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of and for, the periods presented in th[e] report";

(c)    Pearson, Schiller, and/or Rosiello (a) "[d]esigned . . . disclosure controls and procedures, or caused . . . disclosure controls and procedures to be designed under [their] supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to [them] by others within those entities, particularly during the period in which this report is being prepared"; (b) "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under [their] supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements tor external purposes in accordance with [GAAP]"; (c) "[e]valuated the effectiveness of the Company's disclosure controls and procedures and presented in th[e] report [their] conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by th[e] report based on such evaluation"; and (d) "[d]isclosed in th[e] report any change in the Company's internal control over financial reporting that occurred during the Company's most recent fiscal quarter that ha[d] materially affected, or [wa]s reasonably likely to materially affect, the Company's internal control over financial reporting"; and

(d)    Pearson, Schiller, and/or Rosiello "[d]isclosed, based on [their] most recent evaluation of internal control over financial reporting, to the Company's auditors

79

and the audit committee of the Company's board of directors (or persons performing the equivalent functions):

    (i)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which [we]re reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information, and

    (ii)    Any fraud, whether or not material, that involve[d] management or other employees who ha[d] a significant role in the Company's internal control over financial reporting."

205.    Those representations were also included in Valeant's (1) 2Q13 10-Q; (2) 3Q13 10-Q; (3) 2013 10-K; (4) 1Q14 10-Q; (5) 2Q14 10-Q; (6) 3Q14 10-Q; (7) 2014 10-K; (8) 1Q15 10-Q; (9) 2Q15 10-Q; and (10) 3Q15 10-Q.

## D. Defendants' Statements Were False or Misleading When Made, in Light of the Rampant Misconduct at Valeant

206.    The statements recounted in above were false or misleading when made, in light of the rampant misconduct at Valeant.  In sum:

(a)    Valeant's business strategy relied on a series of deceptive practices, which drove the Company's growth in revenues and sales of its key dermatology, neurology, and other products.  Those practices included massive price increases for Valeant drugs, which allowed the Company to meet financial targets; routing patients into Valeant's secret network of captive pharmacies that were falsely made to appear independent; using patient assistance and public relations strategies (such as waiving patient copays) to minimize patient complaints; and concealing those practices from payors, physicians and others to obtain reimbursement for Valeant's high-priced drugs.

(b)    Defendants' business model relied on improper practices by Philidor, which Valeant used to acquire interests in additional retail pharmacies throughout the United States.  Unbeknownst to investors:  (1) Philidor was formed to increase the sales prices of Valeant drugs and to avoid substitution of those drugs with competing generic products; (2) Valeant employees worked at Philidor; (3) Valeant was Philidor's only client and had the ability to shutter its business; (4) Valeant paid Philidor's owners $100 million for the right to acquire Philidor for $0; (5) Valeant was consolidating Philidor's results as its own, and had obtained explicit rights to direct Philidor's activities; and (6) Valeant materially increased its sales volume through Philidor as Philidor expanded its network of pharmacies and began selling in states where it did not obtain, or had been denied, a license.

(c)    Further, Philidor employees, as well as Valeant employees staffed at Philidor, were instructed to employ a host of deceptive practices—referred to in manuals distributed to employees as "back door approaches" to receiving payment from insurance companies—to prevent the substitution of generic equivalents for Valeant-branded drugs.  Those "approaches" included changing prescription codes on claims to require that the prescriptions be filled with Valeant drugs; making claims for refills that were never requested by patients; misrepresenting the identity of dispensing pharmacies to bypass denials of claims for Valeant drugs; and submitting claims that inflated the prices charged by failing to take into account Valeant's waivers of patient copays.

(d)    Valeant's reported revenues, EPS and financial forecasts to investors during the Class Period depended on the Company's ability to continue to conceal its

deceptive practices and did not accurately portray the Company's financial performance and business prospects.  To that end, Valeant improperly recognized Philidor-related revenue, in violation of GAAP, causing Valeant's revenues, net income and EPS to be materially misstated during the Class Period.

(e)     Valeant lacked adequate internal controls, as well as compliance and training programs, and contrary to their representations to investors, Defendants were not committed to compliance with governing legal, regulatory, or contractual obligations.

(f)     Valeant's undisclosed practices significantly increased the Company's exposure to, among other things, government investigations, regulatory sanctions, criminal charges, reputational harm, violations of contracts, decreased sales, and heightened public scrutiny.  Valeant thus was not, as Defendants represented to investors, employing a "lower risk, output-focused research and development model," but rather a strategy that subjected the Company to enormous risk.

(g)     The SOX certifications referenced above falsely stated the accompanying SEC filings did not contain any untrue *statement* of material fact or omit to state a material fact necessary to make the statements made in those filings not misleading.

207.    Additionally, SOX required the use of an appropriate framework in making the assessments to which Pearson and Schiller attested in their SOX certifications, such as the COSO Framework.  During the Class Period, Valeant's financial statements represented that management's evaluations were based on the COSO Framework.

208.    According to the COSO Framework, the control environment sets the tone for the entire structure of internal control and has a pervasive influence on all business activity.  As a

result, deficiencies affecting the control environment are strong indicators of a material weakness. Circumstances that may indicate that a company's control environment is ineffective include "[i]dentification of fraud of any magnitude on the part of senior management" and "[i]neffective oversight of the company's external financial reporting and [internal controls over financial reporting] by the company's audit committee."  *See* Exchange Act Release No. 54976 (Dec. 20, 2006). The concept of "tone at the top" has become widely accepted within the accounting profession to describe the attitude and actions of a company's senior management toward internal financial controls and the control environment.  Indeed, SEC staff has referred to the tone set by top management, *i.e.*, "the corporate environment or culture within which financial reporting occurs," as "the most important factor contributing to the integrity of the financial reporting process."  *See* SEC Staff Accounting Bulletin No. 99.

209.   Control deficiencies that are determined to constitute a "material weakness" must be disclosed in management's annual report on its assessment of the effectiveness of the company's internal controls over financial reporting.  Management may not disclose that it has assessed its internal financial controls as effective if there are one or more control deficiencies determined to be a material weakness.  *See* Exchange Act Release No. 54976.  Indicators of material weaknesses in a company's internal controls over financial reporting include:   (1) identification of fraud, whether or not material, on the part of senior management; (2) restatement of previously issued financial statements to reflect the correction of a material misstatement; (3) identification by the auditor of a material misstatement of financial statements in the current period in circumstances that indicate that the misstatement would not have been detected by the company's internal control over financial reporting; and (4) ineffective oversight of the company's

external financial reporting and internal control over financial reporting by the company's audit committee. *See* AS 5.

210. The misconduct detailed in this Complaint demonstrates that Valeant's internal controls during the Class Period were woefully inadequate. Indeed, Valeant has admitted that material weaknesses in its internal financial controls existed during the Class Period, and that its disclosure controls and procedures were not effective. Specifically, on March 21, 2016, the Company disclosed:

> As a result of the restatement, management is continuing to assess the Company's disclosure controls and procedures and internal control over financial reporting. Management, in consultation with the committee, has concluded that *one or more material weaknesses exist in the company's internal control over financial reporting* and that, as a result, *internal control over financial reporting and disclosure controls and procedures were not effective* as of December 31, 2014 and disclosure controls and procedures were not effective as of March 31, 2015 and subsequent interim periods in 2015 and that internal control over financial reporting and disclosure controls and procedures will not be effective at December 31, 2015.

> * * *

> [A]s part of this assessment of internal control over financial reporting, the company has determined that the tone at the top of the organization and the performance-based environment at the company, where challenging targets were set and achieving those targets was a key performance expectation, may have been contributing factors resulting in the company's improper revenue recognition and the conduct described above.

211. Valeant's 2015 10-K, filed with the SEC on April 29, 2016, confirms the Company's ineffective financial controls, including the existence of two separate material weaknesses as of December 31, 2014 (i.e., the improper "tone at the top" and the failure to detect the Philidor accounting fraud).

IX.  **DEFENDANTS FALSELY REASSURED INVESTORS OF THE SOUNDNESS OF VALEANT'S BUSINESS PRACTICES AND FINANCIAL RESULTS AMIDST QUESTIONS RAISED BY OTHERS**

A.  **Defendants Made Numerous Reassurances in Response to Questions or Concerns Raised in 2014, Mostly in Connection with Valeant's Attempted Acquisition of Allergan**

212.  On April 22, 2014, Valeant issued a press release stating "it ha[d] submitted a merger proposal to the Board of Directors of Allergan under which each Allergan share would be exchanged for $48.30 in cash and 0.83 shares of Valeant common stock."  In total, the unsolicited offer to acquire Allergan, the maker of Botox (a popular anti-wrinkle treatment), was valued at approximately $46 billion. The release disclosed that the proposal was made with the full support of investor Bill Ackman ("Ackman") and Pershing Square, his hedge fund, which had accumulated 9.7% of Allergan's outstanding stock leading up to the proposed acquisition, making it Allergan's largest shareholder.

213.  On May 12, 2014, Allergan issued a press release rejecting Valeant's unsolicited bid, stating its board of directors "believes that the Valeant business model is not sustainable." During a conference call that day, Allergan's Chairman and CEO referred to "the unsustainability of Valeant's business model," emphasized Valeant's lack of organic growth, and cautioned investors to "very carefully" check the results "actually achieved" by Valeant's new product launches and "dig in what are the price increases behind those very low [organic growth] numbers because there are some eye-popping increases of price."

214.  On May 20, 2014, Valeant issued a press release announcing it would be hosting an investor meeting and webcast on May 28, 2014 "to respond to assertions Allergan has made that the Valeant model is not sustainable."  The release continued:  "Our goal for this meeting is *to provide transparency into Valeant's historic, current, and future operating performance and to refute Allergan's allegations through a thoughtful and fact-based presentation*."

215.    On May 27, 2014, Allergan filed a Form 8-K attaching a slide presentation titled "Certain Potential Business Risks and Issues With Valeant Pharmaceuticals International, Inc.," which expressed concern about "Valeant's low organic sales growth (driven mostly by price increases)." It asserted that much of Valeant's growth was attributable to "unsustainable price increases - not volume." The presentation also noted Valeant's "depleted R&D engine" and questioned its "roll-up" business model and "Significant Management Turnover."

216.    On May 28, 2014, Valeant issued a press release announcing it had substantially increased its merger proposal for Allergan by raising the cash consideration, bringing the total consideration to approximately $49 billion. Also that day, the Company hosted its previously announced investor meeting and conference call attended by Pearson, Schiller and Deborah Jorn, during which they refuted Allergan's claims:

(a)    Pearson said they would provide investors with "a much deeper understanding of our operating model and why we believe it is sustainable for many years to come" and show that "when we buy a platform asset, we have either maintained the growth or in most cases, we have accelerated the growth";

(b)    Jorn emphasized the launch of "additional access programs so that patients can get the medicines that their physician prescribes for them";

(c)    Jorn further represented that "in 2014 we have returned the business to growth" and highlighted the growth of dermatology products, including Solodyn and Acanya (medications used to treat acne, which were sold through Philidor):

We have returned many of our core promoted brands to growth. We have new managed care capabilities, we have launched additional access programs so that patients can get the medicines that their physician prescribes for them.

\* \* \*

86

So what type of growth are we talking about? ***It is important that we recognize that we have been able in 2014 to turn around our largest brand, Solodyn***. We entered the year with 49% share, branded share of the dermatology space. We are now up at 51% and as you can see, our competitors have issues. Doryx [used to treat acne] has been declining and Monodox [also used to treat acne] is flat. We are very proud of this accomplishment.

Further, ***we continue to maintain greater than 80% share of the branded Clindamycin/BPO market with our brand, Acanya*** [also used to treat acne]. Despite loss in some major accounts in managed care, we have been able to achieve this;

(d)     Pearson concluded the presentation by claiming Valeant "***has delivered strong organic growth since I have been here***," further stating "***[w]e are very transparent***" and "our basic underlying growth rate is about 8%"; and

(e)     During a question-and-answer session, Pearson was asked to reconcile industry data showing 15% price increases with slides used during the presentation showing a 1% increase.  Pearson claimed Valeant was "***limited***" to "***9%***" price increases in dermatology and denied all of Allergan's claims, stating:   "***We are limited***. For example in the US with our managed care contracts, I think the maximum price increase we can take a year is 9% across dermatology, across ophthalmology, etc. So that is what limits. It is managed care in the United States."  He continued:

I think we showed that when we went through the 10 points that Allergan asserted which was based on just looking at conventional sources and it is just not applicable to the way we run our business. And I would argue it would be less and less applicable to most pharma companies because the role of specialty pharmacies, the role of managed care is changing the landscape in terms of what you can look at.

217.    Also on May 28, 2014, Pearson participated in the Sanford C. Bernstein Strategic Decisions Conference on behalf of the Company, where he responded to several questions about price, volume, and the sufficiency of Valeant's disclosures.

(a)     With regard to price and volume, Pearson stated:

87

The only country in the world that you can really sustainably increase pricing is the United States. And in the United States, you're governed by managed care contracts. And the managed care contract—the highest price increase we could take under any managed care contract we have in the US is 9% a year.

*So, we have a lot of constraints, just like other pharma companies do, in terms of pricing. So, we focus on volume growth*, and the vast majority of our growth on a global basis—and we went through some of that this morning - is volume.

(b)     Addressing why Valeant did not provide more detailed disclosures on product sales, Pearson represented, "*We're more like a generics company in terms of the amount of revenue we get per product*," adding "[it] just makes no sense" to make such disclosures; and

(c)     Pearson was also asked if others were copying Valeant's business model and said they were transparent in what they were doing but it was hard to execute, claiming: "[A]s Howard [Schiller] always says, it's not a very easy model to replicate. It's very simple. We tell you exactly what we're doing. But it's very hard. It requires working really, really hard, sweating the details every day."

218.     On June 17, 2014, Pearson and Schiller hosted a conference call "to refute recent misleading assertions made by Allergan":

219.     During his opening remarks, Pearson represented:

I am pleased to update all of you that our business is continuing to perform well. I find it very odd that Allergan continues to suggest that our Q2 and in particular our Q3 results will demonstrate weakness. . . . *In short, our business is strong and I can assure you our operating model is both durable and sustainable*.

In Allergan's investor presentation dated June 10, 2014, they asserted that Valeant has experienced volume decreases in 11 of its top 15 worldwide pharmaceutical products.

First, the products listed in the presentation are not Valeant's top 15 products by revenue. Only 6 of the products listed are in Valeant's top 15

products. ***The presentation also claimed that most of our products are not growing, when in fact, 13 of our top 15 products are growing and 9 of the top 15 are growing by volume, not just price***.

220. Pearson continued to respond to assertions regarding Valeant's organic growth and price increases later in the call: "I think the other thing we will probably start doing again is price volume. ***People - a lot of assertions are that it's all about price, but it's not***." He further stated:

> So I think what we're talking about earlier this morning is probably we will report what the volume and price parts of our organic growth are. And I suspect it will be surprising to people because I think volume is a much larger piece of our organic growth than most people would assume it is.

221. He also represented that "[o]ur sales force in dermatology now has been stable for a few quarters and . . . ***all our promoted products in dermatology are growing***."

222. On July 18, 2014, Valeant issued a press release announcing it had filed an investor presentation with the SEC that would be used in meetings with Allergan's institutional investors and proxy advisors. The presentation, titled "Investor Presentation Regarding the Allergan Special Meeting Process," included the following "Valeant Operating Principles":

- Put patients and our customers first by maintaining the highest ethical standards in the industry;

- Select high-growth business segments (therapeutic areas and geographies) where the healthcare professional is still the primary decision maker; [and]

* * *

- Ensure tight controls and rigorous compliance standards while avoiding overspending.

223. On August 19, 2014, the Company filed with the SEC a "[c]larification on assertions made about Valeant's business," which purported to respond to statements made by Allergan in its August 5, 2014 press release and in an August 15, 2014 *Financial Times* article. Among other things, Valeant stated its "Promoted Pharmaceutical brands (*i.e.*, Dermatology,

Dental) are growing from a combination of price and volume" and "[w]e have no knowledge of any exposures or issues other than those disclosed or for which reserves have been established."

224.    On September 11, 2014, Valeant filed with the SEC a letter sent by Pearson to the Company's employees referencing Allergan's "attack[s] [o]n our business" and "our business model and our track record of organic growth."  In the letter, Pearson stated "[h]ighlights across Valeant's businesses" included "return to growth of our U.S. Prescription Dermatology business, including the Obagi Medical business, coupled with the early, but exciting launch successes of Jublia and Luzu [an antifungal medication]" and "continued tremendous growth in our U.S. Neuro & Other and OraPharma businesses."

225.    On October 20, 2014, Allergan filed with the SEC a response to Valeant's 3Q14 financial results, and Valeant responded by filing a document titled "October 20th rebuttal items." Valeant there rebutted Allergan's assertion that "price is a large drive[r] of growth for select Valeant U.S. pharmaceutical businesses," stating:

- Overall price/volume for the Valeant business was ~50% volume and ~50% price.

- Like all PhRMA [Pharmaceutical Research and Manufacturers of America] companies, including Allergan, our managed care contracts restrict our price increases each year, and many of our managed care contracts restrict price increases to less than 10% net price increase per year.

- Gross price increases could be seen as higher but do not contribute to our reported net sales growth.

**B.    Defendants' Reassurances in 2014 Were False or Misleading When Made, and Kept Investors in the Dark About the Fraud Pervading Valeant**

226.    The statements identified in above were false or misleading when made.  In sum:

(a)    Valeant's business strategy, and the key growth driver of dermatology sales, depended to a significant degree on the undisclosed practices of:   (1)

dramatic price increases that were unsustainable and far beyond industry norms (including for example, increasing the price of Syprine and Cuprimine by 50% on July 18, 2014); (2) routing patients into Valeant's network of controlled pharmacies that appeared independent, when in fact they were not; (3) using PAP and PR practices to avoid patient scrutiny; and (4) not disclosing those practices to payors and obtaining reimbursement for drugs that would not otherwise be reimbursed or would not be reimbursed at such rates if those practices were disclosed to private payors, patients, physicians, and PBMs;

(b)     although not disclosed to private payors, patients, physicians, PBMs, or investors, Valeant employees worked at Philidor, Philidor had been formed with the assistance and for the benefit of Valeant to increase the sale prices of Valeant products, and Valeant was consolidating Philidor's results as its own;

(c)     Valeant's business risks had materially increased as a result of the undisclosed practices discussed in subparagraph (a) above, which exposed the Company to regulatory sanctions, investigations and associated costs, reputational harm, contractual violations, decreased sales, and nonpayment/substitution of Valeant products by PBMs, private payors and physicians;

(d)     Valeant's purportedly high-growth businesses, including its dermatology business, had grown through exorbitant price increases dependent on acquiring companies and drug portfolios in which it could engage in the

undisclosed practices in subparagraph (a) above, and any slowdown or cessation of such acquisitions would have a material adverse effect on the Company's business, cash flows, and results of operations;

(e)     while Valeant's branded products were subject to competition with more cost-efficient generics that were preferred by PBMs and could be substituted by pharmacies, the undisclosed practices described in subparagraph (a) above allowed the Company to avoid such substitution;

(f)     Valeant's reported revenue, EPS, and profitability, as well as its future business prospects and ability to service its debt, depended on the Company's ability to continue the undisclosed practices in subparagraph (a) above, and because of the undisclosed risks in subparagraph (c) above did not accurately portray the Company's financial performance and business prospects;

(g)     Valeant lacked adequate internal controls, as well as compliance and training programs, to ensure that its SEC filings and other public disclosures were not false or misleading when made;

(h)     Valeant improperly recognized Philidor revenue, in violation of GAAP, causing Valeant's revenues, net income, and GAAP EPS to be materially misstated; and

(i)     in violation of GAAP, Valeant failed to disclose Philidor as a VIE.

227.     Defendants' false or misleading reassurances had the intended effect of continuing to conceal from investors the true state of Valeant's business operations and financial results, and

thus kept the prices of call options on Valeant common stock artificially inflated and the prices of put options on Valeant common stock artificially deflated.

> **C.    Defendants Continued to Reassure Investors in Response to Questions or Concerns Raised in 2015, Even After Valeant Was Forced to Disclose Certain Previously Concealed Facts Regarding Philidor**

228.    On September 28, 2015 Valeant filed a Form 8-K attaching a letter from Pearson to the Company's employees responding to claims that its "business model and strategy is dependent upon large price increases in our U.S. pharmaceutical business" and "[c]oncern around our exposure to U.S. government drug price reimbursement."  In his letter:

(a)    Pearson referred to those concerns as a "bear thesis," claimed they were "incorrect on both accounts," and dismissed the dependency on price increases, stating "Valeant is well-positioned for strong organic growth, even assuming little to no price increases";

(b)    He added, "[a]s we have stated many times, *Valeant's core operating principles include a focus on volume growth* and a concentration on private and cash pay markets that avoid government reimbursement in the U.S.," and "the majority of our portfolio *will continue to deliver strong volume-based organic growth and is not dependent on price increases*";

(c)    Pearson went on to "lay out the facts," noting in part that (i) growth in dermatology, ophthalmology, Rx and dentistry was based on having "delivered over 30% script growth year to date," and (ii) Valeant expected "double-digit script growth and corresponding revenue growth trends to continue" in the "Salix business"; and

(d)    He added, "we expect double-digit organic growth in 2016 and beyond as we prepare for the launch of Addyi and anticipate other potential product approvals."

229.    On October 14, 2015, Valeant issued a press release noting it received subpoenas from the DOJ for documents regarding its patient assistance and distribution practices.  The release quoted Pearson as stating "*[a]ll of us at Valeant firmly believe in maintaining strong regulatory and financial controls and believe we have operated our business in a fully compliant manner*."

230.    On October 19, 2015, Valeant issued a press release announcing its 3Q15 financial results. The release stated:  "Same store sales organic growth of 13%; 5th consecutive quarter of > 10% organic growth, driven by: Continued outperformance of U.S. businesses, particularly dermatology and contact lens . . . ."

(a)    As discussed in below, by that time Valeant's ties to Philidor were beginning to be uncovered by investigative journalists, which forced Valeant to publicly disclose the relationship. To offset the negative impact on the price of Valeant securities, the Company raised revenue and EPS guidance for 4Q15 and full year 2015, stating:

4Q15 Guidance

- Total Revenue increased to $3.25 - $3.45 billion [midpoint of $3.35 billion] from $3.2 - $3.4 billion [midpoint of $3.3 billion]

- Cash EPS increased to $4.00 - $4.2 0 [midpoint of $4.10] from $3.98 - $4.18 [midpoint of $4.08]

Full Year 2015 Guidance

- Total Revenue increased to $11.0 - $11.2 billion [midpoint of $11.1 billion] from $10.7 - $11.1 billion [midpoint of $10.9 billion]

* * *

- Cash EPS increased to $11.67 - $11.87 [midpoint of $11.77] from $11.50 - $11.80 [midpoint of $11.65]; and

(b)     The press release quoted Pearson as stating, "With our strong product portfolio and growth prospects, we feel very confident in our future outlook and we are reaffirming our $7.5 billion EBITDA floor for 2016."

231.     That same day, Pearson, Rosiello, and Kellen hosted a conference call. In an accompanying slide presentation, Valeant included a list of anticipated "Questions from Investors."   One of the "anticipated" questions was "How does Valeant work with specialty pharmacies and what is Valeant's relationship with Philidor," to which Valeant responded in the presentation:

- We have viewed our relationship with Philidor and our other specialty pharmacies as proprietary and as one of our competitive advantages;

- Similar to many pharmaceutical companies in the U.S., *an increasing percentage of our revenue is coming from products dispensed through multiple specialty pharmacies*;

- *We find specialty pharmacies improve patients' access to medicines at an affordable price and help ensure physicians are able to prescribe the medications they believe most appropriate for their patients*;

* * *

- We understand that Philidor:

- Provides services under our programs for commercially insured and cash-paying claims only. Any claim that would be reimbursed in whole or in part by government insurance is not eligible for our co-pay subsidy programs;

- Does not restrict prescriptions it fills to any particular manufacturers (including Valeant); and

- Dispenses generic products as specified in patient's prescription or as requested by patient.

232.     During the call, Pearson repeated some of the same claims:

The topic of specialty pharmacies has not been a focus of ours on past calls because we believe this was a competitive advantage that we did not want to disclose to our competitors. But given all the incorrect assertions *by some, we will provide an update to this call.*

Similar to many pharmaceutical companies in the US, an increasing percentage of our revenue is coming from products dispensed through multiple specialty pharmacies. *We find specialty pharmacies improve patients' access to medicines at an affordable price, and help ensure physicians are able to prescribe the medications they believe most appropriate for their patients*. In almost all cases, our inventory with specialty pharmacies in this channel and the title to our medicine only transfers to the pharmacy when the actual prescription is filled.

233.    Pearson also claimed that "[s]ince we do not recognize the revenue of our products [sold through Philidor] until the prescriptions are filled, this consolidation has the impact of delaying revenue recognition as compared to products that are sold through traditional distribution channels."

234.    In reference to media and government scrutiny of Valeant's pricing practices, Pearson represented:

[I]t's clear that the pharmaceutical industry is being aggressively attacked for past pricing actions. And that's not just Valeant, but I think it's all companies. I do think given that environment, the pricing that pharmaceutical companies will take in the future will be more modest, and *we built that into our forecast for next year*.

235.    Regarding the lawsuit filed by R&O Pharmacy, Pearson reassured investors that the business practices of Valeant and Philidor were proper:

*R&O is one of the specialty pharmacies in our network*, and Valeant has shipped approximately $69 million at wholesale prices to them. This represents approximately $25 million at net prices. Any products R&O dispensed to patients were recognized as our revenues, and are reflected in our receivables. Any products still held by R&O are reflected in our inventory. *R&O is currently improperly holding significant amounts it receives from payers*. We will refrain from comment on active litigation, and *look forward to showing in court that we are owed the money*.

236.    Also during the conference call, Rosiello repeated the increased guidance from that day's press release, adding "[w]e expect our gross margins to approach 80% in the fourth quarter, driven by continued growth in our dermatology and Salix businesses, the launch of Addyi, and

96

decreased sales of Xenazine."  His statements were accompanied by the following chart in the slide presentation:

| | Previous Q4 2015 | New Q4 2015 | Previous Full Year | New Full Year 2015 |
|---|---|---|---|---|
| Revenues | $3.2 - $3.4B | $3.25 - $3.45B | $10.7 - $11.1B | $11.0 - $11.2B |
| Cash | $3.98 - $4.18 per share | $4.00 - $4.20 per share | $11.50 - $11.80 per share | $11.67 - $11.87 per share |
| Adj. Cash Flow from Operations | N/A | N/A | >$3.2B | >$3.35B |

237.    To further alleviate any investor concerns, the Company also stated in the slide presentation that it was "reaffirming our expectations to exceed $7.5 [billion] in EBITDA in 2016." When Pearson was asked during the conference call how the lack of price increases going forward might affect the Company's ability to meet EBITDA guidance in 2016, he responded, in part, "today . . . we feel very comfortable with the $7.5 billion and we expect our guidance next year will exceed that."

238.    On October 21, 2015, Valeant issued a press release responding "to recent accusations made regarding its financial reporting and operations" by online investment newsletter Citron Research that Valeant was inflating revenues through its secret network of pharmacies.  The release represented, in part:

- All shipments to Philidor and other pharmacies in the Philidor pharmacy network, including R&O, are not recorded in Valeant's consolidated net revenue. Sales are recorded only when the product is dispensed to the patient. All sales to Philidor and Philidor network pharmacies are accounted for as intercompany sales and are eliminated in consolidation. They are not included in the consolidated financial results that Valeant reports externally.

- Any inventory at pharmacies in the Philidor pharmacy network are included in Valeant's consolidated inventory balances – *there is no sales benefit from any inventory held at these specialty pharmacies* and inventory held at the Philidor network pharmacies is reflected in Valeant's reported inventory levels.

* * *

97

- The timing of our revenue recognition by selling through the Philidor pharmacy network is actually delayed when compared to selling through the traditional wholesaler channel.

239.    Additionally, Valeant's 3Q15 10-Q filed on October 26, 2015 disclosed that the Company had the "power to direct Philidor's activities" and stated Valeant's entire Board had reviewed Valeant's accounting for Philidor and confirmed its appropriateness:  "During the year ended December 31, 2014, the Company completed other smaller acquisitions, including the consolidation of variable interest entities, *which were not material individually or in the aggregate*."  Valeant further stated:

> *On October 26, 2015, the Company also announced that its Audit and Risk Committee and the full Board of Directors have reviewed the Company's accounting for its Philidor arrangement and have confirmed the appropriateness of the Company's related revenue recognition and accounting treatment.*
>
> As is customary in the pharmaceutical industry, our gross product sales are subject to a variety of deductions in arriving at reported net product sales. Provisions for these deductions are recorded concurrently with the recognition of gross product sales revenue and include cash discounts and allowances, chargebacks, and distribution fees, which are paid to direct customers, as well as rebates and returns, which can be paid to both direct and indirect customers. . . . Gross product sales for products dispensed through Philidor Rx Services, LLC ("Philidor") pharmacy network (which is consolidated as a variable interest entity within our consolidated financial statements) are recognized when a prescription is dispensed to a patient. Net sales recognized through the Philidor pharmacy network represents 7% and 6% of our total consolidated net revenue for the three months and nine months ended September 30, 2015, respectively.

The Company also touted its financial performance:

> Excluding the items described above, we realized incremental product sales revenue from the remainder of the existing business of $236 million and $820 million in the third quarter and first nine months of 2015, respectively. *The growth, which incorporates sales directly to wholesalers and retailers as well as use of specialty pharmacies (primarily Philidor), reflected (1) higher sales of (i) Jublia®* (launched in mid-2014), (ii) the *Retin-A®* franchise (including the launch of RAM 0.08% in mid-2014), (iii) Xenazine®, (iv) Arestin®, (v) *Solodyn®*, and (vi) the Carac® franchise, and (2) higher sales from other recent product launches, including the

launches of Biotrue® ONEday, Bausch + Lomb Ultra®, and Onexton®.

Additionally, Valeant discussed its purportedly "lower risk" business model:

> The growth of our business is further augmented through our lower risk, output-focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense.

240. On October 26, 2015, Valeant issued a press release designed to alleviate any investor concerns, in which the Company:

(a) repeated that its "Audit and Risk Committee and the full Board of Directors have reviewed the company's accounting for its Philidor arrangement and have confirmed the appropriateness of the company's related revenue recognition and accounting treatment";

(b) quoted Pearson as stating "[a]s we have said previously, our accounting with respect to the Company's Philidor arrangements is fully compliant with the law," and "[w]e operate our business based on the highest standard of ethics, and we are committed to transparency"; and

(c) quoted director Robert Ingram as stating that the Board "has fully supported the company's specialty pharmacy strategy," and that Pearson "operates with the highest degree of ethics.''

241. Also on October 26, 2015, Valeant hosted a conference call with investors, which was accompanied by a presentation. Pearson, Schiller, Rosiello, Kellen, Ingram, and Controller Tanya Carro, as well as directors Norma Provencio, Theo Melas-Kyriazi, and Katharine Berghuis Stevenson, participated in the call on behalf of the Company. Valeant disclosed in the presentation that "[o]ur specialty pharmacy strategy originated from the Medicis Alternate Fulfillment Program," and further stated:

    (a)     "Prescriptions through Philidor are less profitable than traditional channels due to lower copay rates, lower cash pay rates and more cash pay scripts in Philidor than in retail and other channels";

    (b)     "***We do not own or control Philidor*** . . ." and "***Philidor employees do not report to Valeant***";

    (c)     "***Philidor is independent***"; and

    (d)     "Unless and until Valeant exercises the option to acquire Philidor, ***Philidor remains independent*** and Valeant has no rights to remove CEO or management."

242.    Pearson also assured investors there was no improper accounting or other improper practices involving Philidor, stating:

    (a)     "***we stand by our accounting treatment of Philidor completely***";

    (b)     "[w]e follow the law and we comply with accounting and disclosure rules'';

    (c)     "[T]he sensational claims made by the short seller Andrew Left, through his entity Citron, are completely untrue. His motivation is the same as someone who runs into a crowded theater to falsely yell fire. He wanted people to run";

    (d)     "after we saw the false report from Citron, we promptly coordinated with our outside regulatory counsel from Cahill [*i.e.*, Cahill Gordon & Reindel LLP] to make a request that the SEC investigate Mr. Left and Citron";

    (e)     "We still believe that the strategy of working with specialty pharmacies is sound and it's good for patients and physicians. ***There have been no issues with regards to the accounting or revenue recognition of the business***.''; and

    (f)     "We have been working with outside counsel and we have found no evidence of illegal activity whatsoever at Philidor."

243. Ingram, speaking on behalf of the entire Board, reaffirmed those representations:

As Mike [Pearson] stated, the Company stands by its accounting completely. The audit committee of the Board and the full Board have reviewed the Company's accounting, the Philidor relationship, and have confirmed the appropriateness of the Company's revenue recognition and accounting treatment.

244. Rosiello echoed Pearson's and Ingram's representations, stating:

(a) "*Valeant consolidates financials with Philidor and the Philidor network, ensuring that revenue recognition and financial statement presentation is appropriate*";

(b) "*Valeant recognizes revenue only when products are dispensed to patients, and Valeant records this at net realized price*";

(c) "There is simply no way to stuff the channel of consolidated variable interest entities, or VIEs, since all inventory remains on Valeant's consolidated balance sheet until dispensed to patients"; and

(d) "Philidor was considered a VIE prior to the purchase option agreement, but since Valeant was not determined to be the primary beneficiary, consolidation was not appropriate. A purchase option agreement for Philidor was executed in December 2014. *The finance and transactions committee, audit and risk committee, and full Board, all reviewed the transaction. The appropriate accounting treatment was determined by management and reviewed with the Audit and Risk Committee*."

245. Carro also defended Valeant's accounting and lack of prior disclosure regarding Philidor, representing that:

(a) as of year-end 2014, "*Philidor is not considered to be material to Valeant's business for reporting purposes*" at the end of 2014 because the "GAAP

requirement for disclosing sales to large customers is 10% of revenue" and in December 2014 Philidor's year-to-date net sales were $111 million; and

(b)     for the first two quarters of 2015 "*__Philidor was not specifically mentioned in our__* *__disclosures because it had not been material to the consolidated financial__* *__statements__*," as "[i]t represented 1% or less of total assets and 7% or less of consolidated net revenues since the fourth quarter of 2014."

246.    Additionally, Schiller reassured investors that there was no evidence of wrongdoing by Pearson:

> [I]f I had any concerns whatsoever about Valeant or Mike, I would not have stayed on the Board. It's as simple as that. When we announced that I was leaving, and Mike and I had a bit of our lovefest, I don't want to repeat all the words but I meant them in terms of Mike is professional, his ethics, his work ethic, his commitment to doing the right thing.

247.    To mitigate the impact of the negative news disclosed on that call, Pearson reaffirmed Valeant's recently increased 2015 guidance, stating:  "Given the continued healthy growth in dermatology, Salix, eye health, and the recent Addyi launch, we expect to meet or exceed our fourth-quarter projections, excluding the one-time expenses associated with recent events." He added, "we continue to be very comfortable with our 2016 EBITDA expectation of greater than $7.5 billion."

248.    On November 10, 2015, before the market opened, Pearson, Rosiello, Carro, and Kellen hosted a conference call with investors to "update [the market] on our strategy with respect to specialty pharmacies, to explain our transition plans for Philidor, to discuss our business performance for the first half of the quarter, and perhaps most importantly to take questions from all of you."  Pearson stated:

> We began working with Philidor because we believed a strong relationship with one specialty pharmacy would deliver better, faster customer service for doctors and patients. We were also looking for a pharmacy which would

102

> be willing to process prescriptions before adjudicating the claims, which would allow us rather than the patient, to assume the risk if the commercial payer denied the claim.

249.    An analyst noted during the call that there were "two kind[s] of major accusations aimed at the Company," one regarding pricing and the other regarding Philidor, and observed that Valeant "decided to limit your pricing going forward" and "cut operations with Philidor."  With regard to Philidor, Pearson responded, in part:

> Well Philidor was very specific. First, there was the Citron report which claimed financial fraud and other things. They quickly came out and there was no financial fraud, in terms of Valeant had to do. But then other allegations were made in terms of the practices of Philidor. And we felt, both management and the Board felt that given these allegations, given what was happening to our stock price and given what many of our major shareholders were asking us to do that the best thing to do was to sever.

250.    On December 16, 2015, Valeant issued a press release formally withdrawing the inflated guidance it had issued less than two months earlier, on October 19, 2015.  Attempting to offset the disappointing revised 2015 guidance and notwithstanding the financial impact of its lost sales through Philidor and increased scrutiny by PBMs and private payors, in the release Valeant projected robust 2016 growth with revenue of $12.5 billion-$12.7 billion, cash EPS of $13.25-$13.75, and EBITDA of $6.9 billion-$7.1 billion.

251.    The same day, Valeant hosted an "Investor Day" presentation. Pearson, Rosiello, Jorn, and Kellen participated on behalf of the Company. During the call:

(a)    Pearson touted Valeant's "very strong controls, in the areas of finance, compliance, audit, pharmacovigilance";

(b)    He further stated "we're continuing to grow, grow, grow, generate cash flow";

(c)     Pearson added: "Addyi . . . a lot of people have said, Addyi is a disaster; ***today you'll see it's not a disaster. So we believe we'll sell between $100 million and $150 million in sales of Addyi next year***."

(d)     Rosiello repeated Defendants' 2016 guidance;

(e)     Pearson stated: "***I feel very comfortable with the guidance***. But each little pieces [sic], I feel little less comfortable this year just given - ***so we put an extra dose of conservatism in***."

252.     Also during that call, Defendants referred to an accompanying presentation titled "Valeant: An Enduring Engine for Growth," which represented, among other things, that the "[d]rivers of Valeant's success" included "[o]ur relentless focus on providing easy and affordable access for physicians and patients"; "[o]ur innovative strategies (often disruptive), which have challenged industry convention"; and "[o]ur decentralized model and talented people, which give us a competitive edge (speed of decision making and in-depth customer knowledge)."

**D.**     **Defendants' Reassurances in 2015 Were False or Misleading When Made, Notwithstanding Their Partial Disclosure of Previously Concealed Facts Regarding Philidor**

253.     Despite disclosing some previously concealed information about Philidor, Defendants' representations identified above were false or misleading when made because they failed to disclose numerous material facts regarding Valeant's actual business practices and financial results, as detailed above.  In sum:

(a)     Valeant's business strategy, and the key growth driver of dermatology sales, depended to a significant degree on the undisclosed practices of (1) dramatic price increases that were unsustainable and far beyond industry norms (including for example, increasing the price of Syprine and Cuprimine by 50% on July 18, 2014);

104

(2) routing patients into Valeant's network of controlled pharmacies that appeared independent, when in fact they were not; (3) using PAP and PR practices to avoid patient scrutiny; and (4) not disclosing those practices to payors and obtaining reimbursement for drugs that would not otherwise be reimbursed or would not be reimbursed at such rates if those practices were disclosed to private payors, patients, physicians, and PBMs;

(b)      Notwithstanding Valeant's partial disclosures regarding Philidor, Defendants falsely stated Philidor was independent of Valeant, when in fact, among other things, Valeant employees worked at Philidor and Philidor had been formed with the assistance and for the benefit of Valeant to increase the sale prices of Valeant products—not, as Pearson represented during the Company's November 10, 2015 conference call, to "deliver better, faster customer service for doctors and patients" or "to process prescriptions before adjudicating the claims, which would allow us rather than the patient, to assume the risk if the commercial payer denied the claim";

(c)      Valeant's business risks had materially increased as a result of the undisclosed practices discussed in subparagraph (a) above, which exposed the Company to regulatory sanctions, investigations and associated costs, reputational harm, contractual violations, decreased sales, and nonpayment/substitution of Valeant products by PBMs, private payors, and physicians;

(d)      Valeant's purportedly high-growth businesses, including its dermatology business, had grown through exorbitant price increases dependent on acquiring companies and drug portfolios in which it could engage in the undisclosed practices in subparagraph (a) above, and any slowdown or cessation of such acquisitions would

have a material adverse effect on the Company's business, cash flows, and results of operations;

(e)     while Valeant's branded products were subject to competition with more cost-efficient generics that were preferred by PBMs and could be substituted by pharmacies, the undisclosed practices described in subparagraph (a) above allowed the Company to avoid such substitution;

(f)     Valeant's reported revenue, EPS, and profitability, as well as its future business prospects and ability to service its debt, depended on the Company's ability to continue the undisclosed practices in subparagraph (a) above, and because of the undisclosed risks in subparagraph (c) above did not accurately portray the Company's financial performance and business prospects;

(g)     Valeant lacked adequate internal controls, as well as compliance and training programs, to ensure that its SEC filings and other public disclosures were not false or misleading when made; and

(h)     Valeant improperly recognized Philidor revenue, in violation of GAAP, causing Valeant's reported revenues, net income, and GAAP EPS to be materially misstated.

254.     Defendants' false or misleading reassurances had the intended effect of continuing to conceal from investors the true state of Valeant's business operations and financial results, and thus kept the prices of call options on Valeant common stock artificially inflated and the prices of put options on Valeant common stock artificially deflated through the remainder of the Class Period.[3]

---

[3] The "safe harbor" afforded by the Private Securities Litigation Reform Act of 1995 to forward-

X.   **THE TRUTH REGARDING DEFENDANTS' MISSTATEMENTS AND OMISSIONS WAS REVEALED TO INVESTORS THROUGH A SERIES OF PARTIAL DISCLOSURES**

255.   Defendants' misstatements and omissions caused the prices of Valeant call options to be artificially inflated and Valeant put options to be artificially deflated throughout the Class Period.  Consequently, the Class did not have the information required to be disclosed under the Exchange Act and therefore engaged in transactions in the subject Valeant derivatives at unfair prices.  Through a series of partial disclosures commencing in September 2015 and ending in August of 2016, the truth emerged regarding Valeant's business operations, financial condition, and prospects.  As the truth was revealed to the market, artificial inflation was removed from the prices of Valeant call options, and artificial deflation was removed from the prices of Valeant put options.  Consequently, Plaintiff and other derivatives investors suffered damages on from Class Period purchases of call options and sales of put options on Valeant common stock.

A.   **Disclosures in September and October 2015**

256.   On September 28, 2015, *Bloomberg* reported that all Democratic members of the House Oversight Committee had sent a letter to Chairman Jason Chaffetz urging him to subpoena Valeant.  In the letter, those Congressmen stated:

> [I]n February, Valeant purchased the rights to sell Nitropress, which is used to treat congestive heart failure and hypertensive episodes, and Isuprel, which is used to treat heart block and abnormal heart rhythm. The same day,

---

looking statements under certain circumstances does not apply to any of the false or misleading statements identified in this Complaint, because:  (i) they were historical statements or statements of current facts and conditions at the time the statements were made; and (ii) to the extent any of those statements can be construed as forward-looking, they were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded in this Complaint, Defendants are nonetheless liable for those statements because at the time each of those statements was made, the speaker(s) knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Valeant who knew the statement was false or misleading when made.

Valeant increased the prices of these drugs to $805.61 and $1,346.62, respectively (increases of 212% and 525%). When asked about its price increases, a Valeant spokeswoman responded: "Our duty is to our shareholders and to maximize the value" of the drugs.

257.   The September 28, 2015 letter also revealed that on July 31, 2015, staff members from the House Oversight Committee participated in a call in which Valeant representatives "failed to adequately answer our questions about the basis for their skyrocketing prices." The letter also revealed that on August 12, 2015, "Ranking Member [Elijah] Cummings sent [a] document request to Valeant" and on September 3, 2015, "Valeant rejected Ranking Member Cummings' request in a dismissive two-page letter that refused to provide any of the requested documents."

258.   Also on September 28, 2015, *The Washington Post* disclosed that Senator Claire McCaskill "sent a detailed list of 22 questions to [Valeant], probing its simple explanation that it increased two heart drug prices because they were 'significantly underpriced.'" Citron Research published a report the same day revealing that Valeant had more than doubled the price of 30 other drugs during the Class Period, stating:   "Martin Shkreli [founder and CEO of Turing Pharmaceuticals] was created by the system. Shkreli is merely a rogue trying to play the gambit that Valeant has perfected." The report also highlighted that "Valeant has made little to no effort to improve these products."

259.   On September 28 and 29, 2015, media outlets reported that Valeant was "in [the] crosshairs of [the] U.S. Congress" for its practice of "engag[ing] in a business strategy of buying old neglected drugs and turning them into high-price specialty drugs," and noted Valeant was using the same business model as Turing.  (Shkreli resigned from Turing three months later following his indictment by federal authorities on securities fraud charges.)

260.   In response to those developments, Valeant issued a press release on September 28, 2015 announcing it had distributed a letter to its employees in which Pearson attempted to address

concerns that Valeant's "business model and strategy is dependent upon large price increases in our U.S. pharmaceutical business" and "[c]oncern around our exposure to U.S. government drug price reimbursement."

261.  In response to the partial disclosures on September 28 and 29, 2015, the price of Valeant stock dropped more than 16%, from a close of $199.47 per share on Friday, September 25, 2015, to a closing price of $166.50 per share on Monday, September 28, 2015, on unusually high trading volume.  The price of Valeant stock continued falling the following day, dropping an additional 5% to close at $158.08 per share on September 29, 2015, also on unusually high trading volume.  The total stock price decline over that two-day period was over 20%, or approximately $41 per share.

262.  The disclosures detailed above revealed the truth regarding Defendants' representations to investors, and accordingly caused the prices of Valeant call options to decrease, removing the artificial inflation, and the prices of Valeant put options to increase, removing the artificial deflation.

263.  On October 4, 2015, *The New York Times* questioned Pearson's September 28, 2015 letter to Valeant employees.  The *Times* article called into doubt, among other things, Pearson's claim that Valeant was well-positioned for growth even without price increases. The article noted that extraordinary price increases on eight Valeant drugs accounted for approximately 7% of the Company's revenue and 13% of its earnings before taxes and interest in the second quarter, and provided insight into Valeant's dependency on price gouging compared to the rest of the pharmaceutical industry, citing a Deutsche Bank finding that in 2015, "Valeant raised prices on its brand-name drugs an average of 66 percent . . . about five times as much as its closest industry peers."  The article cited Mephyton, a drug that helps blood clot, as an example of price gouging,

noting the drug had seen eight price increases since July 2014, costing $58.76 a tablet, up from $9.37. The article cited additional examples, such as Glumetza, a diabetes pill acquired from Salix, whose price was increased over 800% during the year, with a month's supply rising from approximately $500 to $4,600.

264.    On that news, the price of Valeant stock declined by more than 10%, falling from a close of $182.32 per share on Friday, October 2, 2015 to a close of $163.46 per share on Monday, October 5, 2015, on unusually high trading volume.

265.    The disclosures detailed above revealed the truth regarding Defendants' representations to investors, and accordingly caused the prices of Valeant call options to decrease, removing the artificial inflation, and the prices of Valeant put options to increase, removing the artificial deflation.

266.    On October 14, 2015, Valeant issued a press release disclosing that the Company had recently received subpoenas from prosecutors in the U.S. Attorneys' Offices for the District of Massachusetts and the Southern District of New York. The subpoenas did not only relate to Valeant's drug pricing practices, but also sought information about the Company's PAPs and distribution practices. Following disclosure of the subpoenas, Pearson assured investors that the Company believed in "maintaining strong regulatory and financial controls" and "believe[d] we have operated our business in a fully compliant manner." Valeant further stated it "responded to a letter from Senator Claire McCaskill" regarding the pricing of Nitropress and Isuprel and the "reimbursement process for hospital procedures involving Nitropress and Isuprel, the analysis and reasons underlying Valeant's pricing decisions." The Company noted it was "beginning outreach to hospitals where the impact of a price change was significantly greater than average."

267.     On October 15, 2015, news outlets reported that Senator McCaskill condemned Valeant's response to her letter, stating: "It appears obvious to me that Valeant has been anything but responsive or transparent—it refused to take any action until served with federal subpoenas, and is still refusing to provide answers to many of the questions I've asked."

268.     In response to the partial disclosures on October 14 and 15, 2015, the price of Valeant stock dropped by 4.75%, from a close of $177.29 per share on October 14, 2015, to a close of $168.87 per share on October 15, 2015, on elevated trading volume.

269.     The disclosures detailed above revealed the truth regarding Defendants' representations to investors, and accordingly caused the prices of Valeant call options to decrease, removing the artificial inflation, and the prices of Valeant put options to increase, removing the artificial deflation.

270.     On October 19, 2015, Valeant's control over a secret network of pharmacies began to come to light.  Early that morning, Bill Ackman sent an email to Laurie Little, Valeant's Senior Vice President, Investor Relations, and Pearson regarding a Southern Investigating Reporting Foundation report on Valeant describing the connection between Valeant and Philidor.  Little responded, "We knew it was coming and will address on today's call."

271.     The same day, as discussed above, Valeant issued a press release announcing its 3Q15 financial results and hosted a conference call.  Pearson, Rosiello, and Kellen hosted the call using a prepared slide presentation.  Pearson said he wanted to address "the turmoil over the past few weeks from both governmental and media scrutiny."  The Company made limited disclosures, such as confirming its relationship with Philidor, the option to acquire Philidor, and that it had been consolidating Philidor's financial results with its own.  Valeant also effectively conceded that its business strategy was neither sustainable nor less risky by disclosing it would rely less on

acquisitions and more on R&D. Pearson added that Valeant would be "making pricing a smaller part of our growth looking forward" and "will pursue fewer, if any, transactions that are focused on mispriced products."

272.   Valeant further disclosed that it nearly doubled its R&D spending of $56 million in 1Q15 to $102 million in 3Q15 and that "internal R&D will become more of a focus," signaling the unsustainable nature of its business strategy and its illusory lower costs and higher profits.

273.   Pearson also disclosed that price accounted for approximately 60% of Valeant's growth in 2014 and 2015. Valeant stated in the accompanying slide presentation that 85 of the Company's 156 U.S.-branded Pharma products had an average price increase of 36%. With respect to the "Neuro and Other" portfolio, Valeant further disclosed that the year-to-date volume had declined by 7% but the net realized price had increased by 30%. Pearson repeated during the call that the Company was "seriously considering spinning off or selling" the "Neuro and Other portfolio, which is dependent on price," and that "internal R&D will become more of a focus."

274.   Pearson refused to discuss the subpoenas Valeant had received from federal prosecutors, stating "[w]e will not be answering questions." Regarding the government inquiries on price gouging, he stated:

> As you all know, Valeant has responded to Senator McCaskill, and addressed her questions regarding Nitropress and Isuprel. In a letter to her last Wednesday, we discussed . . . the analysis and reasons underlying Valeant's pricing decision, and Valeant's programs designed to improve patient access, among other topics. We also noted that we are beginning an outreach to hospitals where the impact of a price change was significantly greater than average.

275.   When asked what percentage of U.S.-branded prescription business flowed through "alternative fulfillment" and "how much of that is Philidor," Pearson stated:

> It's really primarily our dermatology brands and then some of our specialty products like Ruconest, Arestin, and some of the other orphan drugs. For certain products it's quite large. For Jublia it's probably 15%. For a lot of

other dermatologies it's much less. I'm sorry, I can't - it's significant but it's - I don't know the precise number but it's certainly, of our US portfolio, 10%, 20%, maybe. Tanya [Carro]'s nodding probably closer to 10%.

276.    After the market closed on October 19, 2015, *The New York Times* published an article titled "Drug Makers Sidestep Barriers on Pricing," discussing how Philidor's application for a license in California had been rejected because it had concealed its owners.  The *Times* reported that Valeant used Philidor to "keep the health system paying for high-priced drugs" and to keep prices high for its dermatology products, quoting a Florida dermatologist as stating that Valeant's program was designed to buffer physicians and insurers from complaints about high prices. Discussing Philidor, the article stated, in part:

> Valeant had said little about Philidor until Monday, when J. Michael Pearson, Valeant's chief executive, revealed on his company's quarterly earnings call that Valeant had purchased an option to acquire Philidor late last year. He said that Valeant consolidated Philidor's results in its own financial reports.
>
> * * *
>
> Specialty pharmacies are most known for providing patients with assistance with complex drugs, many of them requiring refrigeration and injections, for diseases like cancer, multiple sclerosis and rare genetic disorders. But the drugs dispensed through the specialty pharmacies used by . . . Valeant are for common ailments like arthritis pain, acne, and toenail fungus. What was started as administering complex, costly drugs has been co-opted as a sales/marketing tool to drive the growth of minor differentiation standard retail drugs.

277.    In response to the partial disclosures on October 19, 2015, the price of Valeant stock declined by nearly 8%, falling from a close of $177.56 per share on Friday, October 16, 2015 to a close of $163.83 per share on Monday, October 19, 2015, on elevated trading volume.  The following day, Valeant shares fell an additional 10% to close at $146.74 per share on October 20, 2015, also on unusually high trading volume.  The total stock price decline over that two-day period was over 17%, or approximately $30 per share.

113

278.    The disclosures detailed above revealed the truth regarding Defendants'
representations to investors, and accordingly caused the prices of Valeant call options to decrease,
removing the artificial inflation, and the prices of Valeant put options to increase, removing the
artificial deflation.

279.    On October 21, 2015, Citron Research published a report titled "Valeant: Could
this be the Pharmaceutical Enron?," questioning the propriety of Valeant's accounting and prior
disclosures. The report asked "**Why** would Valeant, a major **big cap pharma**, a **darling** of the
hedge fund crowd . . . be secretly maneuvering to buy a little known pharmacy [Philidor] with a
dubious ownership structure," and inquired as to why Philidor was "NEVER disclosed in any prior
company disclosure?"  The report asserted Valeant was using a network of mail-order pharmacies
under its control to prop up sales and keep patients and their insurance companies from switching
to less costly generics.  Citron also questioned whether Valeant's revenues were inflated through
Philidor.

280.    The Citron report also linked Philidor to other pharmacies through shared phone
numbers, identical privacy notices, a shared facsimile number, and shared websites.  Citron
claimed "it appears to Citron that Valeant/Philidor have created an entire network of phantom
captive pharmacies," which included West Wilshire, SafeRx, and Orbit.  The report also provided
investors with details of the R&O lawsuit, noting Valeant resembled a "house of cards" and could
be "Enron part Deux."  After Citron's report was published, trading in Valeant shares was
temporarily halted because of the rapid decline in their price.

281.    In response to the partial disclosures on October 21, 2015, the price of Valeant stock
dropped more than 19%, from a close of $146.74 per share on October 20, 2015 to a close of
$118.61 per share on October 21, 2015, on extraordinary trading volume.

282.   The disclosures detailed above revealed the truth regarding Defendants' representations to investors, and accordingly caused the prices of Valeant call options to decrease, removing the artificial inflation, and the prices of Valeant put options to increase, removing the artificial deflation.

283.   Philidor then issued a press release after trading closed on October 21, 2015, disclosing that it had a contractual relationship with "affiliated pharmacies," including R&O, and that Philidor "does not currently have a direct equity ownership in R&O Pharmacy or the affiliated pharmacies, but does have a contractual right to acquire the pharmacies now or in the future subject to regulatory approval."

284.   The following day, October 22, 2015, BMO Capital Markets Corp. stated it "cannot defend the specialty Pharmacy structure" Valeant was using and downgraded the shares to "market perform."   BMO added: "We've been strong, vocal Valeant bulls," but "we find Valeant's arrangements with specialty pharmacy Philidor as not just aggressive, but questionable."   The same day, a *Bloomberg* article titled "Valeant Still Has Explaining to Do, Citron Research's Left Says," reported on Valeant's option to buy Philidor and noted it was "a relationship other [drug] companies don't appear to have" with pharmacies.   The article noted that when manufacturers previously owned PBMs in the 1990s they were all spun off because it was "perceived" as a conflict of interest.

285.   Following Philidor's October 21, 2015 press release and the additional partial disclosures on October 22, 2015, as the market continued to digest the negative news regarding Valeant, the price of Valeant stock continued to decline on October 22, falling an additional 7%, to close at $109.87 per share on unusually high trading volume.   The total stock price decline over the period October 21-22, 2015 was over 25%, or approximately $36 per share.

286.    The disclosures detailed above revealed the truth regarding Defendants' representations to investors, and accordingly caused the prices of Valeant call options to decrease, removing the artificial inflation, and the prices of Valeant put options to increase, removing the artificial deflation.

287.    Revelations of Valeant's misconduct continued as Philidor employees came forward disclosing the improper practices employed by Philidor.  On Sunday, October 25, 2015, *The Wall Street Journal* reported it had interviewed former Philidor employees who revealed that Valeant employees worked directly at Philidor and were using fictitious names to "conceal the ties so it didn't appear Valeant was using the pharmacy to steer patients to the drug company's products."  A former employee interviewed by *The Wall Street Journal* noted the Valeant employees' "real identities were well known to the other Philidor employees."

288.    That night, Ackman forwarded a media article to Pearson, Schiller, Rosiello, Ingram, and Little reporting that Pearson's explanation that Valeant did not disclose Philidor because it was a competitive advantage "comes up short."  The article noted that "[w]hile Valeant may argue it didn't think the consolidation of Philidor was material, the market's reaction shows investors think otherwise. And since materiality is a qualitative, not a quantitative, concept the company shouldn't try to stonewall."  Ackman suggested the Company admit "some mistakes were made."  As an example, Ackman wrote "it a mistake not to disclose Philador [sic]? In retrospect, it certainly appears to have been a mistake as the lack of disclosure made the company a potential target for a short attack which implied the company was hiding something."  Ackman observed that "the lack of disclosure on Philidor was a big surprise and raised concerns among shareholders."  He suggested they "explain whether or not the board, audit committee, auditors

116

understood and agreed with the accounting, strategy, and disclosure of this business," adding "[i]nvestors fear fraud."

289.    On October 26, 2015, Valeant filed its 3Q15 10-Q, which included disclosures relating to Philidor, including that Valeant had the "power to direct Philidor's activities."  The 10-Q also revealed that Valeant established a special "ad hoc" committee of the Board to investigate Valeant's relationship with Philidor, to be led by Ingram, the Company's lead outside director, and to include Provencio, chairman of the Audit and Risk Committee, director Colleen Goggins, and Mason Morfit, President of ValueAct Capital (one of Valeant's largest shareholders), who had been added to the Valeant Board that morning and immediately placed on the ad hoc committee.

290.    Also that day, Valeant hosted a conference call that included a presentation stating, among other things:

- "44% of Jublia revenue flowed through Philidor in Q3 2015";

- "we maintain regular communication, have a joint steering committee, have rights (and have utilized them) to approve key positions (*e.g.*, in-house lawyer, chief compliance officer), included Philidor in Valeant's SOX 404 Internal Control Testing and Internal Audit program for 2015";

- "Valeant [has] contractual rights [to Philidor] including: Joint Steering Committee, Right to require hires for certain positions, Substantial information rights, Covenants respecting Philidor's compliance with all applicable laws"; and

- in a section addressing Valeant's "Management Rights" over Philidor, "Valeant has the right (but not the obligation) to appoint or cause Philidor to hire: Advisor to the CEO, Head Compliance Officer, In-House lawyer, Head IT officer, Other employees as reasonably requested."

291.    On the conference call, Rosiello stated:  "Philidor was considered a VIE prior to the purchase option agreement, but since Valeant was not determined to be the primary beneficiary, consolidation was not appropriate.  A purchase option agreement for Philidor was executed in

December 2014."  And Carro admitted "Valeant reviews the financials of the Philidor network pharmacies on a regular basis."

292.     Shortly after the call, *Bloomberg* reported that the remarks on the call "left investors skeptical, failing to answer critical questions on Valeant's continuing relationship with Philidor, according to analysts."

293.     In response to the partial disclosures on October 25 and 26, 2015, the price of Valeant stock dropped more than 5%, from a close of $116.16 per share on Friday, October 23, 2015 to a close of $110.04 per share on Monday, October 26, 2015, on unusually high trading volume.

294.     The disclosures detailed above revealed the truth regarding Defendants' representations to investors, and accordingly caused the prices of Valeant call options to decrease, removing the artificial inflation, and the prices of Valeant put options to increase, removing the artificial deflation.

295.     On October 27, 2015, Ackman emailed Pearson and Schiller, stating "I don't think you are handling this correctly and the company is at risk of getting into a death spiral as a result." In another email that day, Ackman wrote to Ingram, Pearson, Schiller, Morfit, and Little regarding *The New York Times* article by Joe Nocera on whether Valeant was the "Next Enron?," in which the reporter wrote "Valeant . . . is a sleazy company."  Ackman stated in his email, "when one of the most credible journalists in the world accuses you of being the next Enron, time is short." He warned "[y]our reputation and that of the rest of the board along with the company is at grave risk of being destroyed on a permanent basis."  Ackman criticized Pearson for ending the last conference call abruptly : "When Mike said that you were running out of time on the call, he was right in that the company is running out of time to save itself. When shareholders hear that

management doesn't have time to address their concerns, they assume the worst. There is no amount of time that should [be] spared addressing shareholders [sic] concerns." Ackman noted it took a "short seller to bring Philador [sic] to light and that has destroyed managements [sic] compact with shareholders."

296.    In his October 27, 2015 email to Pearson and Schiller, Ackman advised, "I strongly recommend you immediately hold a conference call to address every remaining question from shareholders," of "unlimited duration." Ackman pleaded with the executives to "answer the questions honestly no matter how embarrassing the answers are and no matter what the legal implications are." Ackman noted the business risks, including, "Valeant has become toxic. Doctors will stop prescribing your products," and "[r]egulators around the world will start investigating and competing to find problems with every element of your business." He further stated: "The only people that need scripts and limited questions are crooks. Joe Nocera is right. You look like Enron." He added, "You should assume that the truth will come out eventually so there is zero downside to having it out now," and "If mistakes have been made, admit them immediately and apologize." Ackman closed the email by stating:

> *You have previously made the mistake of waiting while Rome was burning. There is now a conflagration. It takes no time to prepare for a conference call to tell the truth. The time to do it is today. We are on the brink of tragedy. Please do the right thing.*

297.    Pearson did not follow Ackman's advice, but the truth nonetheless continued to emerge. After the market closed on October 28, 2015, *Bloomberg* reported that an internal Philidor training manual showed that Philidor relied on "back door" tactics to boost payments and "instructed employees to submit claims under different pharmacy identification numbers if an insurer rejected Philidor's claim—to essentially shop around for one that would be accepted."

298.    On October 29, 2015, *Bloomberg Businessweek* reported additional accounts by former Philidor employees of the improper tactics by Philidor.  The article disclosed that:

- "to fill more prescriptions with Valeant products instead of generics . . . [w]orkers at . . . Philidor . . . were given written instructions to change codes on prescriptions in some cases so it would appear that physicians required or patients desired Valeant's brand-name drugs—not less expensive generic versions—be dispensed, the former employees said";

- "[a]n undated Philidor document obtained by *Bloomberg* provides a step-by-step guide on how to proceed when a prescription for Valeant dermatological creams and gels . . . is rejected"; and

- an October 2014 employee manual noted "[w]e have a couple of different 'back door' approaches to receive payment from the insurance company."

299.    Later that day, while the market was still open, reports disclosed that CVS Caremark (one of the three largest PBMs in the United States) terminated its relationship with Philidor after an audit of Philidor's practices, citing "noncompliance" with its provider agreement.

300.    In response to the partial disclosures on October 28 and 29, 2015, the price of Valeant stock dropped nearly 5%, from a close of $117.00 per share on October 28, 2015 to a close of $111.50 per share on October 29, 2015, on unusually high trading volume.

301.    The disclosures detailed above revealed the truth regarding Defendants' representations to investors, and accordingly caused the prices of Valeant call options to decrease, removing the artificial inflation, and the prices of Valeant put options to increase, removing the artificial deflation.

302.    After the market closed on October 29, 2015, Express Scripts and UnitedHealth's OptumRx, the other two largest PBMs, similarly announced they had terminated their relationships with Philidor.  Thus, in the same day, the three largest PBMs in the country announced they would no longer pay for medication dispensed by Philidor.  And on October 30, 2015, just after

underscoring the purported benefits and independence of Philidor, Valeant announced before the market opened that Philidor would be shutting down as soon as possible.

303.    In response to the partial disclosures on October 29 and 30, 2015, Valeant shares fell by nearly 16%, from a close of $111.50 per share on October 29, 2015 to a close of $93.77 per share on October 30, 2015, on unusually high trading volume.

304.    The disclosures detailed above revealed the truth regarding Defendants' representations to investors, and accordingly caused the prices of Valeant call options to decrease, removing the artificial inflation, and the prices of Valeant put options to increase, removing the artificial deflation.

### B.    Disclosures in November and December 2015

305.    On November 4, 2015, it was reported that the Senate Aging Committee formally launched a probe into Valeant's price increases for three drugs.  On the same day, *Bloomberg* reported further information regarding the financial impact of closing Philidor, disclosing that just weeks earlier, Valeant was planning to expand its use of the specialty pharmacy; that revelation further called into question the viability of the Company's recently issued financial guidance.  And after the market closed that day, *The Wall Street Journal* reported that Ackman told Valeant's lead director, Ingram, that Pearson might need to leave Valeant and that Ackman was considering liquidating his hedge fund's entire $3.8 billion investment in the Company.  *The Wall Street Journal* article further noted that Ackman had pushed Valeant to hold a conference call to "come clean" and disclose the full extent of executives' knowledge regarding Philidor, and that he was disappointed the Company did not comply.

306.    In response to the partial disclosures on November 4, 2015, the price of Valeant stock dropped by approximately 6%, from a close of $97.86 per share on November 3, 2015 to a

close of $91.98 per share on November 4, 2015, on elevated trading volume.  Valeant shares continued to decline the following day, falling by more than 14%, to close at $78.77 per share on November 5, 2015, on extraordinary trading volume.  The total stock price decline over that two-day period was 19.5%, or approximately $19 per share.

307.    The disclosures detailed above revealed the truth regarding Defendants' representations to investors, and accordingly caused the prices of Valeant call options to decrease, removing the artificial inflation, and the prices of Valeant put options to increase, removing the artificial deflation.

308.    On November 10, 2015, Valeant hosted a conference call with investors to "update [the market] on our strategy with respect to specialty pharmacies, to explain our transition plans for Philidor, to discuss our business performance for the first half of the quarter, and perhaps most importantly to take questions from all of you."  Pearson, Rosiello, Carro, and Kellen participated on Valeant's behalf.  Pearson stated, "As of last week, Philidor has stopped adjudicating claims. . . . Philidor has committed to cease operations by January 30, 2016 at the latest."

309.    Pearson also began to disclose the negative financial impact the closing of Philidor and the government inquiries into its practices were having, stating in relevant part:

> In the very short term, disruption in our dermatology business will be significant. Last week, we asked Philidor to stop adjudicating claims and to fill all prescriptions at no cost for the week.
>
> Turning to Neuro, we are also seeing some short-term pressure in our Neuro business, in particular with respect to Nitropress and Isuprel, given all the publicity around those two drugs. We're working with our large customers and providing direct discounts to protect volume.

310.    Despite having just raised guidance less than a month before (on October 19, 2015), Pearson suggested it would be withdrawn and lowered:

> In terms of guidance, we are working to quantify the potential short-term impact of recent events, including the termination of our relationship with Philidor.

122

Specifically, the downsides in Q4 will be primarily in dermatology and to a lesser extent, neurology RX. Obviously, what has happened will impact Q4. We are working to quantify the impact on Q4 and 2016 and we will provide you with updated guidance at our investor day in December.

311.    Pearson was asked about the impact the Company would see in 4Q15 in the

dermatology division, and responded:

So, again, based on the data we have, we've not seen volume declines. It's largely the value of the average selling price for a script. Now, I would not be shocked to see some volume declines over the next few weeks.

In fact, I would expect that. But I don't think they're going to be hugely material. The onus is on us to get some sort of a Plan B in place, and we are quite confident that we'll be able to get that done quite quickly.

312.    Additionally, in response to an analyst's question regarding pricing scrutiny,

Pearson stated "if we're viewed as aggressive, we're going to have to listen to that."  He

acknowledged "the past few weeks have been a painful learning experience for me personally"

and stated "[t]he other things I'm dedicated to doing going forward is listening more to our

patients, our partners, and our critics."

313.    In response to those partial disclosures on November 10, 2015, the price of Valeant

stock dropped 2%, from a close of $85.41 per share on November 9, 2015 to a close of $83.68 per

share on November 10, 2015, on unusually high trading volume.

314.    The disclosures detailed above revealed the truth regarding Defendants'

representations to investors, and accordingly caused the prices of Valeant call options to decrease,

removing the artificial inflation, and the prices of Valeant put options to increase, removing the

artificial deflation.

315.    Additionally, after the market closed on November 10, 2015, it was reported that

the Sequoia Fund, Valeant's biggest shareholder, had paid and was offering to pay Philidor

employees in order to obtain information regarding Valeant's practices.  And on November 11,

2015, *Bloomberg* reported that Valeant creditors were "spooked by possibility of revenue squeeze" and concern was "growing that disruption to Valeant's cash flow could heighten the risk of the company violating lender limits on its debt burden." The article reported that according to one creditor, "The Big question is: What is the true cash-flow generation nature of the company? Will it be materially different?" The report further noted Valeant's dermatology and neurology business accounted for 24 percent of company revenue, which Pearson stated would be "significantly" disrupted. Also that day, Nomura analysts cut their Valeant price target. Additionally, on November 12, 2015, *Bloomberg* released another article regarding Valeant's relationship with Philidor and media reports recounted how numerous analysts had lowered their price targets for the Company.

316.    In response to those partial disclosures, Valeant's stock price dropped an additional 6.5%, to close at $73.77 per share. The total stock price decline from November 10 through November 12, 2015 was over 13%, or approximately $11 per share.

317.    The disclosures detailed above revealed the truth regarding Defendants' representations to investors, and accordingly caused the prices of Valeant call options to decrease, removing the artificial inflation, and the prices of Valeant put options to increase, removing the artificial deflation.

318.    On November 16, 2015, *Bloomberg* reported that Congressman Elijah Cummings wrote to Pearson requesting that he make Valeant employees Gary Tanner, Bijal Patel, and Alison Pritchett available for interviews based on allegations "that a group of Valeant employees helped launch Philidor's business in 2013 and have remained involved in its daily operations." Congressman Cummings also asked for contact information for Laizer Kornwasser, who had recently left the Company. After the market closed that day, *The Washington Post* published an

article titled "House Committee to hold hearing on prescription drug pricing," reporting that the House Oversight Committee would hold a formal hearing in early 2016 focusing on prescription drug pricing and that the Committee had reached out to Valeant to gather information. The article also stated members of the House Oversight Committee were calling for Valeant executives to testify at the hearing.

319.    In response to the partial disclosures on November 16, 2015, the price of Valeant stock dropped by nearly 3%, from a close of $75.41 per share on November 13, 2015 to a close of $73.32 per share on November 16, 2015, on unusually high volume, and continued to decline on November 17, 2015, dropping an additional 4% to close at $70.32, on high trading volume.

320.    The disclosures detailed above revealed the truth regarding Defendants' representations to investors, and accordingly caused the prices of Valeant call options to decrease, removing the artificial inflation, and the prices of Valeant put options to increase, removing the artificial deflation.

321.    On December 15, 2015, Valeant issued a press release announcing it had entered into a deal with Walgreens to distribute Valeant products, which included 10% price reductions for its branded prescription-based dermatological and ophthalmological products.

322.    On December 16, 2015, Valeant issued a press release formally withdrawing the inflated guidance it had issued on October 19, 2015. Valeant issued new 4Q15 revenue guidance of $2.7 billion-$2.8 billion (a reduction of approximately $600 million from $3.25 billion-$3.45 billion) and Cash EPS guidance of $2.55-$2.65 (a reduction of approximately $1.50 from $4.00-$4.20). Valeant also issued new 2015 full year revenue guidance of $10.4 billion-$10.5 billion (a reduction of approximately $700 million from $11.0 billion-$11.2 billion) and new 2015 Cash EPS guidance of $10.23-$10.33 (an approximately $1.50 reduction from $11.67-$11.87). Finally,

Defendants issued new 2016 EBITDA guidance of $6.9 billion-$7.1 billion (a reduction of approximately $500 million from $7.5 billion).

323.    On December 16, 2015, an analyst for Piper Jaffray reported that Valeant was not "well positioned for significant [price/earnings] recovery anytime soon given the credibility gap associated with senior management."  The next day, Mizuho Securities USA cut its rating on Valeant stock to "neutral" from "buy," pointing to a lack of clarity regarding Valeant's agreement with Walgreens and stating that Valeant management had "not done a good job in articulating the details" and that "[w]e still don't understand how this partnership will improve filled prescriptions if payer restrictions persist."  During market hours that day, *Bloomberg* published an article reporting on the Mizuho downgrade.  On that news, the price of Valeant stock declined nearly 6%, falling $7 from a closing price of $118 on December 16, 2015 to close at $111 on December 17, 2015.

**C.    Disclosures in February and March 2016**

324.    On February 19, 2016, a Wells Fargo report by analyst David Maris, which provided a detailed analysis of Valeant, drew significant media attention. The media noted Maris had identified inconsistencies with regard to Defendants' disclosures concerning Philidor's impact on the business.  Specifically, Maris found that Valeant initially claimed Philidor accounted for 7% of sales, yet lowered 4Q15 revenue guidance by 17%-19% (from $3.25 billion - $3.45 billion to $2.7 billion-$2.8 billion) and EPS guidance by nearly 37% (from $4.00-$4.20 to $2.55-$2.65). Maris commented "Valeant has not explained how the unwinding of a business that represents only approximately 7% of total revenue, and is, according to Valeant, less profitable than traditional prescriptions, results in a 36.6% reduction in EPS."  Maris added that at approximately 7% of revenue, Philidor would have represented approximately $227.8 million in revenue for 4Q15, yet guidance was lowered by $526.5 million.  He concluded "the new guidance is not

compatible with the data presented by Valeant" and "the reduction in guidance does not match the impact, as described by Valeant."

325.   Further, according to media reports, Maris stated "we believe investors are likely questioning the judgment and decision making of [the] management team and board," adding "corporate cultures . . . are difficult to change without management and board changes."  Maris noted "the slide in Valeant's shares is directly related to decisions that the board and management have made," including "the board review and approval of a relationship with Philidor, which later caused a significant decline in shareholder value and corporate reputation."

326.   Media reports also recounted that Maris discussed the reduced financial outlook for Valeant, noting "management has said that it is not planning to complete any acquisitions in 2016, nor is it planning to raise prices excessively," and concluding "this will pose significant risk for a company that was dependent on both."  He further commented "the model of cutting R&D and spending, and dramatically raising prices, in pursuit of higher and higher EPS to fuel a roll-up strategy built on earnings accretion for deals is shortsighted, as often the cuts undermine the longer-term prospects of the business."

327.   Finally, according to media reports, Maris identified how Valeant's accounting was misaligned with Valeant's purported performance.  He said "receivables growth has outstripped sales growth over the past several years" and noted that a screening tool it uses "to predict the likelihood of accounting misstatements, puts Valeant in the 'substantial risk' category," adding that when "receivables are increasing faster than revenue, it can often indicate that customers are hesitant to pay for products" and "[a]n alternative explanation for a dramatic rise in receivables is a company's improperly timed recognition of revenue."  Maris further stated that "gross-to-net revenue adjustments" in 2012 were 19.1% of gross revenues but had steadily increased to 41.1%

of gross revenues by 3Q15, and that "Valeant suggests the reason for the increasing provision is growing returns, rebates, and co-pay assistance programs related to select dermatology products."

328.   In response to the partial disclosures on February 19, 2016, the price of Valeant stock dropped by nearly 10%, falling from a close of $94.11 per share on February 18, 2016 to a close of $84.99 per share on February 19, 2016, on elevated trading volume.

329.   The disclosures detailed above revealed the truth regarding Defendants' representations to investors, and accordingly caused the prices of Valeant call options to decrease, removing the artificial inflation, and the prices of Valeant put options to increase, removing the artificial deflation.

330.   On February 22, 2016, Maris released an updated note regarding Valeant that included two additional valuation models and a $62 price target, and CVS announced it would restrict the use of Jublia, one of Philidor's most heavily distributed drugs, by requiring patients to first try a less-expensive generic drug.

331.   Also on that day, *Market Watch* reported that Valeant "likely needs to restate some of its previous financial results based on the findings of an internal investigation into its business, according to people familiar with the matter." *Market Watch* noted the "potential revisions concern revenue that Valeant booked when its drugs were shipped to a distributor" and involved "late 2014 and early 2015."

332.   That evening, Valeant issued a release confirming its financial restatement. In the release, Valeant admitted "the Company has preliminarily identified certain sales to Philidor during 2014, prior to Valeant's entry into an option to acquire Philidor, that should have been recognized when product was dispensed to patients rather than on delivery to Philidor." The release stated the Company "currently believes that approximately $58 million of net revenues previously

recognized in the second half of 2014 should not have been recognized upon delivery of product to Philidor," and "[c]orrecting the misstatements is expected to reduce reported 2014 GAAP EPS by approximately $0.10."

333.    Valeant also revealed internal control problems, stating that the Company would "delay filing its 2015 10-K pending completion of the review of related accounting matters by the Ad Hoc Committee . . . and the Company's ongoing assessment of the impact on financial reporting and internal controls." Schiller assured investors that the Company was "committed to improving reporting procedures, internal controls and transparency for our investors" and "[w]e have made mistakes in the past and our focus today is on executing our business plan and rebuilding trust."

334.    In response to the partial disclosures on February 22, 2016, the price of Valeant stock dropped by over 10%, from a close of $84.99 per share on Friday, February 19, 2016 to a close of $75.92 per share on Monday, February 22, 2016, on unusually high trading volume. Valeant shares continued falling in after-hours trading on February 22, 2016 as news of the impending restatement hit the market, dropping as low as $68 per share.

335.    The disclosures detailed above revealed the truth regarding Defendants' representations to investors, and accordingly caused the prices of Valeant call options to decrease, removing the artificial inflation, and the prices of Valeant put options to increase, removing the artificial deflation.

336.    On Sunday, February 28, 2016, Valeant issued a press release announcing that Pearson was returning from his medical leave but that the Company was separating the role of CEO and Chairman of the Board, naming Ingram as Chairman. The release further disclosed that "[i]n the interim, the Company is withdrawing its prior financial guidance," adding that "[a]s

previously announced, the Company will delay filing its 2015 10-K pending completion of the review of certain accounting matters by the Ad Hoc Committee" and "the Company's ongoing assessment of the impact on financial reporting and internal controls." Pearson was quoted as admitting that "I realize that recent events are disappointing to everyone" and that among his priorities would be "improving Valeant's reporting procedures, internal controls and transparency." Numerous media outlets reported on these disclosures prior to the market's opening on February 29, 2016. Wells Fargo analyst Maris wrote in a research note, for instance, that he was "concerned by Pearson's return" and that "[a]s of this writing, Valeant has lost more market value than it has created." Later that day, *Bloomberg* reported that Pearson would hold a call with sell-side analysts that day, despite canceling the public earnings call scheduled for earlier in the day. Additionally, Moody's placed Valeant ratings on review for potential downgrade, reflecting concerns that Valeant's underlying operating performance was weaker than Moody's previous expectations, potentially impeding the Company's deleveraging plans. Then, within hours of release of the *Bloomberg* article regarding Valeant's non-public conference call, reports surfaced that Valeant had cancelled its non-public analyst call "due to media interest." As the day progressed, reports surfaced, and Valeant ultimately confirmed, that the Company was under investigation by the SEC and had received a subpoena from the SEC during 4Q15.

337.    In response to the partial disclosures on February 28 and 29, 2016, the price of Valeant stock dropped by more than 18%, from a close of $80.65 per share on Friday, February 26, 2016 to a close of $65.80 per share on Monday, February 29, 2016, on unusually high trading volume.

338.    The disclosures detailed above revealed the truth regarding Defendants' representations to investors, and accordingly caused the prices of Valeant call options to decrease,

removing the artificial inflation, and the prices of Valeant put options to increase, removing the artificial deflation.

339. On March 15, 2016, Valeant reduced its financial guidance for 2016 and provided unaudited financial information regarding its 4Q15 performance. With regard to 2016 guidance, Valeant lowered revenue guidance to $11 billion-$11.2 billion (a reduction of approximately $1.5 billion and 12% from the full year 2016 $12.5 billion-$12.7 billion guidance given on December 16, 2015), Cash EPS guidance to $9.50-$10.50 (a reduction of approximately $3.50 from its prior $13.25-$13.75 guidance), and full year 2016 EBITDA guidance to $5.6 billion-$5.8 billion (an approximately $1.3 billion reduction from its prior $6.9 billion-$7.1 billion guidance). The Company blamed "reduced revenue assumptions for certain businesses, new managed care contracts, and increased investment in key functions, such as financial reporting, public and government relations and compliance, as well as the impact of the weak first quarter of 2016."

340. The Company hosted a conference call that same day. During the call, Rosiello stated Valeant's first quarter results were below guidance in part due to "realizing a slower- than-expected rebound in dermatology," and Pearson added that "increases in rebates are due to more competitive pressure in response to our store price increases for our late life cycle products." In a press release also issued that day, Valeant disclosed $51.3 million in "wind down costs" for Philidor, which included writedowns of fixed assets and bad-debt expenses during the "wind down period November 1, 2015 through December 31, 2015." The Company also disclosed a "$79.0 million impairment charge related to Philidor Rx Services."

341. During the conference call, Pearson explained why the guidance was being lowered. In particular, he cited "higher-than-expected inventory reductions that transition from Philidor to Walgreens and the cancellation of almost all price increases." Pearson added that "any

131

future price increases will be more modest and in line with industry practices and managed- care contracts," and noted "[w]e have experienced increased competitive pressure at the payer level, resulting in increased rebates for access for our key growth products, like Jublia." He further revealed that the Company had already committed to reducing pricing on certain dermatology products "within the Walgreens' portfolio, on average, 10%" and that the "price reduction is on WAC and will impact and will be taken across all channels, not just Walgreens."

342.    During the conference call, Defendants further admitted that even the Company's release from that morning was inaccurate in reporting forecasted adjusted EBITDA for the next four quarters of $6.2 to $6.6 billion, when the number should have been only $6.0 billion.

343.    Additionally, during that call, an analyst noted "the fact that management needs to rebuild credibility with investors" and that the guidance was "lowered far more than any investor anticipated." The analyst asked "how can we be confident in what you're saying today about the business, given that you were positive in December and January?" Pearson responded, in part, "we have to earn back the credibility."[4]

344.    Also on March 15, 2016, Moody's further downgraded Valeant's credit ratings, as well as those of its subsidiaries.

345.    In response to the partial disclosures on March 15, 2016, the price of Valeant stock fell by more than 50%, from a close of $69.04 per share on March 14, 2016 to a close of $33.51 per share on March 15, 2016, on extremely high trading volume.

346.    The disclosures detailed above revealed the truth regarding Defendants' representations to investors, and accordingly caused the prices of Valeant call options to decrease,

---

[4] In a publicly disclosed message to Valeant employees the next day, Pearson reiterated that "[r]estoring the public's confidence will take time."

removing the artificial inflation, and the prices of Valeant put options to increase, removing the artificial deflation.

347.    On March 21, 2016, Valeant filed a Form 8-K announcing the restatement of its prior financial statements.  The Company disclosed that in light of the ad hoc committee's review of recent allegations and related matters it was determined that "approximately $58 million in net revenues relating to sales of Philidor during the second half of 2014 should not have been recognized upon delivery of product to Philidor."  Valeant therefore disclosed that the Company's last four financial statements, the 2014 10-K, and the 10-Qs for the first, second and third quarters of 2015, along with PricewaterhouseCooper's audit report on the 2014 10-K, should no longer be relied on.

348.    Specifically, the ad hoc committee determined that the Company's revenue recognition "on a sell-in basis (*i.e.*, recorded when the Company delivered the product to Philidor)" before the Company's purchase option agreement with Philidor was improper.  Instead, "revenue for certain transactions should have been recognized on a sell-through basis (*i.e.*, record[ed] revenue when Philidor dispensed the products to patients) prior to entry into the option agreement."  As a result, the Company was no longer able to record revenues for shipments to Philidor and could only record revenues upon shipment to the patient. The press release further disclosed:

> Management, in consultation with the [ad hoc] committee, has concluded that one or more material weaknesses exist in the Company's internal control over financial reporting and that, as a result, internal control over financial reporting and disclosure controls and procedures were not effective as of December 31, 2014 and disclosure controls and procedures were not effective as of March 31, 2015 and the subsequent interim periods in 2015 and that internal control over financial reporting and disclosure controls and procedures will not be effective at December 31, 2015.

The Company further admitted:

> The ***improper conduct*** of the company's former chief financial officer [Schiller] and former corporate controller [Carro], which resulted in the

provision of incorrect information to the committee and the company's auditors, contributed to the misstatement of results. In addition, as part of this assessment of internal control over financial reporting, the company has determined that the ***tone at the top of the organization*** and the performance-based environment at the company, where challenging targets were set and achieving those targets was a key performance expectation, may have been contributing factors resulting in the company's improper revenue recognition.

349.    The Company further stated it would begin searching for a new CEO to replace Pearson, who would continue to serve as CEO and a director until his replacement was appointed.

350.    On March 22, 2016, *Business Insider*, in an article titled "Bill Ackman's Plan to Fix Valeant Is Doomed," attempted to quantify the impact of the change in business strategy from Valeant's non-traditional approach to that of a traditional pharmaceutical company.  The article noted that without price hikes, "Valeant would lose 10% of its revenue."   The analysis showed that operating margins would decrease from 24% to 7% and with an increase in R&D spending to 13% instead of 3% that "Valeant would be losing money. *A lot of money.*"  (Emphasis in original.) The article further noted that, according to an analysis conducted by *Bloomberg*, "[i]f Valeant was operating more like a traditional specialty pharma company, it could have had a trailing 12-month (4Q15) loss of $2.44 rather than an adjusted EPS of $1.53. Ebit could have dropped to $606 million from $2.5 billion . . .Valeant could have had an adjusted net loss of $842 million instead of net income of $527 million."

### D.    Disclosures from April to August 2016

351.    On April 9, 2016, *The New York Times* published an article titled "The Female Viagra, Undone by a Drug Maker's Dysfunction," which noted "Valeant dismissed the entire sales force behind [Addyi]" and "doctors had prescribed the drug fewer than 4,000 times as of February."   Citing interviews with former employees, analysts, investors and doctors, the article attributed Addyi's failure to Valeant's pricing actions and reliance on Philidor. The article

explained that Sprout (the maker of Addyi) had determined that Addyi should be sold at $400 and "Anthem, one of the nation's largest insurers, said it would cover the drug at the $400 price." However, once Valeant acquired the drug, it doubled the price to $800, causing payors to reconsider their coverage.  Valeant also terminated Sprout's distribution agreement with Cardinal Health, deciding instead to rely on Philidor.

352.    On April 29, 2016, Valeant released its annual report on Form 10-K for the year ended December 31, 2015, which confirmed the financial restatement and the Company's material weaknesses.  Additions to the 2015 10-K demonstrated the inadequacy of the disclosures in the Company's prior annual and quarterly reports.  On this news, Valeant's common stock dropped $1.89 a share, or 5.36%, to a close of $33.36, on heavy trading volume.

353.    On May 3, 2016, Valeant announced the appointment of Joseph C. Papa as its CEO and Chairman of the Board, reuniting the roles it recently had separated.  Three weeks later, on May 23, 2016, Papa spoke publicly at the UBS Global Healthcare Conference. While answering questions from investors and analysts, Papa described Valeant as "a great turnaround opportunity" and discussed a number of the challenges he inherited. Papa acknowledged that with Philidor "clearly we had some question marks," "there were some pricing mistakes that were made" and "some transparency things that [could be] improve[d] on at Valeant."  Regarding internal controls, Papa recognized "there are some functions that we need to put some additional [] controls" and "there is some investment that needs to happen in areas," such as finance, "where [Valeant] just need[s] to bring some additional financial capabilities."  To that end, Papa disclosed that the Company "just recently hired a new Controller."

354.    On June 7, 2016, Valeant made additional disclosures regarding the financial impact of shutting down its captive pharmacy network, restricting the Company's ability to price

gouge and engage in deceptive practices.  That day, Valeant filed its 1Q16 10-Q, issued a press release and hosted a conference call regarding the Company's long-awaited 1Q16 financial results, which had been delayed by several months.  Valeant disclosed a GAAP loss per share of ($1.08) for 1Q16 and significantly lowered its 2016 guidance again to total revenue of $9.9 billion-$10.1 billion (down from $11 billion-$11.2 billion), adjusted EPS (non-GAAP) of $6.60-$7.00 (down from $8.50-$9.50), and adjusted EBITDA (non-GAAP) of $4.80 billion-$4.95 billion (down from $5.6 billion-$5.8 billion).  During Valeant's conference call that day, Rosiello stated "[t]he base business in Q1 declined by $289 million, driven by dermatology . . . and the transition to Walgreens."

355.    Further revealing the detrimental effect that the loss of Philidor was having on Valeant's pricing, volume and drug refills, Rosiello added that:

> Following the launch of the Walgreens program in January, we saw volume flattening and ASPs [average selling prices] declining post launch. **Overall volume challenges were exacerbated by the loss of refills following the shutdown at the end of January of our previous specialty pharmacy [Philidor] relationship**, as well as the negative external narrative and some internal disruptions . . . .

356.    Papa added that the "vast majority" of Valeant's "revenue shortfall in dermatology in our revised guidance relates to this average selling price shortfall."  During the question-and-answer portion of the call, Papa further revealed how much the Company's drug pricing and profitability were suffering as a result its cessation of price gouging and deceptive practices and the termination of its relationship with Philidor:

> The issue is that **there is a percentage of the business where the average selling price is significantly below what we had previously expected as we put the program together. And in fact, in some places that average selling price is negative and by that [it] means, every time a prescription goes out the door we're taping dollar bills to that prescription as it goes out the door**. That's something that we have to get fixed.

357.    In response to the partial disclosures on June 7, 2016, which further revealed the extent to which Valeant relied on Philidor to boost prescription drug sales, refills and prices during much of the Class Period, the price of Valeant stock dropped by nearly 15%, from $28.85 on June 6, 2016 to close at $24.64 on June 7, 2016, on a reported volume of over **104 million shares**.  As of this date, it was the second most active trading day in Valeant's history.

358.    The disclosures detailed above revealed the truth regarding Defendants' representations to investors, and accordingly caused the prices of Valeant call options to decrease, removing the artificial inflation, and the prices of Valeant put options to increase, removing the artificial deflation.

359.    On July 31, 2016, *The New York Times* published an article titled "How Valeant Cashed In Twice on Higher Drug Prices," which detailed Valeant's use of "price appreciation credits" to inflate the Company's revenues.  The article explained that the credits, which come about when a drug company increases the cost that its wholesalers must pay for a product they have contracted to distribute, were "an obscure but vital source of cash to Valeant that is directly linked to its pricing practices."  As reported by *The New York Times*, "[n]ow that those practices are under scrutiny, the money Valeant receives from these credits is likely to decline substantially or disappear outright," noting the "unique" and "outsize contributions" of the credits to Valeant's cash flows.  "In recent periods, they have equaled one-fifth or more of Valeant's operating cash flow," the article emphasized, based on the Company's reported financials.

360.    On August 9, 2016, Valeant issued a release and hosted a conference call regarding the Company's 2Q16 financial results.  In the release, Valeant disclosed a GAAP loss per share of ($0.88) for 2Q16 and a drop in revenue of 11.4%, with the Company blaming the slow recovery in its dermatology division, which suffered greatly from Philidor's closing.  The release disclosed

that Valeant's dermatology revenue dropped 55% compared to 2Q15, with Solodyn and Jublia sales down 74% and 69%, respectively, year-over-year.  The two Valeant drugs singled out by Congress at the start of its probes, the heart drugs Nitropress and Isuprel, experienced year-over-year revenue declines of 46% and 19%, respectively.  In Valeant's conference call that day, Papa stated that "I don't want to suggest for an instant that there [aren't] challenges" and that it "will take time to implement and execute our turnaround plan."  Additionally, the Company cited lower price appreciation credits as one of the reasons revenues declined 14% in Developed Markets.

361.    Also on August 9, 2016, in an article titled "Valeant Begins to Look Like A Normal Drug Company, But With Way Too Much Debt," *Forbes* reported on analysis by Wells Fargo analyst Maris.  Further demonstrating the challenges facing the Company following the closure of its secret pharmacy network and the cessation of its deceptive practices, *Forbes* noted that by Maris's calculations, "Papa will have to deliver a 55% sequential increase in adjusted EPS and a 30% increase in adjusted EBITDA in the second half of 2016 to meet guidance" and that "Xifaxan remains off pace to hit $1 billion in 2016 sales, a previous Valeant target."  Quoting Maris, *Forbes* added:  "If Papa falls short in coming quarters, it is likely many will see the company's new reign as 'just new paint on the same old shed' . . . ."

362.    After the market closed on August 10, 2016, *The Wall Street Journal* reported that Valeant was under criminal investigation by the DOJ regarding whether it defrauded insurers by concealing its relationship to Philidor and for a variety of other deceptive business practices. According to the *Journal* article, which was quickly picked up by a variety of other media outlets, federal prosecutors in the U.S. Attorney's Office in Manhattan were investigating possible mail and wire fraud violations based on whether Valeant "defrauded insurers by shrouding its ties to a mail-order pharmacy [Philidor] that boosted sales of its drugs," and for deceptive business

practices used to sell Valeant drugs, such as rebates and other compensation provided to patients. According to sources interviewed by the *Journal* familiar with the matter, "[p]rosecutors are investigating not only the level of control Valeant exerted over Philidor's business, but the extent of the ties, including Valeant's role in Philidor's growth." The *Journal* cited those sources as stating "***the probe is expected to be the most serious Valeant currently faces***, and could lead to criminal charges against former Philidor executives and Valeant as a company." The article quoted a statement by Valeant that it "has been cooperating and continues to cooperate with the ongoing Southern District of New York investigation."

363. In response to that news, which further revealed the enormous risks presented by Valeant's secret pharmacy network and other undisclosed business practices, the price of Valeant stock declined by over 10%, from $27.32 on August 10, 2016 to close at $24.49 on August 11, 2016, on a reported volume of over ***56 million shares***.

364. The disclosures detailed above revealed the truth regarding Defendants' representations to investors, and accordingly caused the prices of Valeant call options to increase, removing the artificial inflation, and the prices of Valeant put options to increase, removing the artificial deflation.

365. Further, the timing and magnitude of the price declines discussed above negate any inference that Plaintiffs' losses were caused by changed market conditions, macroeconomic or industry factors, or Company-specific factors unrelated to Defendants' wrongful conduct.

## XI.   RECENT EVENTS CONTINUE TO EVIDENCE MASSIVE FRAUD AT THE COMPANY

366. On October 31, 2016, *Bloomberg* reported that Valeant's former CEO, Defendant Pearson, and the Company's former CFO, Defendant Schiller, are the focus of a criminal probe by prosecutors at the Justice Department concerning accounting fraud related to Valeant's

concealment of its ties to Philidor and the secret pharmacy network. *Bloomberg* further reported that U.S. prosecutors in Boston and Philadelphia are conducting additional, separate inquiries of Valeant. The investigation by federal prosecutors in Boston is centered on Valeant's payments to charities that then helped patients make co-payments for the high cost of Valeant drugs. The investigation by federal prosecutors in Philadelphia focuses on Valeant's improper billing of government health care programs.

367.    On November 17, 2016, then-United States Attorney for the Southern District of New York, Preet Bharara ("Bharara"), announced the arrests of Tanner and Davenport. The Justice Department's complaint alleges that Tanner and Davenport engaged in a multi-million dollar fraud and kickback scheme. The claims for wire fraud, money laundering, and conspiracy carry sentences of up to 20 years in prison. In announcing the criminal complaint, Mr. Bharara emphasized that the charges were only the first charges brought by the Government in its ongoing probe of Valeant. Mr. Bharara rebuked Tanner and Davenport for engaging in a "fraudulent scheme to illegally use Philidor as a vehicle for personal profit and self-dealing," which "illegally converted Valeant shareholder money into their own personal nest eggs."

368.    On March 13, 2017, Ackman's Pershing Square withdrew its investment in Valeant at a massive loss, estimated by *Fortune* to be in excess of $4 billion. In Pershing Square's 2016 Annual Report, released March 28, 2017, Ackman admitted to investors that investing in Valeant was "a huge mistake" and questioned the credibility of Valeant's former executives, acknowledging that he had "misjudged the prior management team."

369.    Valeant has also overhauled its Board of Directors since the end of the Relevant Period. In addition to removing Defendants Pearson and Schiller from the Board, on June 19,

2017, Valeant announced that it had expanded the Board of Directors to a total of eleven members, ten of whom are independent.

370.    On May 22, 2018, following a three-week trial, Tanner and Davenport were found guilty on all charges, including wire fraud and conspiracy to commit money laundering. Sentencing is set for September 19, 2018.

371.    Valeant remains under investigation by the United States Attorney for the Southern District of New York, the United States Attorney for the District of Massachusetts, the SEC, as well as the Autorité des marchés financiers (Canada's principal securities regulator), for the fraudulent practices alleged herein.

## XII.    ADDITIONAL INDICA OF DEFENDANTS' SCIENTER

372.    As addressed above, the Defendants operated an elaborate scheme spanning years to defraud investors by issuing false and misleading statements about Valeant and its financial and operating performance.  Valeant defrauded PBMs, physicians and insurers through secret and illicit practices intended to boost the sales and prices of Valeant-branded products.  The Management Defendants were personally aware of the deceptive and fraudulent practices detailed herein, as the Management Defendants designed and implemented those practices.  Moreover, due to their frequent meetings and their effective control over, and contractual right to review and approve, Philidor's records and policies, the Management Defendants were either personally aware of, or were severely reckless in disregarding, the improper and deceptive tactics that Philidor employed.  The Management Defendants also possessed significant motives to engage in, design and implement the aforementioned fraudulent conduct.  The facts below further demonstrate the Management Defendants' scienter.

## A.    Valeant's Admission of Improper Conduct

373.    Valeant has already admitted the falsity of several of the Management Defendants' statements from the Class Period.   For example, on February 3, 2016, Valeant admitted that Pearson's April 29, 2015 claim that "volume was greater than price in terms of our growth" was false.

374.    Similarly, on February 22, 2016, Valeant issued a press release admitting that the Company had improperly recognized Philidor-related revenues.   One month later, on March 21, 2016, Valeant issued another press release, this time accompanied by a Form 8-K, to disclose that Valeant had material weaknesses in internal controls and that Valeant's 2014 10-K and 1Q2015, 2Q15 and 3Q2015 10-Q's could no longer be relied upon.

375.    Moreover, Valeant concluded that Schiller had engaged in "improper conduct" and "that the tone at the top of the organization and the performance-based environment . . . may have been contributing factors resulting in improper revenue recognition."

376.    Finally, Valeant asked Schiller to resign from the Board and forced Pearson and Carro out of the Company.

## B.    The Management Defendants' Role in Valeant's Business Strategy

377.    The Management Defendants were active and culpable participants in the fraudulent scheme alleged herein because they received information reflecting the truth regarding Valeant, controlled and received Valeant's materially misleading misstatements and, by virtue of their positions within Valeant, were privy to confidential and proprietary information regarding the Company's unsustainable business model and its reliance on deceptive practices.   The fraud was pervasive, multi-faceted and carefully designed.   Such a sophisticated and wide-ranging fraudulent scheme could not have been orchestrated for such a long period without the knowledge of or extreme recklessness by the most senior personnel at the Company, including the

142

Management Defendants.  This is particularly true where, as here, the Management Defendants were actively involved in the day-to-day operations of the Company.

378.    For example, Pearson's management style, as reported by *Bloomberg Businessweek*, ensured that he would know of the Company's fraudulent practices.  Pearson "had his fingers in everything, from operations to making decisions about the salaries of individual employees" and actively "micromanaged things he deemed important."  Further demonstrating his involvement in the wrongdoing, Pearson admitted in a written statement to the United States Senate that, "as [Valeant's] leader, [he] was too aggressive in pursuing price increases on certain drugs."

379.    Pearson also worked closely with the other Management Defendants.  For example, he held a call each Tuesday at 11:00 a.m. with all the leaders of Valeant's business, during which Valeant's senior management discussed opportunities, assessed the business, addressed developing issues and attempted to ensure that the Company did not face any surprises at the end of each quarter.

380.    Another of the Management Defendants, Schiller, acknowledged his and Pearson's active involvement in and awareness of Valeant's strategy.  For example, on the April 29, 2015 conference call in which he announced his resignation as CFO, Schiller stated that Pearson "sets the tone at Valeant."  Schiller also stated:

> "I've completely bought into our unique strategy and culture, the transparency and fact-based approach to running our business, and our relentless focus on building a great Company and on creating shareholder value . . . . Valeant's business has never been stronger and its prospects have never been brighter. . . ."

381.    Schiller similarly revealed his and Pearson's hands-on approach, and therefore inference of scienter, when he disclosed on a May 28, 2014 conference call with investors that he and Pearson "religiously track each deal on a quarterly basis.  Our Board of Directors receives a

report every quarter on each deal.  We review every quarter and ask ourselves how are we doing. We are our own biggest critics."  Later that same day, Pearson bragged to investors and industry specialists at the Sanford C. Bernstein Strategic Decisions Conference that Valeant was "tracking every product around the world."

382.   Valeant documents, interviews with former Valeant/Philidor employees and sworn testimony further demonstrate that the Management Defendants were directly engaged in the business, including Valeant's pricing strategies for individual products.  For example, when Valeant added Isuprel and Nitropress to its orphan drug portfolio, Pearson, Schiller, Kornwasser, Davis, Steve Sembler (the Company's former Senior Vice President of Neurology and Other) and Sandeep Lalilt (the Company's Senior Director of Marketing) all participated in a meeting to discuss the pricing of the newly-acquired drugs.  Prominent newspapers, including *The Wall Street Journal*, reported that Pearson intended to implement drastic price increases to attain Valeant's profit targets.  At his hearing before the United States Senate, Schiller testified that, despite the recommendation of the rest of the group, "Pearson made a decision to go with the higher price."

383.   The Management Defendants also represented themselves to investors as the persons most knowledgeable about Valeant's business, operating model, strategies (including pricing, the AF initiative and specialty pharmacies), acquisitions, organic growth, internal controls, ethical standards, compliance programs and the volume, pricing and performance of Valeant's products.  The Management Defendants voluntarily and repeatedly chose to speak on these topics, so they either knew or recklessly disregarded the fact that their statements were materially misleading.

384.   For example, during a May 21, 2016, RBC Investor Meeting, Pearson discussed Valeant's stock price, stating "[w]e expect our stock to go up 50%, 70% a year, that's our

expectation, that's what I get paid to do and our long-term investors appreciate it." He also said "I believe that our company is fundamentally undervalued" and that "last year when we were trading at 105 it was so obvious to me that we were so undervalued why wouldn't all you guys rush in? Not just you guys but I mean investors clearly we weren't worth 105."

385.    Similarly, when Allergan called into question Valeant's pricing practices in mid-2014, Pearson and Schiller vigorously refuted these allegations and claimed Allergan lacked the knowledge about Valeant's business which both Pearson and Schiller possessed. For example, on July 21, 2014, the Company announced it had contacted Quebec and U.S. regulators regarding Allergan's "false and misleading statements regarding Valeant's business," including assertions by Allergan in "an SEC filing that Bausch + Lomb's pharmaceutical sales were stagnant or declining." In the same release, Pearson stated:

> We can no longer tolerate unjustified attacks on Valeant's business and strongly believe we are obligated to take action to protect Valeant shareholders from Allergan's apparent attempts to mislead investors and manipulate the market for Valeant stock. . . . Allergan's continued disparagement of Valeant and repeated questioning of Bausch + Lomb's performance demonstrate their fundamental lack of knowledge about Valeant's business. . . .
>
> Finally, we do not believe that it is productive for either company to conduct due diligence in a public forum and although we have consistently offered Allergan the opportunity to conduct due diligence on our business, its management and board have refused, and have instead chosen to make misrepresentations and false statements about our business.

386.    Additionally, Pearson, Schiller and Rosiello were responsible for obtaining the knowledge necessary to ensure the Company's disclosures to the market were true when executing SOX Certifications. Pearson, Schiller and Rosiello either drafted, prepared or approved Valeant's various SEC filings, releases and other public statements, as evidenced by their signatures and their managerial control over the information disclosed within those statements.

145

### C.    The Management Defendants' Decision to Close Philidor

387.    The Management Defendants designed, implemented or possessed knowledge of Valeant's reliance upon Philidor and the related secret network of captive pharmacies to artificially inflate Valeant's growth rates until Philidor's closure in late 2015.  The Management Defendants also knew that Valeant was concealing its relationship with Philidor, because the Management Defendants were involved in the acquisition of Medicis and developed the "alternative fulfillment" strategy initially employed only for Medicis pharmaceuticals that led to the formation of Philidor on January 2, 2013.

388.    Indeed, Valeant announced the hiring of Kornwasser on January 3, 2013, one day after the formation of Philidor.  Kornwasser and Tanner served as Valeant's primary points of contact at Philidor and reported to Pearson (Kornwasser directly, Tanner through Kornwasser).  The fact that Kornwasser received $8.8 million in total compensation in his first year of employment evidenced the central role that Philidor was intended to serve in Valeant's business model.

389.    Furthermore, Pearson, Schiller and senior management signed the Philidor agreements and frequently discussed the benefits of Valeant's new "alternative fulfillment program" with investors, while misrepresenting the true nature of that program.  The Management Defendants knew that numerous Valeant employees assisted in the formation of Philidor and subsequently worked at Philidor under aliases in order to conceal the connection between Valeant and Philidor.

390.    Prior to purchasing the option to acquire Philidor, Pearson, Schiller and Valeant's Board of Directors performed extensive due diligence of Philidor.  Notably, prior to the purchase of the option, the entire Audit and Risk Committee of Valeant's Board personally toured Philidor's facility in Pennsylvania.  Valeant thereby gained further additional knowledge about Philidor's

146

business practices and operation.  After Valeant paid $100 million to acquire the option to purchase Philidor (for $0), Valeant failed to disclose—and, in fact, actively concealed—its relationship with Philidor, including in Valeant's financial statements. Valeant's entire Board of Directors also reviewed and affirmatively approved the Philidor transaction and Valeant's accounting treatment of that transaction, despite the fact that the accounting practices violated GAAP.

391.    Because Valeant possessed actual control over Philidor from the day it was created, the Management Defendants were at minimum aware of, or they were specifically involved in designing, Philidor's role in facilitating Valeant's fraudulent revenue-inflating scheme.  Valeant held a contractual right to inspect Philidor's books, records and facilities, and to audit Philidor's practices.  Valeant either conducted such an audit and knowingly approved of Philidor's deceptive practices so long as they benefited Valeant, or it recklessly failed to conduct such an audit with the knowledge that Philidor's deceptive practices were best ignored as they benefited Valeant's revenue.  In fact, Philidor employees have confirmed that the deceptive practices within Philidor were widely known (within Philidor), discussed and even documented in Philidor's training manuals, demonstrating that any audit would have revealed the wrongdoing to Valeant.  Moreover, Valeant's internal control testing and internal audit program in 2015 included Philidor, and Valeant and Philidor created a joint steering committee guiding Philidor's strategic plan, contractual obligations with insurers, and "internal policies, manuals, and processes."

392.    Contemporaneous email correspondence confirms that Pearson personally monitored or directed Philidor's business practices.  For example, in an email sent by Kellen to Pearson on March 9, 2015, Kellen stated "Met with Deb [Jorn]. . . . Suggested we get all the [District Managers] in for a day . . . goal to go over the practices in each district where Philidor is working well and identify next [approximately] 10 practices where we should push harder to build

it out. That will help fuel growth." Pearson responded, "Good stuff." Additionally, Valeant's management invited Philidor managers to meet Valeant's Board of Directors in July 2015.

393.   Valeant and the Management Defendants also closely monitored the network of pharmacies through which Philidor operated. For example, when R&O Pharmacy withheld invoices from Valeant because of R&O's suspicions about fraudulent conduct involving Philidor, it was Valeant's general counsel that sent a letter to R&O's owner demanding "immediate payment."

394.   When the details of Philidor's relationship with Valeant first began to emerge to the market, the Management Defendants further revealed their intimate knowledge of Philidor's operations. For example, on October 19, 2015, Pearson, Rosiello and Kellen held a conference call with investors in which they defended Philidor (and Valeant's failure to disclose Philidor) as Valeant's "competitive advantage that we did not want to disclose to our competitors." On another conference call a week later, on October 26, 2015, Pearson stated that Philidor was "independent" and sales through it were "less profitable." Valeant announced four days later that Philidor would cease operations due to Philidor's improper practices. The fact that the Management Defendants elected to shut down Philidor only four days after declaring it was in fact "independent" and "less profitable" illustrates that the Management Defendants were already well aware of Philidor's deceptive and illegal practices and further investigation was unnecessary.

395.   The Management Defendants' knowledge of Philidor's illicit practices is also apparent from Pearson's repeatedly highlighting the benefits of Valeant's "alternative fulfillment" strategy while simultaneously refusing to provide meaningful details to investors or the public. Pearson himself admitted that it was a conscious decision to conceal Valeant's relationship with Philidor for supposed "competitive" reasons.

396.    Additionally, Pearson, Ingram and Carro each publicly defended Valeant's accounting in an attempt to refute Citron Research's report, which suggested that Valeant artificially boosted its revenue through Philidor.  Ingram represented on an October 26, 2015 conference call with investors that the entire Valeant Board and Audit Committee had reviewed and confirmed as appropriate Valeant's accounting practices concerning Philidor.  However, when the SEC opened an investigation into Valeant's relationship with Philidor, the Board asked Carro and Schiller to step down because they had engaged in "improper conduct" concerning Valeant's accounting of Philidor-related sales.  Valeant later admitted, as described in ¶ 132, that it needed to restate its prior financial statements because, among other things, it improperly inflated revenues through Philidor by double-booking revenues—a blatant violation of GAAP.

397.    Philidor's efforts to conceal its improper conduct further indicate the Management Defendants acted with scienter, given the effective and actual control Valeant exerted over Philidor.  Reuters reported that, in September 2015, "Philidor began requiring employees to sign confidentially agreements" that would enable "the pharmacy to sue workers who divulged information about its activities."  The timing of Philidor's adoption of confidentiality agreements, immediately following R&O's threat to sue, illustrates Philidor's efforts to conceal wrongdoing.

### D.    Valeant's Refusal to Pursue Remedies Against Individual Wrongdoers

398.    The strong inference of scienter is further supported by the fact that Valeant declined to pursue remedies (such as incentive pay "clawbacks") against Pearson, Schiller, Philidor and the Philidor executives that engaged in the fraudulent conduct.

399.    Valeant's failure to take remedial action was not for lack of options.  In fact, in 2014, Valeant instituted a "clawback" policy that allowed the Company to take back an executive's incentive compensation if a restatement was required within three years of the Class Period and the executive was found to have participated in any fraudulent or illegal conduct.  Valeant did not

pursue that remedy here—after all, the Company had approved of the fraudulent conduct.  In fact, as Ingram revealed, the Board approved the accounting for Philidor.  Thus, notwithstanding the clawback right, Valeant only terminated the employment of the wrongdoers and closed Philidor.

400.    Rather than pursuing a clawback, a month after announcing Pearson would be replaced as CEO, Valeant paid Pearson even more money – effectively a multimillion dollar gratuity.  Valeant retroactively modified Pearson's employment contract to provide him with a $2 million salary for 2016, in addition to other financial benefits, despite the fact that Pearson was entitled to only a performance bonus, but no salary, in 2016.  Valeant has since given Pearson a $9 million severance package.

401.    In addition to failing to enforce the clawback provisions, Valeant also failed to enforce broad indemnification rights against Philidor.  Specifically, the Philidor Purchase Option that Valeant acquired stated that Philidor "shall indemnify, defend, and hold harmless" Valeant "from and against all Losses" that Valeant suffered "as a result of the operation of the Pharmacy or the performance by the Pharmacy of its duties."   However, the Philidor Purchase Option agreement included a provision that any such indemnity liability "shall be reduced to the extent . . . that such Losses are caused by or arise out of . . . the negligence or intentional misconduct of Manufacturer."   Tellingly, rather than pursue its indemnification claim, Valeant entered into a mutual release with Philidor, effective November 1, 2015.

### E.    Congressional Hearings

402.    Congressional committees started investigating Valeant's business practices late in the summer of 2015, and many of the admissions made during these investigations and hearings further support an inference of scienter.

403.    In connection with a February 4, 2016 House Oversight Committee Hearing, Valeant produced 75,000 pages of documents to the House Oversight Committee.  A number of

these documents confirm the allegations set forth in this Complaint.  Specifically, a summary of Valeant's document production affirmed that:  (i) "Mr. Pearson purchased Isuprel and Nitropress in order to dramatically increase their prices" and "Valeant identified goals for revenues first, and then set drug prices to reach those goals;" (ii) "Valeant used its patient assistance programs to justify raising prices and to generate increased revenues by driving patients into closed distribution systems;" (iii) Valeant "sought to exploit this temporary monopoly by increasing prices dramatically to extremely high levels very quickly;" and (iv) "Mr. Pearson utilized this strategy with many more drugs than Isuprel and Nitropress," as Valeant increased by more than 200% the prices of a number of prescription drugs in its portfolio from 2014 to 2015.

404.    Also at the hearing on February 4, 2016, Schiller acknowledged that Valeant acquired the Marathon drugs (Nitropress and Isuprel) for the purpose of raising prices, as the two drugs accounted for 4% of 2015 revenues despite the fact that they were only two of nearly two thousand drugs in Valeant's portfolio.  Schiller also testified at the hearing that risks associated with Valeant's price-gouging strategy included "increased pressure for rebates from the payers, decreased sales volumes from hospitals, increased substitution of alternative products, and heightened competition from new generic or branded drugs."

405.    Pearson, Schiller and Ackman also testified before the Senate Aging Committee, which conducted hearings concerning Valeant on April 27, 2016.  Pearson submitted a written statement prior to the hearing that acknowledged "the company was too aggressive—and ***I, as its leader, was too aggressive—in pursuing price increases*** on certain drugs."  Pearson and Schiller demonstrated throughout the hearing that they were actively involved in directing and implementing Valeant's drug pricing strategy.  While Pearson sought to depict the price increases

as industry standard, he acknowledged, in direct contravention of his prior statements, that "*[o]ur pricing has driven more growth than volume. . . .*"

406.   In response to Senator McCaskill's observation that price had been more responsible for growth than volume in all quarters since 2013 bar one, Pearson confirmed that Senator McCaskill was correct.  This confirmation directly contradicted Pearson's April 29, 2015 statement and his October 14, 2015 letter to Senator McCaskill in which he represented that "[t]here is a misperception in the media that Valeant's revenue growth for existing products has been driven primarily by price."

407.   Finally, the Congressional probes focused on the December 2014 Philidor Purchase Option and why the "option" cost $100 million but the potential "acquisition" would be free. Philidor's counsel provided the following written response:  "Philidor concluded that Valeant's conduct was consistent with a concern about the economic impacts of any PBM response if Valeant had purchased Philidor."  This statement confirms that Philidor and Valeant were aware that the disclosure of Valeant's control over Philidor would result in PBMs refusing to reimburse prescriptions filled by Philidor (which would have negative repercussions on Valeant), which Valeant failed to disclose even as Philidor's existence was revealed.

F.   **The Stream of Executive Departures in the Wake of the Fallout from the Fraud Further Indicates Defendants' Scienter**

408.   The departure of numerous executives and directors, including certain Management Defendants, shortly before and after the revelations concerning the deceptive practices by Valeant and Philidor, further supports an inference of scienter.

409.   For example, on April 29, 2015, less than a half year before Philidor's relationship with Valeant was revealed, Valeant announced that Schiller would resign his CFO position upon the appointment of a successor.

410. Kornwasser departed Valeant in July 2015—even more proximate to the Philidor revelations. Following his departure, Kornwasser declined to speak to the press, and Valeant never made him available for an interview with the House Oversight Committee.

411. Following the Philidor revelations, numerous senior-level members of management departed the Company. For example, on or about March 2, 2016, news outlets reported that Jorn, the head of the U.S. Gastrointestinal and Dermatological divisions, was leaving Valeant, effective immediately. As explained above, Philidor played a particularly vital role in boosting the sales of U.S. dermatology product lines.

412. On March 21, 2016, Valeant announced in a press release that Pearson would leave the Company. In that same press release, Valeant admitted that Schiller and Carro engaged in "improper conduct" while serving in Valeant's management. Schiller was asked to resign from the Board and Carro was replaced as Corporate Controller.

413. On April 29, 2016, Valeant announced that seven of its board members would not stand for re-election. Pearson and Schiller were among the seven board members who departed.

414. On May 20, 2016, Valeant revealed that Stoltz had resigned as Senior Vice President of Neurology, Dentistry and Generics.

**G.    Pearson Actively Misled Ackman, a Significant Valeant Investor**

415. The fact that Pearson actively concealed Valeant's deceptive and illegal practices from Ackman, another large investor with whom Pearson had a continuing business relationship, provides further evidence of Pearson's scienter.

416. In 2014, Ackman, who controlled Pershing Square, one of Valeant's then-largest shareholders, met with Pearson to create a partnership between Pershing Square and Valeant with the goal of acquiring Allergan. Pursuant to their plan, Pershing Square bought a significant stake

in Allergan in order to provide Valeant shareholder support.  Pershing Square would also publicly vouch for the value of Valeant's stock (which Valeant was attempting to use to acquire Allergan).

417.   After Allergan's resistance and public campaign against Valeant's takeover attempt, in which Allergan challenged the sustainability of Valeant's business model, Pershing Square conducted further due diligence on Valeant.  Pershing Square subsequently invested another $4 billion in Valeant.  Ackman and Pearson had frequent contacts, including phone calls, emails, and dinners. Ackman even introduced other investors to Pearson, offered to assist Pearson with earnings calls and provided Pearson with advice after earnings calls.

418.   Despite Ackman's extensive relationship with Pearson, Pearson concealed the extent of Valeant's price gouging and deceptive and illegal conduct.  Ackman, revealing his lack of knowledge, frequently defended Valeant against public attacks and even as late as October 6, 2015, publicly stated that a "[v]ery small part of Valeant's business is repricing drugs."

419.   Eventually, like the rest of the market, Ackman learned the truth.  Ackman testified before the Senate, under oath, that he was unaware of the "horrible" and "wrong" price increases that were later publicly disclosed with regard to Cupromine, Isuprel and Nitropress. He further testified that "[c]learly [there] were things I did not understand about the business."

### H.    Valeant's Executive Compensation Program

420.   Valeant had an unusual compensation structure that provided incredibly rich compensation packages if increasingly difficult performance goals were met.  The incentive to meet these goals, coupled with the threat of termination for failing to meet them, created a culture that valued fraudulent practices and results above ethics and truthfulness.

421.   Pearson's statement at a May 28, 2014 conference is illustrative of the increasingly difficult goals.  He stated that "[t]here's no tenure at Valeant.  It's up and out. . . . It's more like a professional services firm than a sort of traditional pharmaceutical company."   He further

explained that Valeant's compensation system was entirely dependent on an increasing stock price, stating:

> So, our Company senior management and the Board—we—there's only one metric that really counts, and it's total return to shareholders. That's how we're paid. We have a unique pay model, that at least we—at least—if we don't at least achieve a 15% total return to shareholders each year, compounded annual growth rate, that basically the equity we receive in terms of our stock grabs is worth nothing.

422.    Valeant would ultimately admit that the aggressive compensation and performance-goal system employed at the Company contributed to the Defendants' wrongdoing.  On March 21, 2016, the Company stated that it "determined that the tone at the top of the organization and the performance-based environment at the Company, where challenging targets were set and achieving those targets was a key performance expectation, may have been contributing factors resulting in the Company's improper revenue recognition."

423.    Though missing targets was punished with forfeiture of bonuses or worse, meeting the aggressive financial targets resulted in multi-million-dollar awards for executives.  For example, in 2014, Pearson received an $8 million incentive bonus, which was four times his $2 million base compensation.  Similarly, Schiller received a $2.4 million incentive bonus, which was nearly two and half times his base compensation.

424.    These incentives paled in comparison to the amount Pearson would receive if he was able to maintain (or increase) Valeant's stock price until 2017, when he would be permitted to sell his Valeant shares.  The value of those shares as of March 31, 2014 was approximately $1.3 billion.  If Pearson could hold steady or raise the stock price through 2017, he could cash out his shares for well over $1 billion.  Ackman revealed in April 2014 that much of Pearson's compensation was tied to incredibly aggressive stock price targets requiring compounded returns over three years of between 15% and 60%.

425. This unusual package incentivized Pearson to use any means necessary, including illegal and deceptive means, to continue to increase the stock price through 2017 even at the expense of the Company's long-term health and financial stability.

426. Pearson also took out a $100 million margin loan from Goldman Sachs pledging his shares (which he could not sell) as collateral—which was against Company guidelines and therefore required board approval. This loan created a further incentive to artificially inflate the price of the Valeant shares because if the value of the shares fell, Goldman Sachs could make a margin call and force the sale of the shares to repay itself. This, in fact, happened in November 2015.

427. During the Class Period, Schiller also had millions of dollars in incentive compensation tied to meeting challenging share price increases.

428. Ultimately, on March 21, 2016, Valeant admitted that its overly aggressive compensation targets had contributed to the wrongdoing at Valeant, stating: "the Company has determined that the tone at the top of the organization and the performance-based environment at the Company, where challenging targets were set and achieving those targets was a key performance expectation, may have been contributing factors resulting in the Company's improper revenue recognition."

429. Valeant's admitted issues with the "tone at the top" further supports an inference of scienter, since accounting and internal control guidance expressly recognize the importance of "top management" setting an appropriate tone, *See* SEC Staff Accounting Bulletin No. 99 at 16. As CEO during the Class Period, Pearson was ultimately responsible for Valeant's internal controls and setting an appropriate "tone at the top" which prioritized ethics and compliance with accounting practices over personal financial gain. He failed to do so.

I.      **The Necessity of Inflating Valeant's Stock Price to Sustain Valeant's Acquisition-Centric Business Model**

430.    The Management Defendants also possessed the motive to conceal their fraudulent business practices meant to inflate Valeant's stock price so as to sustain the viability of Valeant's acquisition strategy.  Without spending on R&D, Valeant was entirely dependent upon acquiring drugs or entire portfolios from other pharmaceutical companies.  The price of Valeant's stock played a significant role in either facilitating or impeding these acquisitions.

431.    In 2014, for example, Valeant issued a cash and shares tender offer for shares of Allergan's stock, meaning that the value of Valeant's stock determined the value of Valeant's offer.  Indeed, Allergan's shareholders indicated to Ackman that they would support Valeant's bid if Valeant could "deliver $180 a share in Valeant in the value of the bid," meaning that the higher Valeant's stock price rose, the less cash Valeant would be required to include its offer.

432.    Similarly, Defendants utilized Valeant's inflated stock price to raise significant sums of capital in debt and stock offerings, which they used to fund Valeant's acquisition strategy.  For example, during the Class Period, Valeant conducted a series of massive high-yield debt offerings, producing almost $15 billion in cash for the Company from the investing public, which Valeant then used to acquire companies such as Salix and Bausch & Lomb.  As another example, the March 16, 2015 stock offering provided an additional $1.5 billion of capital for Valeant's acquisition of Salix.

## XIII.   LOSS CAUSATION

433.    Defendants' materially false or misleading statements and omissions of material fact, as alleged above, caused Valeant call options to trade at artificially inflated prices and put options to trade at artificially deflated prices during the Class Period and operated as a fraud or deceit upon Class Period purchasers of Valeant call options and sellers of Valeant put options.

434.    When the false and misleading nature of Defendants' statements became apparent to the market, commencing in the third quarter of 2015 and continuing through August 11, 2016, Valeant's stock price plummeted, closing at *$24.49* on August 11, 2016, removing the artificial inflation of Valeant call options and artificial deflation of Valeant put options, causing substantial damage to Plaintiff and other members of the Class.

435.    The corrective disclosures, revealing the artificially inflated prices of Valeant shares and call options (and artificially deflated prices of put options), were disseminated gradually through a number of disclosures, discussed above, revealing the truth and gradually undermining the market's willingness to accept the Defendants' misrepresentations and material omissions. These disclosures caused economic injury to Plaintiff and other Class members.   No single disclosure was sufficient to fully negate the:  (i) artificial inflation present in call options on Valeant common stock; or (ii) artificial deflation present in put options on Valeant common stock, because each single disclosure only partially revealed the concealed risks in Valeant's business.

436.    Moreover, Defendants' repeated misstatements and omissions after or even in direct response to a corrective revelation further mitigated the corrective impact of any particular disclosure.  The continued obfuscation not only functioned to mitigate the impact of full disclosure on the price of Valeant call and put options, so as to artificially preserve some degree of inflation (or in the case of put options, deflation), but also directly induced Plaintiff to continue to trade in Valeant derivative securities even after certain corrective information had entered the market.

## XIV.   PLAINTIFF'S RELIANCE

437.    During the Class Period, Plaintiff relied upon the materially false and misleading statements alleged herein when purchasing Valeant call options and selling Valeant put options.

438.     In this case, there is a presumption of reliance established by fraud-on-the-market doctrine because:  (i) the Defendants made public misrepresentations or failed to disclose material facts during the Class Period; (ii) the misrepresentations and omissions were material; (iii) the Company's common stock, call options and put options traded in efficient markets; (iv) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and (v) Plaintiff purchased Valeant call options and sold Valeant put options between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed without knowledge of the misrepresented or omitted facts.

439.     Further, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XV.    THE EFFICIENCY OF THE MARKET FOR THE SUBJECT DERIVATIVES

440.     At all relevant times, the market for the subject Valeant derivatives was efficient. Plaintiff's demonstration of the market efficiency of the underlying security – Valeant common stock – is sufficient to entitle it to rely on the fraud-on-the market theory here.  The market for the underlying security was efficient for the following reasons, among others:

   a.   Valeant's common stock met the requirements for listing, and was listed and actively traded on the NYSE (symbol VRX), a highly efficient and automated market;

   b.   as a regulated issuer, Valeant filed regular reports with the SEC;

   c.   during the Class Period, thousands of shares of Valeant common stock were traded on a daily basis, demonstrating a very active and broad market for Valeant permitting a strong presumption of an efficient market;

d.   Valeant regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

e.   Valeant was regularly followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period.  Each of these reports was publicly available and entered the public marketplace; and

f.   unexpected material news about Valeant was rapidly reflected and incorporated into the Company's stock price during the Class Period.

441.   As a result of the foregoing, the market for Valeant's securities promptly reacted to current information regarding Valeant from all publicly available sources and reflected such information in the trading prices of Valeant securities, including common stock.  Under these circumstances, all purchasers of common stock call options and sellers of common stock put options suffered similar injury through their trades in these securities.  Because those option prices were derivative of Valeant common stock, those option prices did not reflect their true value.  Plaintiff is thus entitled to a presumption of reliance.

## XVI.   NO SAFE HARBOR

442.   The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made.  Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the

statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

443.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Valeant who knew that the statement was materially false or misleading when made.

## XVII.  CLASS ACTION ALLEGATIONS

444.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all other persons or entities that purchased call options on Valeant common stock and/or sold put options on Valeant common stock during the Class Period, and were damaged thereby.  Excluded from the Class are Defendants herein; members of the immediate families of each of the Defendants; any person, firm, trust, corporation, officer, director or other individual or entity in which any of the Defendants has a controlling interest or which is related to or affiliated with any the Defendants; and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

445.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number at least in the hundreds, if not the thousands, and that they are geographically dispersed.

446.    Plaintiff's claims are typical of the claims of the other members of the Class because Plaintiff's and all the Class members' damages arise from and were caused by the same

representations and omissions made by or chargeable to Defendants.  Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

447.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

    a.   whether Defendants violated federal securities laws;

    b.   whether statements made by or chargeable to Defendants during the Class Period omitted and/or misrepresented material facts;

    c.   whether the prices of Valeant call options were artificially inflated during the Class Period;

    d.   whether the prices of Valeant put options were artificially deflated during the Class Period; and

    e.   the extent of damages sustained by members of the Class and the appropriate measure of damages.

448.    Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intend to prosecute this action vigorously.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impracticable for Class members to individually seek redress for the conduct alleged herein.  Plaintiff knows of no difficulty that will be encountered in this litigation that would preclude its maintenance as a class action.

XVIII. COUNTS

### COUNT I
### VIOLATIONS OF SECTION 10(b) OF THE
### SECURITIES EXCHANGE ACT OF 1934 AND RULE 10(b)
#### (Against All Defendants)

449.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

450.    This claim is brought by Plaintiff against Valeant and the Management Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

451.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or recklessly disregarded were misleading in that they misrepresented or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

452.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and other Class members related to the purchase and/or acquisition and sale of Valeant derivatives.

453.    In addition to the duties of full disclosure imposed on the Defendants attendant to their affirmative false and misleading statements to the public, Defendants had a duty under SEC Regulations S-X (17 C.F.R. §210.01, et seq.) and S-K (17 C.F.R. §229.10, et seq.) to promptly disseminate truthful information with respect to Valeant's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC,

including with respect to the Company's revenue and earnings trends, so that the market prices of the Company's securities would be based on truthful, complete, and accurate information.

454.    As a direct and proximate cause of Defendants' wrongful conduct, Plaintiff and other members of the proposed Class suffered damages in connection with their purchases and acquisitions of Valeant call options and sales of Valeant put options during the Class Period.  In reliance on the integrity of the market, Plaintiff traded in Valeant derivative securities and experienced losses when the artificial inflation was removed from the common stock as a result of the revelations and the price of Valeant call options declined and the price of Valeant put options rose as discussed herein.  Plaintiff would not have purchased or acquired Valeant call options or sold Valeant put options at the prices it paid, or at all, if it had been aware of Defendants' false and misleading statements and omissions.

455.    By virtue of the conduct alleged herein, Defendants named in this Count have each violated 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5), and are liable to Plaintiff and other members of the proposed Class.

### COUNT II
### VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT OF 1934
#### (Against Defendants Valeant, Pearson, Schiller and Rosiello)

456.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

457.    This claim is brought by Plaintiff against Defendants Valeant, Pearson, Schiller and Rosiello for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78(a).

458.    During their tenures as officers and/or directors of Valeant, Pearson, Schiller and Rosiello were controlling persons of Valeant within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of Valeant,

these Defendants had the power and authority to cause Valeant to engage in the conduct complained of herein.  These Defendants were able to, and did, control, directly and indirectly, the decision making of Valeant, including the content and dissemination of Valeant's public statements and filings described herein, thereby causing the dissemination of the materially false and misleading statements and omissions as alleged herein.  Valeant exercised control over and directed the actions of its senior managers, directors and agents, including the Management Defendants. Valeant controlled Pearson, Schiller, Rosiello and all of its employees and subsidiaries.

459.    In their capacities as senior officers and/or directors of Valeant, and as more fully described herein, Pearson, Schiller and Rosiello participated in the misstatements and omissions set forth above. These Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and had access to non-public information regarding Valeant's deceptive and risky business practices.  Valeant, Pearson, Schiller and Rosiello had the ability to influence and direct and did so influence and direct the activities of each of the Defendants in their violations of Section 10(b) of the Exchange Act and Rule 10b-5.

460.    As a result, Valeant, Pearson, Schiller and Rosiello, individually and as a group, were control persons within the meaning of Section 20(a) of the Exchange Act.

461.    As set forth above, Valeant violated Section 10(b) of the Exchange Act.  By virtue of their positions as controlling persons, and as a result of their aforesaid conduct and culpable participation, Pearson, Schiller and Rosiello are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as Valeant is liable to Plaintiff and other members of the proposed Class.  Valeant exercised control over the Management Defendants and all of its employees and subsidiaries and, as a result of its aforesaid conduct and culpable

participation, is liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Management Defendants are liable to Plaintiffs and other Class members.

462. By reason of the foregoing, Valeant, Pearson, Schiller and Rosiello violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and are liable to Plaintiff and other members of the proposed Class.

## XIX.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.   Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and b(3) of the Federal Rules of Civil Procedure;

B.   Awarding Plaintiff and other members of the proposed Class compensatory damages in an amount to be proven at trial for all injuries sustained as a result of Defendants' wrongdoing, including pre-judgment and post-judgment interest as allowed by law;

C.   Awarding Plaintiff and other members of the proposed Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.   Awarding such other relief as this Court may deem just and proper.

## XX.   JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury in this action on all issues so triable.

Dated: June 6, 2018                    Respectfully submitted,

                                       /s/ *Christopher W. Kinum*_____
                                       Christopher W. Kinum
                                       CRITCHLEY, KINUM
                                         & DENOIA LLC.
                                       75 Livingston Avenue, Suite 303
                                       Roseland, New Jersey 07068
                                       Telephone: (973) 422-9200
                                       cwkinum@critchleylaw.com

                                       *Local Counsel for Plaintiff Timber Hill LLC*


                                       Andrew J. Entwistle
                                       Robert N. Cappucci
                                       Sean M. Riegert (*pro hac vice* forthcoming)
                                       ENTWISTLE & CAPPUCCI LLP
                                       299 Park Avenue, 20th Floor
                                       New York, NY 10171
                                       Telephone: (212) 894-7200
                                       Fax: (212) 894-7272
                                       aentwistle@entwistle-law.com
                                       rcappucci@entwistle-law.com
                                       sriegert@entwistle-law.com

                                       *Counsel for Plaintiff Timber Hill LLC*